ACCEPTED
03-15-00007-CV
7091444
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/24/2015 5:01:10 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00007-CV

_____

### *IN THE THIRD COURT OF APPEALS*
### *AUSTIN, TEXAS*

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/24/2015 5:01:10 PM
JEFFREY D. KYLE
Clerk

_____

### JOHN DOE
*Appellant*

### V.

### BOARD OF DIRECTORS OF THE STATE BAR OF TEXAS, COMMISSION FOR LAWYER DISCIPLINE, AND LINDA ACEVEDO, IN HER OFFICIAL CAPACITY AS THE CHIEF DISCIPLINARY COUNSEL OF THE STATE BAR OF TEXAS
*Appellees*

_____

On Appeal from the 126th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-001635

_____

### APPELLANT'S UNOPPOSED MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF

_____

| | |
|---|---|
| **WEST, WEBB, ALLBRITTON & GENTRY, P.C.** | GAINES WEST |
| 1515 Emerald Plaza | State Bar No. 21197500 |
| College Station, Texas 77845 | gaines.west@westwebblaw.com |
| Telephone ~ (979) 694-7000 | |
| Facsimile ~ (979) 694-8000 | JENNIFER D. JASPER |
| | State Bar No. 24027026 |
| | jennifer.jasper@westwebblaw.com |

**APPELLANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF**      **1**

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellant, John Doe, files the following Motion for Leave to File Supplemental Brief. *See* TEX. R. APP. P. 38.7.

Based on the panel's questions at oral argument, and the unique nature of the issues in the proceeding, Appellant seeks leave to file a Supplemental Brief in the interest of justice, and to aid the Court in its consideration of this appeal. The Supplemental Brief is attached as Exhibit "A."

This Supplemental Brief specifically supplements Doe's arguments regarding the interpretation of Texas Rule of Disciplinary Procedure 2.16, and further responds to Appellees' assertion of sovereign immunity, and justiciability.

[*This space intentionally left blank*.]

## **PRAYER**

Appellant John Doe prays that this Court grant this Unopposed Motion for Leave to File Supplemental Brief, and for any further relief to which Doe may be entitled.

Respectfully submitted,

**WEST, WEBB, ALLBRITTON & GENTRY, P.C.**
1515 Emerald Plaza
College Station, Texas 77845-1515
Telephone:  (979) 694-7000
Facsimile:   (979) 694-8000

By: /s Gaines West
    GAINES WEST
    State Bar No. 21197500
    gaines.west@westwebblaw.com

    JENNIFER D. JASPER
    State Bar No. 24027026
    jennifer.jasper@westwebblaw.com

## CERTIFICATE OF CONFERENCE

On September 24, 2015, the undersigned conferred with Cynthia Hamilton, counsel for Appellee, about the merits of the foregoing Motion and Ms. Hamilton stated that she is unopposed to this Unopposed Motion for Leave to File Supplemental Brief.

/s Jennifer D. Jasper
Jennifer D. Jasper

## CERTIFICATE OF SERVICE

On September 24, 2015, the undersigned certifies that he served a copy of Appellant's Unopposed Motion for Leave to File Supplemental Brief with attached Exhibit A [Appellant's Supplemental Brief] on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

Cynthia Canfield Hamilton
Senior Appellate Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
P.O. Box 12487
Austin, Texas 78711

Via email: chamilton@texasbar.com
Via E-file Notification
and Certified Mail, RRR

Paul Homburg
Disciplinary Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
711 Navarro, Suite 750
San Antonio, Texas 78205

Via email: phomburg@texasbar.com
Via E-file Notification
and Certified Mail, RRR

Rebecca Stevens
Disciplinary Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
P. O. Box 12487
Austin, Texas 78711-2487

Via email: bstevens@texasbar.com
Via E-file Notification
and Certified Mail, RRR

/s Gaines West
Gaines West

**NO. 03-15-00007-CV**

_____

*IN THE THIRD COURT OF APPEALS*
*AUSTIN, TEXAS*

_____

**JOHN DOE**
*Appellant*

**V.**

**BOARD OF DIRECTORS OF THE STATE BAR OF TEXAS,
COMMISSION FOR LAWYER DISCIPLINE, AND LINDA ACEVEDO, IN
HER OFFICIAL CAPACITY AS THE CHIEF DISCIPLINARY COUNSEL
OF THE STATE BAR OF TEXAS**
*Appellees*

_____

On Appeal from the 126th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-001635

_____

**<u>EXHIBIT A</u>
TO
APPELLANT'S UNOPPOSED MOTION FOR LEAVE
TO FILE SUPPLEMENTAL BRIEF**

_____

| | |
|---|---|
| **WEST, WEBB, ALLBRITTON & GENTRY, P.C.**<br>1515 Emerald Plaza<br>College Station, Texas 77845<br>Telephone ~ (979) 694-7000<br>Facsimile ~ (979) 694-8000 | GAINES WEST<br>State Bar No. 21197500<br>gaines.west@westwebblaw.com<br><br>JENNIFER D. JASPER<br>State Bar No. 24027026<br>jennifer.jasper@westwebblaw.com |

# NO. 03-15-00007-CV

_____

## *IN THE THIRD COURT OF APPEALS*
## *AUSTIN, TEXAS*

_____

## JOHN DOE
*Appellant*

## V.

## BOARD OF DIRECTORS OF THE STATE BAR OF TEXAS, COMMISSION FOR LAWYER DISCIPLINE, AND LINDA ACEVEDO, IN HER OFFICIAL CAPACITY AS THE CHIEF DISCIPLINARY COUNSEL OF THE STATE BAR OF TEXAS
*Appellees*

_____

On Appeal from the 126th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-001635

_____

## APPELLANT'S SUPPLEMENTAL BRIEF

_____

| | |
|---|---|
| **WEST, WEBB, ALLBRITTON & GENTRY, P.C.** | GAINES WEST |
| 1515 Emerald Plaza | State Bar No. 21197500 |
| College Station, Texas 77845 | gaines.west@westwebblaw.com |
| Telephone ~ (979) 694-7000 | |
| Facsimile ~ (979) 694-8000 | JENNIFER D. JASPER |
| | State Bar No. 24027026 |
| | jennifer.jasper@westwebblaw.com |

# TABLE OF CONTENTS

Index of Authorities ..................................................................................... iii

A. Review of Texas Rules of Disciplinary Procedure 2.16 ........................................1

B. The Legislature expressly contemplated providing an explanation to
   a complainant, upon dismissal of a complaint ......................................................2

C. Exceptions to sovereign immunity apply in this case ...........................................3

    1. Doe's challenge to Rule 2.16 falls within the exception for
       "challenging <u>a statute</u>." ..................................................................4

    2. Linda Acevedo acted *ultra vires* when she refused to provide the
       requested information without legal authority. ..........................................7

D. There is a real controversy and a real injury, which will continue to evade
   judicial review ......................................................................................................9

    1. Doe's declaratory judgment action to interpret Rule 2.16
       does not seek to <u>usurp</u> control vested in the Texas Supreme Court ...........9

    2. This case meets the public interest exception to the mootness doctrine ...10

Prayer ..........................................................................................................12

Certificate of Compliance ...............................................................................14

Certificate of Service ......................................................................................14

# INDEX OF AUTHORITIES

## CASES

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ................................................................. 4, 5, 7, 8

*Sefzik v. Tex. Dep't of Transp.*,
267 S.W.3d 127 (Tex. App.—Corpus Christi 2008)............................................5

*State Bar of Texas v. Gomez,*
891 S.W.2d 243 (Tex. 1994). ........................................................................9

*Tex. Educ. Agency v. Leeper,*
893 S.W.2d 432 (Tex. 1994). ......................................................................6, 7

*Tex. Dep't of Transp. v. Sefzik*,
355 S.W.3d 618 (Tex. 2011). ................................................................. 4, 5 6, 7

*Univ. Scholastic League v. Buchanan*,
848 S.W.2d 298 (Tex. App.—Austin 1993, no writ). ..........................................10

## RULES AND CODES

TEX. CIV. PRAC. & REM. CODE §37.006(b) ...................................................................6

TEX. R. DISC. P. 1.06(u) ................................................................................ 12

TEX. R. DISC. P. 2.12 .................................................................................... 11

TEX. R. DISC. P. 2.13 ................................................................................ 11,12

TEX. R. DISC. P. 2.14 .................................................................................... 11

TEX. R. DISC. P. 2.16 ................................................................. *passim*

TEX. EDUC. CODE §21.032 ..........................................................6

TEX. EDUC. CODE §21.033 ..........................................................6

TEX. GOV'T CODE §81.072 .......................................................2, 3

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellant, John Doe, files this Supplemental Brief to provide additional support for his position in this proceeding.

## A. Review of Texas Rule of Disciplinary Procedure 2.16

Texas Rule of Disciplinary Procedure 2.16 does not prohibit Appellees from providing Doe with the Chief Disciplinary Counsel's recommendation to the summary disposition panel regarding Doe's grievance, which was summarily dismissed with no explanation to Doe. *See* Tex. R. Disciplinary P. 2.16.

For the Court's convenience, the relevant text of Rule 2.16 is stated below:

> **2.16 Confidentiality**
> A. All members and staff of the Office of Chief Disciplinary Counsel, Board of Disciplinary Appeals, Committees and Commission shall maintain as confidential all Disciplinary Proceedings and associated records, except that:
> . . .

Tex. Rules Disciplinary P. R. 2.16, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A-1 (West 2013) ("Rule 2.16").

This rule thus provides that "Disciplinary Proceedings and associated records" "shall [be] maintained as confidential," with some specified exceptions. *Id.*

Notably, Rule 2.16 does not expressly address from whom the proceedings are kept confidential. *Id.* The Rule does not expressly indicate that the proceedings must be kept confidential from the *complainant himself. Id.* Such a

rule would seem misplaced, when it is the complainant himself who initiated the disciplinary process, who knows the underlying facts, who knows the attorney under investigation, and who knows the exact allegations raised against that attorney.

Admittedly, however, Rule 2.16 does not expressly state that its confidentiality requirement does not apply to complainants. For this reason, Rule 2.16 must be, and has been, *interpreted*. In this case, and presumably in all cases, the Commission for Lawyer Discipline through the Chief Disciplinary Counsel ("CDC") has interpreted Rule 2.16 as keeping the CDC's recommendation to the summary disposition panel confidential from *complainants*.

Doe disagrees with this interpretation of Rule 2.16 and instead, believes a common sense interpretation should prevail—pursuant to which the Disciplinary Proceedings, and associated records, are indeed confidential as to *all third-parties*; but not as to the complainant who initiated the proceeding and who already has knowledge of the underlying facts.

Doe's interpretation is supported by existing Texas statutory law, as discussed below.

**B.     The Legislature expressly contemplated providing an explanation to a <u>complainant, upon dismissal of a complaint.</u>**

Section 81.072 of the Texas Government Code, in relevant part, states:

Sec. 81.072. GENERAL DISCIPLINARY AND DISABILITY PROCEDURES. (a) In furtherance of the supreme court's powers to supervise the conduct of attorneys, the court shall establish disciplinary and disability procedures in addition to the procedures provided by this subchapter.

(b) The supreme court shall establish minimum standards and procedures for the attorney disciplinary and disability system. **The standards and procedures for processing grievances against attorneys <u>must</u> provide for:**

(1) classification of all grievances and investigation of all complaints;

**(2) a full explanation to each complainant on dismissal of an inquiry or a complaint; . . . .**

Tex. Gov't Code ¶ 81.072 (emphases added).

Section 81.072's plain language requires the provision of "a full explanation to each complainant on dismissal of an inquiry or complaint." *Id.* Clearly, the Legislature contemplated providing a complainant with a "full explanation" when his complaint is dismissed. *Id.* Construing Rule 2.16 to prohibit a complainant from learning the reason his complaint was referred to a summary disposition contradicts this requirement.

Accordingly, because Appellees' interpretation of Rule 2.16 contradicts the Legislature's intent in section 81.072, it cannot stand. *See id.*; Rule 2.16.

C. <u>Exceptions to sovereign immunity apply in this case.</u>

Appellees' primary defense to Doe's declaratory judgment action is sovereign immunity; but well-recognized exceptions to immunity apply in this case.

Appellees have not disputed that 2 exceptions to sovereign immunity exist in a declaratory judgment case: (1) the state is an appropriate party to a suit that "challenges the validity of a statute"; and (2) the state actor is an appropriate party to a suit that makes an *ultra vires* allegation. These exceptions were discussed in *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618 (Tex. 2011) (the primary case upon which Appellees rely for their sovereign immunity argument) and *City of El Paso v. Heinrich*, 284 S.W.3d 366 (Tex. 2009), a predecessor case to *Sefzik*. Both cases are discussed below.

1. Doe's challenge to Rule 2.16 falls within the exception for "challenging a statute."

Appellees argue Doe is <u>not</u> "challenging the validity of a statute," and thus this exception to sovereign immunity cannot apply in this case.

Appellees, however, misunderstand what it means to "challenge the validity of a statute," as evidenced by the fact that at oral argument, they insisted that the case at bar was just like *Sefzik*.

In *Sefzik*, the Texas Department of Transportation ("TxDOT") denied Sefzik's application for a sign permit. 355 S.W.3d at 620. Sefzik appealed this denial, but lost. *Id*. Sefzik then complained that he was entitled to a hearing on the denial, because the APA's procedures pertaining to contested cases applied. *Id*. TxDOT disagreed, refused to grant him a hearing, and Sefzik then sought a

declaratory judgment "that the APA's 'contested case' procedures entitled him to a hearing." *Id*.

Notably, Sefzik was <u>not</u> complaining about, or "challenging," the underlying regulations pertaining to the sign permit. He was <u>not</u> complaining that the regulations applied to him, when they should not have. He was <u>not</u> complaining that the regulations had been misconstrued, misinterpreted, or misapplied. Sefzik's *sole* complaint before the trial court was that the APA's contested-case procedures applied to his permit denial, so that he was entitled to a hearing. *Id*.

The Sefzik defendants sought to dismiss the case, based on sovereign immunity. *Id*. at 620. Sefzik argued a declaratory judgment action *did not implicate* sovereign immunity. *Sefzik v. Tex. Dep't of Transp*., 267 S.W.3d 127, 131 (Tex. App.—Corpus Christi 2008) *rev'd in part*, 355 S.W.3d 618. Ultimately, the Texas Supreme Court agreed in part with the Sefzik defendants, and found the Declaratory Judgment Act itself does not waive immunity. In doing so, however, the Court recognized exceptions to sovereign immunity in declaratory judgment cases:

> Although the UDJA waives sovereign immunity in particular cases, Sefzik's claim does not fall within the scope of those express waivers. For example, **the state may be a proper party to a declaratory judgment action that challenges the validity of a statute.** *Heinrich*, 284 S.W.3d at 373 n. 6 (citing Tex. Civ. Prac. & Rem. Code

§ 37.006(b)); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 629, 697-98 (Tex. 2003); ***Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)**.

*Id*. at 622 (emphasis added).

By expressly citing *Leeper* as an example of when the state may be a proper party to a declaratory judgment action, the Court gave litigants clear direction regarding what it means to "challenge the validity of a statute." *Id*., citing *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994).

In *Leeper*, the plaintiffs brought a declaratory judgment against State entities complaining that the defendants had misinterpreted the private school exemption to Texas's compulsory attendance law. 893 S.W.2d at 433 (citing Tex. Educ. Code §§ 21.032 and 21.033(a)(1)).[1] Specifically, the plaintiffs claimed that home-schooling should be interpreted as falling within the private school exemption. *Id*.

The case at bar is analogous to *Leeper* (and <u>not</u> to *Sefzik*), because like *Leeper*, there is a specific statute (or rule) at issue being "challenged."

As in *Leeper*, Doe's argument is that the particular provision at issue has been "misinterpreted." *Id*. Specifically, in *Leeper*, the plaintiffs argued the State entities had misinterpreted the private school exemption as not applying to, or not

---

[1] *Leeper* did not expressly address sovereign immunity; but it is nonetheless instructive based on *Sefzik*'s reference to that case. *Sefzik*, 355 S.W.3d at 622, citing *Leeper*, 893 S.W.2d at 446.

including, home-schooled children. *Id.* In the case at bar, Doe makes an analogous argument: the State entities have misinterpreted 2.16, so as to preclude Doe from obtaining the requested information.

Finally in *Leeper*, the plaintiffs challenged the State's actions (prosecuting parents of home-schooled children), which were taken based on the State's (mis)interpretation of the statute at issue. *Id.* at 433. In the case at bar, Doe has challenged the CDC's actions (refusing to provide information to Doe), which were taken based on the CDC's misinterpretation of Rule 2.16.

Thus, Doe has indeed "challenged the validity of a statute," as did the plaintiffs in *Leeper*, and in contrast to the plaintiff in *Sefzik*. *Compare id. with Sefzik,* 355 S.W.3d at 622. Accordingly, the exception to sovereign immunity exemplified by *Leeper* applies to make the State entities proper parties to this proceeding. *See Leeper*, 893 S.W.2d at 438, 446; *Heinrich*, 284 S.W.3d at 372.

2.    Linda Acevedo acted *ultra vires* when she refused to provide the requested information without legal authority.

In the alternative, by refusing to provide the requested information without any legal authority for doing so, the Chief Disciplinary Counsel, Linda Acevedo, has acted *ultra vires*.

In *Heinrich*, the Texas Supreme Court discussed the contours of the *ultra vires* exception to sovereign immunity. 284 S.W.3d at 372-74. "To fall within this

*ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, ***that the officer acted without legal authority or*** failed to perform a purely ministerial act." *Id.* at 372.

Heinrich complained that the City's reduction of her pension benefits under a municipal pension fund was "illegal or unauthorized." *Id.* at 378. She argued that the City had improperly and without legal authority made a retrospective reduction in her pension benefits. *Id.* The Court found some evidence to support her position, and thus affirmed the lower court's denial of the plea to the jurisdiction with respect to specific named state actors, under the *ultra vires* doctrine. *Id.* at 379-80.

In the case at bar, Appellees focus on the "ministerial act" portion of the *ultra vires* exception, and argue that there is no such act in this case. Appellees argue that because Rule 2.16 does expressly require them to provide a complainant with the information Doe requested, there is no ministerial act to implicate the *ultra vires* exception.

This argument is misplaced, because Doe is not complaining there was some failure to perform a ministerial act (nor is a ministerial act required, to implicate the *ultra vires* doctrine). Acting without legal authority is also a proper basis for an *ultra vires* finding. *See id.* And that is exactly what Doe has alleged in this case: that the State actor, Linda Acevedo, acted without legal authority, when she

refused to give the requested information based solely on a misinterpretation of Rule 2.16. As discussed above, Rule 2.16 does not expressly prohibit disclosure of the information requested to a complainant.

Accordingly, the *ultra vires* exception to sovereign immunity applies in this case to render Linda Acevedo a required party to this action. *Id.*

**D.    There is a real controversy and a real injury, which will continue to evade judicial review.**

Appellees raised several additional arguments as to why the lower court lacked subject matter jurisdiction. Examined individually, each argument fails.

    1.  Doe's declaratory judgment action to interpret Rule 2.16 does not seek <u>to usurp control vested in the Texas Supreme Court.</u>

Relying primarily on *State Bar of Tex. v. Gomez*, 891 S.W.2d 243 (Tex. 1994), Appellees urge this court to find that Doe's actions constitute an attempt to usurp power that is vested exclusively in the Texas Supreme Court: the power to institute Disciplinary Rules. This argument fails because its premise is incorrect. Doe is not seeking to "rewrite" Rule 2.16, or "change" Rule 2.16 as Appellees allege. Doe is simply asking for Rule 2.16 not to be misinterpreted as keeping recommendations to summary dismissal panels confidential from complainants, for all the reasons described above.

*Gomez* is inapposite because in that case, the plaintiffs asked a state district court to create a mandatory duty for attorneys to undertake *pro bono*

representations. 891 S.W2d at 246. The supreme court held that creating duties for attorneys is the *sole* province of the supreme court, and thus the district court lacked authority to grant the relief requested by the plaintiff. Because the district court could not grant the relief requested, the case before it was not justiciable, and that court lacked jurisdiction. *Id.*

But in the case at bar, Doe is <u>not</u> asking the trial court to create a new rule, institute a new program, insert a new requirement, or promulgate a new policy or regulation. All the trial court is asked to do is declare that Rule 2.16 does not prohibit the CDC from disclosing its recommendation to a summary disposition panel.

2. <u>This case meets the public interest exception to the mootness doctrine.</u>

Because the questions involved in this case are of considerable public importance, are capable of arising again between the same parties or other members of the public, and will continue to evade judicial review, this case meets the "public interest" exception to the mootness doctrine. *See Univ. Scholastic League v. Buchanan*, 848 S.W.2d 298, 304 (Tex. App.—Austin 1993, no writ).

Appellees have argued that this court should not apply the public interest doctrine in this instance, because there is another way of obtaining what Doe wants: a petition to the Texas Supreme Court. Again, though, Appellees

mischaracterize Doe's request. Doe is not asking for a rule re-write, a new rule, or new policy. Doe is simply asking for an interpretation of Rule 2.16.

In addition, Doe has suffered a real harm and injury because he could bring another grievance, and preventing him from understanding why his prior grievance was dismissed, hamstrings him in preparing another complaint. The Appellees have taken the position that, because the Commission only makes "recommendations" to a summary disposition panel ("SDP"), and the SDP ultimately makes the decision to dismiss, Doe cannot possibly stand to gain from knowledge of the Commission's recommendation. This is simply false and mischaracterizes the process.

The Commission decides whether any filing constitutes an "inquiry" or a "grievance." Tex. Rules Disciplinary P. R. 2.12. If a filing is classified as a "grievance," the Commission then decides, after investigation, whether or not Just Cause exists. *Id*. (providing that "the Chief Disciplinary Counsel shall investigate the Complaint and determine whether there is Just Cause."). *Id*. Only *after* the CDC has determined that <u>no</u> Just Cause exists, is the matter referred to a summary disposition panel. *Id*.

If the CDC determines Just Cause exists, then the grievance bypasses the summary disposition panel, and the matter is either decided by an evidentiary panel or district court. Tex. Rules Disciplinary P. R. 2.13 and 2.14.

In the case at bar, based solely on the fact that Doe's grievance landed before a summary disposition panel, we know that the CDC made a "no just cause" determination. *See* Tex. Rules Disciplinary P. R. 2.13. Thus, when Doe asks for the CDC's recommendation regarding his grievance, he wants to know why his grievance did not meet the very low "Just Cause" threshold.[2] That information would absolutely help him in determining whether he would file an additional grievance based on the same underlying facts.

Appellees' insistence that they should not have to to "show their hand" by giving Doe this information demonstrates a lack of appreciation for *who is asking*. Doe is not the opposing party. Doe is the CDC's ally and potentially best witness in any case against the respondent. It does not jeopardize the CDC's position in future proceedings if it explains to Doe, or allows Doe to see, why it made a "no just cause" determination.

## **PRAYER**

Appellant John Doe prays that this Court reverse the trial court's dismissal and remand this case for further proceedings.

---

[2] The Rules of Disciplinary Procedure define "Just Cause" as "such cause as is found to exist upon a reasonable inquiry that would induce a reasonably intelligent and prudent person to believe that an attorney either has committed an act or acts of Professional Misconduct requiring that a Sanction be imposed, or suffers from a Disability that requires either suspension as an attorney licensed to practice law in the State of Texas or probation." Tex. Rules Disciplinary P. R. 1.06(u). This is a low threshold. It focuses on what a reasonable "person" would believe (not a reasonable attorney), which is in keeping with the overall purposes of the Rules: to protect the public.

Respectfully submitted,

**WEST, WEBB, ALLBRITTON & GENTRY, P.C.**
1515 Emerald Plaza
College Station, Texas 77845-1515
Telephone:   (979) 694-7000
Facsimile:   (979) 694-8000

By: /s/ Gaines West
     GAINES WEST
     State Bar No. 21197500
     gaines.west@westwebblaw.com

     JENNIFER D. JASPER
     State Bar No. 24027026
     jennifer.jasper@westwebblaw.com

## CERTIFICATE OF COMPLIANCE

I certify that this **APPELLANT'S SUPPLEMENTAL BRIEF** complies with the typeface and word-count requirement set forth in the Rules of Appellate Procedure. This motion has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This motion contains 2,735 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the notice exempted by TEX. R. APP. P. 9.4(i)(1).

/s Gaines West
Gaines West

## CERTIFICATE OF SERVICE

On September 24, 2015, the undersigned certifies that he served a copy of Appellant's Supplemental Brief on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

Cynthia Canfield Hamilton
Senior Appellate Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
P.O. Box 12487
Austin, Texas 78711

Via email: chamilton@texasbar.com
Via E-file Notification
and Certified Mail, RRR

Paul Homburg
Disciplinary Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
711 Navarro, Suite 750
San Antonio, Texas 78205

Via email: phomburg@texasbar.com
Via E-file Notification
and Certified Mail, RRR

Rebecca Stevens
Disciplinary Counsel
Chief Disciplinary Counsel
State Bar of Texas
P. O. Box 12487
Austin, Texas 78711-2487

Via email: bstevens@texasbar.com
Via E-file Notification Office of the
and Certified Mail, RRR


/s Gaines West
Gaines West

[PDF] Original Image of 284 S.W.3d 366 (PDF)

284 S.W.3d 366
Supreme Court of Texas.

The CITY OF EL PASO, et al., Petitioners,

v.

Lilli M. HEINRICH, Respondent.

No. 06–0778. | Argued Nov. 13, 2007. | Decided May 1, 2009.

**Synopsis**

**Background:** Police officer's widow brought action against city, public employee's pension fund, board of trustees of pension fund, and named individuals, alleging that board breached its fiduciary duty by reducing her pension benefits by one-third, and seeking total pension benefits allegedly owed to her plus cost of living allowances. The 346th District Court, El Paso County, 2005 WL 4926502, Angie Barill, J., denied defendants' plea to the jurisdiction. Defendants appealed. The Court of Appeals, 8th District, El Paso, 198 S.W.3d 400, Richard Barajas, C.J., affirmed, and defendants appealed.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

[1] widow's declaratory judgment and injunction action regarding pension was not barred by sovereign immunity;

[2] widow's lawsuit regarding reduction of pension did not implicate constitutional prohibition of bill of attainder, ex post facto law, retroactive law, or any law impairing obligation of contracts; and

[3] fact questions precluded grant of plea to the jurisdiction.

Affirmed in part, reversed in part, and remanded.

**Attorneys and Law Firms**

**\*368** Jennifer F. Callan, Laura P. Gordon, Asst. City Attys., Michele Little Locke, John Lomax Anderson, El Paso, Eric G. Calhoun, Richard J. Pradarits Jr., Travis & Calhoun, P.C., Dallas, Robert D. Klausner, Stuart A. Kaufman, Klausner & Kaufman, P.A., Plantation, FL, for Petitioners.

Stewart W. Forbes, Forbes & Forbes, El Paso, for Respondent.

Philip Durst, Deats Durst Owen & Levy, P.L.L.C., Austin, for Amicus Curiae Texas State Association of Fire Fighters.

Kristofer S. Monson, Asst. Solicitor Gen., Austin, for Amicus Curiae State of Texas.

**Opinion**

Chief Justice JEFFERSON delivered the opinion of the Court.

 **[1]** **[2]** **[3]** "Sovereign immunity protects the State from lawsuits for money damages." *Tex. Nat. Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 853 (Tex.2002). But "an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars." *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). Today we examine the intersection of these two rules. We conclude that while governmental immunity **\*369** generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions. We affirm in part and reverse in part the court of appeals' judgment and remand this case to the trial court for further proceedings.

I

**Background**

Lilli M. Heinrich is the widow of Charles D. Heinrich, a member of the El Paso Police Department who died in August 1985 from wounds received in the line of duty. Shortly after Charles died, the El Paso Firemen & Policemen's Pension Fund began paying Heinrich monthly survivor benefits equal to 100% of the monthly pension her husband had earned. [1] The parties contest how those payments were apportioned. The City of El Paso, the El Paso Firemen & Policemen's Pension Fund ("the Fund"), the Fund's Board of Trustees ("the Board"), and the individual board members contend that the Fund's bylaws assigned only two-thirds of this payment to Heinrich, the other third being paid to her on behalf of her then-minor child. Heinrich, on the other hand, contends that, notwithstanding the bylaws, the Board voted to award

her 100% of Charles' pension benefits in her own right, as more fully explained below.

Accordingly, when in 2002 the Board reduced the monthly payments to Heinrich by one-third after Heinrich's son turned 23, Heinrich filed this lawsuit, alleging that petitioners violated the statute governing the Fund by reducing her benefits retroactively. Heinrich sought both declaratory relief and an injunction restoring Heinrich to the "status quo from [the] date of the illegal act." Petitioners filed pleas to the jurisdiction asserting that governmental immunity shielded the governmental entities from suit and that the individual board members enjoyed official immunity. The trial court denied the pleas, and petitioners filed an interlocutory appeal.

The court of appeals affirmed, holding that "a party may bring a suit seeking declaratory relief against state officials who allegedly act without legal or statutory authority and such suit is not a 'suit against the state.' " 198 S.W.3d 400, 406. The court acknowledged that, if successful, Heinrich would be entitled to past and future benefits, but held that Heinrich's suit made a valid claim for her vested right to pension benefits rather than money damages. *Id.* at 407. We granted the petition for review in order to clarify the types of relief that may be sought without legislative consent. [2] 50 Tex. Sup.Ct. J. 910 (June 22, 2007).

## II

## Discussion

## A

## *Ultra Vires* Claims

Petitioners contend that although Heinrich requests declaratory and equitable relief, her claim is essentially for past and future money damages, and that governmental immunity therefore bars her suit. As we said in *Reata Construction Corp. v. City of Dallas,* " '[s]overeign immunity protects the State from lawsuits for money damages.' Political subdivisions of the state ... are entitled to such immunity — **\*370** referred to as governmental immunity—unless it has been waived." *Reata,* 197 S.W.3d 371, 374 (Tex.2006) (citations omitted); *see also Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex.2003). We have said

repeatedly that the Legislature is in the best position to waive or abrogate immunity, "because this allows the Legislature to protect its policymaking function." *IT–Davy,* 74 S.W.3d at 854 (citations omitted) (collecting cases).

Heinrich concedes that the City, Fund, and Board enjoy governmental immunity from suit, but argues that because her claim alleges a reduction in her benefits that was unauthorized by law, it is not barred. This is so, she says, because "[p]rivate parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority." *Id.* at 855 (citing *Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432 (Tex.1994) (suit challenging state officials' construction of compulsory school-attendance law)); *see also Fed. Sign.,* 951 S.W.2d at 404 ("A private litigant does not need legislative permission to sue the State for a state official's violations of state law.") (citations omitted). We explained the rationale behind this exception to governmental immunity in *Federal Sign*:

> A state official's illegal or unauthorized actions are not acts of the State. Accordingly, an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars. In other words, we distinguish suits to determine a party's rights against the State from suits seeking damages. A party can maintain a suit to determine its rights without legislative permission.

*Fed. Sign,* 951 S.W.2d at 404 (citations omitted).

 [4]  [5]  On this basis, Heinrich argues that rather than money damages, she seeks only equitable and injunctive relief under the Uniform Declaratory Judgment Act. That Act is a remedial statute designed "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM.CODE § 37.002(b). It provides: "A person ... whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the ... statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). The Act, however, does not

enlarge a trial court's jurisdiction, and a litigant's request for declarative relief does not alter a suit's underlying nature. [3] **\*371** *IT–Davy,* 74 S.W.3d at 855; *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994). It is well settled that "private parties cannot circumvent the State's sovereign immunity from suit by characterizing a suit for money damages ... as a declaratory-judgment claim." *IT–Davy,* 74 S.W.3d at 856 (citing *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 842 (1958)).

 **[6]** Heinrich relies on *State v. Epperson,* 121 Tex. 80, 42 S.W.2d 228, 231 (1931), in which we held that a suit against a tax collector for the recovery of money (alleged to be due under a contract and withheld unlawfully) was not barred by immunity. There, we noted that the tax collector had no discretion under the governing law to deny payment on Epperson's contract:

> By legislative act the state has constituted the tax collector of the county its agent to receive delinquent taxes collected under such contract, and it is the duty of such officer to pay all fees and commissions lawfully incurred in the collection thereof to the various parties who may be entitled thereto. Under such circumstances, the tax collector's duty with reference to money belonging to persons who are entitled under valid contracts to receive the same from him is purely ministerial. If he withholds the payment of such funds when a person is lawfully entitled to receive same, he has failed to discharge a duty imposed upon him by law and his act is a wrongful one.

*Epperson,* 42 S.W.2d at 231. We therefore concluded that although the trial court would "not possess jurisdiction to enforce the specific performance of the contract relied upon by Epperson or to award damages for any breach of said contract," Epperson's suit was "simply an action to compel an officer, as agent of the state, to pay over funds to a party who claims to be lawfully entitled thereto." *Id.*

Thus, the rule arising out of *Epperson* is that while suits for contract damages against the state are generally barred by immunity, where a statute or the constitution requires that government contracts be made or performed in a certain way,

leaving no room for discretion, a suit alleging a government official's violation of that law is not barred, even though it necessarily involves a contract. We explained this distinction in *W.D. Haden Co. v. Dodgen*:

> [A]lthough [*Epperson* ] ar[ose] out of [ ] contract transaction ... [it] appears to fall into the class of cases projected by *United States v. Lee,* [106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882) ].[4] In that class of cases it is held that suits for property alleged to be unlawfully or wrongfully withheld from the rightful owner by officers of the state are not suits against the sovereign itself and may be maintained without permission of the sovereign.

158 Tex. 74, 308 S.W.2d 838, 841 (1958). In other words, where statutory or constitutional provisions create an entitlement to payment, suits seeking to require state officers to comply with the law are not barred by immunity merely because they compel the state to make those payments. This rule is generally consistent with the letter and spirit of our later caselaw. In *IT–Davy,* we distinguished permissible declaratory-judgment suits against state officials **\*372** "allegedly act[ing] without legal or statutory authority" from those barred by immunity: "In contrast [to suits not implicating sovereign immunity], declaratory-judgment suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State. *That is because such suits attempt to control state action by imposing liability on the State.*" 74 S.W.3d at 855–56 (citations omitted) (emphasis added).

 **[7]** From this rationale, it is clear that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money. To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act. *Compare Epperson,* 42 S.W.2d at 231 ("the tax collector's duty ... is purely ministerial") *with Catalina Dev., Inc. v. County of El Paso,* 121 S.W.3d 704, 706 (Tex.2003) (newly elected commissioners court immune from suit where it "acted within its discretion to protect

the perceived interests of the public" in rejecting contract approved by predecessor), *and Dodgen,* 308 S.W.2d at 842 (suit seeking "enforcement of contract rights" barred by immunity in the absence of any "statutory provision governing or limiting the manner of sale"). Thus, *ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state.[5] Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy.

Further, while "[a] lack of immunity may hamper governmental functions by requiring tax resources to be used for defending lawsuits ... rather than using those resources for their intended purposes," *Reata Constr. Corp.,* 197 S.W.3d at 375, this reasoning has not been extended to *ultra vires* suits, *see Fed. Sign,* 951 S.W.2d at 404 (citing *Dir. of the Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.,* 600 S.W.2d 264, 265–66 (Tex.1980) (legislative consent not required for suit for injunctive relief against state agency to halt unauthorized printing equipment and printing activities), *Tex. Highway Comm'n v. Tex. Ass'n of Steel Imps., Inc.,* 372 S.W.2d 525, 530 (Tex.1963) (legislative consent not required for declaratory judgment suit against Highway Commission to determine the parties' rights), and *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 712 (1945) (legislative consent not required for declaratory judgment suit against State Comptroller to determine parties' rights under tax statute)). Further, extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended. This is particularly true since, as discussed below, suits that lack merit may be speedily disposed of by a plea to the jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004).

**B**

**Proper Parties**

 [8]  [9]  [10]  Nonetheless, as a technical matter, the governmental entities themselves—as opposed to their officers in **\*373** their official capacity—remain immune from suit. We have been less than clear regarding the permissible use of a declaratory remedy in this type of *ultra vires* suit.[6] Must it be brought directly against the state or its subdivisions? Or must it be brought against the relevant government actors in their official capacity? *Compare Fed.*

*Sign,* 951 S.W.2d at 404 ("A private litigant does not need legislative permission to sue the State for a state official's violations of state law.") (citations omitted), *with IT–Davy,* 74 S.W.3d at 855 ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority.") (citations omitted). It seems to us, however, that because the rule that *ultra vires* suits are not "suit[s] against the State within the rule of immunity of the State from suit" derives from the premise that the "acts of officials which are not lawfully authorized are not acts of the State," *Cobb,* 190 S.W.2d at 712, it follows that these suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity.[7] This is true even though the suit is, for all practical purposes, against the state. *See Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond."); *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 844 (Tex.2007) ("It is fundamental that a suit against a state official is merely 'another way of pleading an action against the entity of which [the official] is an agent.' ") (quoting *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

**C**

**Permissible Relief**

 [11]  But the *ultra vires* rule is subject to important qualifications. Even if such a claim may be brought, the remedy may implicate immunity. *Cf.* 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3524.3 (under federal **\*374** immunity law, an *ultra vires* suit may be brought but "if the defendant is a state officer, sovereign immunity bars the recovery of damages from the state treasury in a private suit"). This is a curious situation: the basis for the *ultra vires* rule is that a government official is not following the law, so that immunity is not implicated, but because the suit is, for all practical purposes, against the state, its remedies must be limited. *Cf. Fla. Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 685, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) ("There is a well-recognized irony in *Ex parte Young*; unconstitutional conduct by a state officer may be 'state action' for purposes of the Fourteenth Amendment yet not attributable to the

State for purposes of the Eleventh."). We recently held that retired firefighters could not pursue a declaratory judgment action against the City to recover amounts allegedly previously withheld from lump-sum termination payments in violation of the Local Government Code. *City of Houston v. Williams,* 216 S.W.3d 827, 828 (Tex.2007). Without discussing *Epperson,* we applied the rule from *IT–Davy* and *Dodgen* that the declaratory judgment act cannot be used to circumvent immunity, noting that "[t]he only injury the retired firefighters allege has already occurred, leaving them with only one plausible remedy—an award of money damages." *Id.* at 829. *Williams* stands for the proposition, then, that retrospective monetary claims are generally barred by immunity.

We also stated that "in every suit against a governmental entity for money damages, a court must first determine the parties' contract or statutory rights; if the sole purpose of such a declaration is to obtain a money judgment, immunity is not waived." *Id.* This does not mean, however, that a judgment that involves the payment of money necessarily implicates immunity. Drawing the line at monetary relief is itself problematic, as "[i]t does not take much lawyerly inventiveness to convert a claim for payment of a past due sum (damages) into a prayer for an injunction against refusing to pay the sum, or for a declaration that the sum must be paid, or for an order reversing the agency's decision not to pay." *Bowen v. Massachusetts,* 487 U.S. 879, 915–16, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (Scalia, J., dissenting) (discussing section 702 of the Administrative Procedure Act, which waives sovereign immunity in actions against federal agencies as long as the plaintiff seeks "relief other than money damages") (quoting 5 U.S.C. 702 (2000)).

Parsing categories of permissible relief in cases implicating immunity inevitably involves compromise. *See, e.g.*, DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 482 (3d ed. 2002) ("The law of remedies against governments and government officials is a vast and complex body of doctrine, full of technical distinctions, fictional explanations, and contested compromises."). The United States Supreme Court has held that, under federal immunity law, claims for prospective injunctive relief are permissible, while claims for retroactive relief are not, as such an award is "in practical effect indistinguishable in many aspects from an award of damages against the State." *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This rule originated in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), in which the Court held that an

action to restrain a government official from unconstitutional conduct was not barred by immunity. Later, in *Edelman,* the Court recognized that the distinction between prospective and retrospective relief "will not in many instances be that between day and night" and cautioned that a fiscal impact on the **\*375** State did not necessarily implicate immunity:

> The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*. In *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

*Id.* at 667–68, 94 S.Ct. 1347 (footnote omitted). The retroactive portion of the *Edelman* district court's decree was different, however, as "[i]t require[d] payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard." *Id.* at 668, 94 S.Ct. 1347.

While "[t]he line between prospective and retrospective remedies is neither self-evident nor self-executing," LAYCOCK, MODERN AMERICAN REMEDIES at 483, the Supreme Court shed further light on the issue in *Milliken v. Bradley,* 433 U.S. 267, 269, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), a case involving desegregation of the Detroit school system. The Supreme Court upheld a trial court's order requiring state officials to spend $6 million on education to remedy effects of segregation. *Milliken,* 433 U.S. at 290, 97 S.Ct. 2749. The Court held that this relief was permissible under *Edelman:* "That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system." *Id.*; *see also* 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3524.3 (noting that, under *Edelman,* "[i]njunctions requiring expenditure of state funds are acceptable, so long as the order is prospective" but "[r]etroactive relief, including compensatory damages from state funds are barred").

This compromise between prospective and retroactive relief, while imperfect, best balances the government's immunity with the public's right to redress in cases involving *ultra vires* actions, and this distinction "appear[s] in the immunity of the United States, and in the law of most states' immunity from state-law claims." LAYCOCK, MODERN AMERICAN REMEDIES at 482. It also comports with the modern justification for immunity: protecting the public fisc. **\*376** *Tooke v. City of Mexia,* 197 S.W.3d 325, 331–32 (Tex.2006) (observing that immunity "shield[s] the public from the costs and consequences of improvident actions of their governments"); *Federal Sign,* 951 S.W.2d at 417 (Enoch, J., dissenting) (noting that suits against the state would deplete treasury resources and tax funds necessary to operate the government). Moreover, it is generally consistent with the way our courts of appeals have interpreted *Williams. See, e.g.*, *City of Round Rock v. Whiteaker,* 241 S.W.3d 609, 633–34 (Tex.App.-Austin 2007, pet. denied) (approving, under

*Williams,* dichotomy between declaratory and injunctive claims regarding past statutory violations and those seeking only to compel the city to follow the law in the future; the government was immune from the former but not the latter); *Bell v. City of Grand Prairie,* 221 S.W.3d 317, 325 (Tex.App.-Dallas 2007, no pet.) (holding that, under *Williams,* firefighters' requested declaration regarding past statutory violation was barred, but to the extent the requested declaration concerned future violations, the claim was not barred, providing the firefighters did not seek an award of money damages). And finally, it ensures that statutes specifically directing payment, like any other statute, can be judicially enforced going forward.

[12]    This approach is inconsistent with *Epperson,* however, in which we held that, if successful, Epperson would be entitled to "the sum of $93,000 which belonged to him as his commission for services rendered." *Epperson,* 42 S.W.2d at 229. In that respect, *Epperson* conflicts with *Williams,* in which we implied that prospective remedies might not be barred even though retrospective monetary ones were. *Williams,* 216 S.W.3d at 829 (noting that "[t]he only injury the retired firefighters allege has already occurred, leaving them with only one plausible remedy—an award of money damages" and that "they assert no right to payments from the City in the future"). The best way to resolve this conflict is to follow the rule, outlined above, that a claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief, as measured from the date of injunction. *Cf. Edelman,* 415 U.S. at 669, 94 S.Ct. 1347 (using entry of injunction to distinguish retrospective from prospective relief). Thus, while the *ultra vires* rule remains the law, *see Federal Sign,* 951 S.W.2d at 404, *Epperson's* retrospective remedy does not.

[13]    But this rule is not absolute. For example, a claimant who successfully proves a takings claim would be entitled to compensation, and the claim would not be barred by immunity even though the judgment would require the government to pay money for property previously taken. *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001) (noting that governmental immunity "does not shield the State from an action for compensation under the takings clause"); *cf.* WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 3524.3 ("If the state cannot invoke its immunity, retroactive relief against it is allowed.").

[14]    Heinrich has not alleged a takings claim. In the trial court, Heinrich alleged only that "a suit for equitable relief

against a governmental entity for violation of a provision of the Texas Bill of Rights is excepted from ... sovereign immunity under Texas Constitution article [I], section 29" without specifying which provision of the Bill of Rights had been violated. In the court of appeals, however, she clarified that her constitutional complaint was a "violation of Article 1, section 16." TEX. CONST. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). Petitioners contend that she waived this argument by failing to **\*377** raise it in the trial court. *See Tex. Dep't of Protective & Regulatory Servs. v. Sherry,* 46 S.W.3d 857, 861 (Tex.2001) (" '[A]s a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal.' ") (citations omitted). Even if Heinrich's constitutional argument was properly presented, however, it has no merit. Heinrich does not challenge the governing statute or bylaws, but rather the Board's actions under those provisions. Indeed, Heinrich argues that "[t]he Pension Board and its individual members acted outside their authority and in violation of the Texas Constitution when they reduced [Heinrich's] benefits." Because Heinrich does not allege that any law sanctioned the retroactive reduction in her benefits, her constitutional argument fails. [8]

As we have repeatedly noted, the Legislature is best positioned to waive immunity, and it can authorize retrospective relief if appropriate. *See, e.g.,* TEX. LOCAL GOV'T CODE § 180.006 (enacted after *Williams* and waiving immunity for firefighter and police officer claims for back pay and civil penalties). There are cases in which prospective relief is inadequate to make the plaintiff whole, but the contours of the appropriate remedy must be determined by the Legislature.

Thus, Heinrich's claims for prospective relief may be brought only against the appropriate officials in their official capacity, and her statutory claims for future benefits against the City, Fund, and Board must be dismissed. [9] Heinrich's pleadings are unclear as to the capacity or capacities in which she has sued the individual Board members. The United States Supreme Court has observed that, "[i]n many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also United States ex rel. Adrian v. Regents of Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir.2004). In these cases, " '[t]he course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed."

*Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099 (citations omitted). Here, the injunctive relief Heinrich seeks would necessarily come from the Board, rather than the individual members. Considering "the nature of the liability sought to be imposed," *id.,* and construing Heinrich's pleadings liberally, *Miranda,* 133 S.W.3d at 226, we conclude that she has sued the Board members in their official capacities, and her claims are therefore not automatically barred by immunity. [10] To the extent that the court of appeals held that the suit is against the Board members in their individual capacities, we reverse that portion of its judgment.

### D

### Evidence That Petitioners Acted *Ultra Vires*

**[15]**   In their second issue, petitioners argue that governmental immunity prohibits **\*378** Heinrich's suit because Heinrich has offered no evidence that the reduction in her benefits was illegal or unauthorized. We conclude, however, that Heinrich has presented evidence raising a fact question on this issue.

**[16]**   "When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Miranda,* 133 S.W.3d at 226 (citations omitted). Here, Heinrich alleges that petitioners violated article 6243b, section 10A(b) of the Texas Revised Civil Statutes when they reduced her benefits. Thus, if Heinrich's allegations are true, her suit would fall within the *ultra vires* exception to governmental immunity as described above.

**[17]**   **[18]**   This is not the end of our analysis, however: "if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227. If there is no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law. *Id.* at 228. If, however, the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder. *Id.* at 227–28. This standard mirrors our review of summary judgments, and we therefore take as true all

evidence favorable to Heinrich, indulging every reasonable inference and resolving any doubts in her favor. *Id.* at 228.

Petitioners argue that, in accordance with the governing bylaws, the payments to Heinrich were reduced when her son ceased to be eligible to receive them, and asserts that the statutory provisions Heinrich relies upon are "inapplicable." Conversely, Heinrich alleges that she was awarded 100% of her husband's pension in accordance with these provisions, and that petitioners' subsequent retroactive reduction of her benefits violated, among others, article 6243b, section 10A(a)(1) of the Texas Revised Civil Statutes. The relevant portions of article 6243b, section 10A provide:

(a) Notwithstanding anything to the contrary in other parts of this Act and subject to Subsections (b) and (c) of this section, the Board of Trustees may, by majority vote of the whole board, make from time to time one or more of the following changes, or modifications:

(1) modify or change prospectively or retroactively in any manner whatsoever any of the benefits provided by this Act, except that *any retroactive change or modification shall only increase pensions or benefits;*

\* \* \*

(b) None of the changes made under Subsection (a) of this section may be made unless all of the following conditions are sequentially complied with:

(1) the change must be approved by a qualified actuary selected by a four-fifths vote of the Board; the actuary's approval must be based on an actuarial finding that the change is supported by the existing funding status of the fund; the actuary, if an individual, must be a Fellow of the Society of Actuaries or a Fellow of the Conference of Actuaries in Public Practice or a Member of the American Academy of Actuaries; the actuary, if an actuarial consulting firm, must be established in the business of providing actuarial consulting services to pension plans and have experienced personnel able to provide the requested **\*379** services; the findings upon which the properly selected and qualified actuary's approval are based are not subject to judicial review;

(2) the change must be approved by a majority of all persons then making contributions to the fund as employees of a department to which the change would directly apply, voting by secret ballot at an election held after ten (10) days' notice given by posting at a prominent

place in every station or substation of a department to which the change would directly apply and in the city hall;

TEX.REV.CIV. STAT. art. 6243b, § 10A (emphasis added). Under this statute, while benefits may be increased if certain procedures are followed, the Board has no discretion to retroactively lower pensions. Petitioners, however, cite the provisions of the 1980 bylaws, under which the reduction would be proper due to Heinrich's son's age. They therefore suggest that Heinrich erroneously relies on 1985 changes to the bylaws that increased the surviving spouse's share but were prospective only in nature and do not apply to Heinrich.

Heinrich submitted an affidavit from John Batoon, former Assistant City Attorney for El Paso.[11] Batoon's affidavit provided:

I was serving as an Assistant City Attorney for the City of El Paso in 1985. I reviewed and approved the award to Ms. Lilli M. Heinrich of 100% of her deceased husband's, Charles D. Heinrich, benefits from The El Paso Firemen & Policemen's Pension Fund. All procedures were followed according to the Plan and according to law. The membership voted and approved of the benefits awarded Ms. Heinrich as was required by the Plan. Because Mr. Heinrich had been an outstanding police officer for the City of El Paso and because he was killed in the line of duty, the Board of Trustees and the membership voted to award Ms. Heinrich 100% of Mr. Heinrich's benefits.

Consideration of the amount of benefits awarded Ms. Heinrich was not based, in any way, on the fact that she had a minor child at that time. Ms. Heinrich was awarded 100% of the benefits because Mr. Heinrich had been a well-loved officer and his death was a terrible loss for the police department. It was the Board of Trustees and the membership's way of paying tribute to a fallen officer.

Along with this sworn testimony, the evidence included a pair of October 16, 1985 letters from the chief of police, one signed by the then-Board members, stating that "Mrs. Heinrich will receive 100% of her husband's final pension amount," and one unsigned, stating that 100% would go to "Mrs. Heinrich and her dependent children." The minutes of the November 20, 1985 Board meeting also indicate that the membership had previously voted to change benefits so that surviving spouses' benefits would increase from 66 2/3 to 100% of the pension amount. The Board contends that these bylaw changes do not apply to Heinrich, but even if they do not, Batoon's affidavit and the letters raise a fact

question as to whether Heinrich's individual benefits were increased to 100% of her husband's pension payments under the provisions of article 6243b and subsequently reduced in violation thereof. We conclude that the trial court correctly denied that portion of the plea to the jurisdiction **\*380** challenging Heinrich's claims against the individuals in their official capacities. *Miranda,* 133 S.W.3d at 227–28.

### E

### The Individuals' Immunity

In their final issue, petitioners assert that the trial court erred in denying the individual board members' plea to the jurisdiction based on governmental and official immunity. With the limited *ultra vires* exception discussed above, governmental immunity protects government officers sued in their official capacities to the extent that it protects their employers. *See Univ. of Tex. Med. Branch v. Hohman,* 6 S.W.3d 767, 776 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.).* Because of this exception, however, governmental immunity does not bar Heinrich's claims against the individuals in their official capacities. Official immunity, by contrast, is an affirmative defense protecting public officials from individual liability. *See Telthorster v. Tennell,* 92 S.W.3d 457, 459–60 (Tex.2002). Because we

hold that Heinrich has not sued the Board members in their individual capacities, official immunity is inapplicable here. [12]

### III

### Conclusion

In sum, because there is a question of fact as to whether Heinrich's pension payments have been reduced in violation of state law, her claims for prospective declaratory and injunctive relief against the Board members and the mayor in their official capacities may go forward, but we dismiss her retrospective claims against them. All of her claims against the City, Fund, and Board, however, are barred by governmental immunity, and we dismiss them. Finally, we hold that the Board members have not been sued in their individual capacities, and to the extent the court of appeals held otherwise, we reverse its judgment. We affirm in part and reverse in part the court of appeals' judgment and remand this case to the trial court for further proceedings. TEX.R.APP. P. 60.2(a),(d).

### Parallel Citations

52 Tex. Sup. Ct. J. 689

### Footnotes

1    The City withheld a percentage of Charles's compensation (and that of other officers) to fund the plan.

2    The State of Texas and the Texas State Association of Fire Fighters submitted amicus curiae briefs.

3    We recently dismissed a claim for declaratory and injunctive relief against the Houston Municipal Employees Pension System in which the "plaintiffs ... requested that the trial court issue an injunction directing the pension board to comply with the trial court's interpretation of Article 6243h," the governing statute. *Houston Mun. Employees Pension Sys. v. Ferrell,* 248 S.W.3d 151, 158–59 (Tex.2007). Under Article 6243h, the Houston board's "interpretation of [the] Act [is] final and binding on any interested party," TEX.REV.CIV. STAT. art. 6243h § 2(y), and we held that this language precluded judicial review. *Ferrell,* 248 S.W.3d at 158 ("There is no right to judicial review of an administrative order unless a statute explicitly provides that right or the order violates a constitutional right.") (citations omitted). Here, however, Article 6243b contains no language similar to that in 6243h granting the Board exclusive authority to interpret the act, *see* TEX.REV.CIV. STAT. art. 6243b, and, in any case, Heinrich does not challenge petitioners' interpretation of 6243b, but rather alleges that they have violated that statute under an undisputed reading thereof. *See Ferrell,* 248 S.W.3d at 160 (Brister, J., concurring) ("A different case might be presented if the plaintiffs alleged the board was clearly violating some provision of the statute. Article 6243h gives the pension board complete discretion to interpret the statute, but not to violate it.").

4    The *Dodgen* Court expressly declined to limit *Epperson* based on changes in federal immunity jurisprudence. *Dodgen,* 308 S.W.2d at 843.

5    Because the policy embodied in the law extends only as far the amount wrongfully withheld, claims for amounts beyond those alleged to be due under the relevant law, such as consequential damages, remain barred by immunity.

6    For claims challenging the validity of ordinances or statutes, however, the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and thereby waives immunity. TEX. CIV. PRAC. & REM.CODE §

37.006(b) ("In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard."); *see Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 697–698 (Tex.2003) ("[I]f the Legislature requires that the State be joined in a lawsuit for which immunity would otherwise attach, the Legislature has intentionally waived the State's sovereign immunity."); *Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994) ("The DJA expressly provides that persons may challenge ordinances or statutes, and that governmental entities must be joined or notified. Governmental entities joined as parties may be bound by a court's declaration on their ordinances or statutes. The Act thus contemplates that governmental entities may be—indeed, must be—joined in suits to construe their legislative pronouncements."). Here, Heinrich is not challenging the validity of the bylaws or the governing statute, but rather petitioners' actions under them.

7   State officials may, of course, be sued in both their official and individual capacities. Judgments against state officials in their individual capacities will not bind the state. *See Alden v. Maine,* 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.").

8   Further, although the parties do not address it, we note that the reduction in Heinrich's survivor payments occurred before the effective date of article XVI, section 66 of the Texas Constitution ("Protected Benefits Under Certain Public Retirement Systems"), and we do not consider whether it would otherwise apply in this case.

9   While this case was pending on interlocutory appeal, the Legislature enacted 271.151–.160 of the Local Government Code, waiving immunity from suit for certain claims against cities and other governmental entities. Heinrich does not argue that her claims fall within these provisions, and we express no opinion on that subject.

10   Because the mayor of El Paso, who is also a Board member, was named as a defendant in his official capacity, Heinrich may seek liability from the City through that officer, although her claims against the City itself must be dismissed.

11   The Fund, the Board, and the Board members objected to this evidence. The trial court did not explicitly rule on the objections, and the petitioners do not raise any evidentiary issues on appeal.

12   The court of appeals failed to draw this distinction, instead discussing the protections available to officials from governmental immunity. 198 S.W.3d at 407. This conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

**Judgment Reversed in Part by** Texas Dept. of Transp. v. Sefzik, Tex., October 21, 2011

**267 S.W.3d 127**
**Court of Appeals of Texas,**
**Corpus Christi–Edinburg.**

Roger SEFZIK, Appellant,
v.
TEXAS DEPARTMENT OF TRANSPORTATION, Appellee.

No. 13–06–550–CV. | June 19, 2008. | Rehearing Overruled Oct. 2, 2008.

**Synopsis**
**Background:** Applicant for permit to erect outdoor-advertising sign brought suit against Texas Department of Transportation (TxDot), seeking declaration that Administrative Procedure Act's provisions governing "contested cases" applied to TxDot's denial of his application and alleging that denial of contested-case proceeding violated due process. The 53rd District Court of Travis County, Suzanne Covington, J., granted TxDot's plea to jurisdiction based on sovereign immunity. Applicant appealed.

**Holdings:** The Court of Appeals, Benavides, J., held that:

[1] suit seeking declaration of rights was not subject to sovereign immunity defense;

[2] Administrative Procedure Act's (APA) declaratory relief provision was not a waiver of sovereign immunity; but

[3] sovereign immunity was not waived as to constitutional claims.

Affirmed in part, reversed and remanded, in part.

Vela, J., dissented and filed opinion.

**Attorneys and Law Firms**

**\*129** C. Russell Woody, J. Allen Smith, Scott J. Conrad, SettlePou, Dallas, TX, for Appellant.

Betsy J. Johnson, Office of the Atty. Gen. of Texas, Austin, TX, for Appellee.

Before Chief Justice VALDEZ and Justices BENAVIDES and VELA.

**OPINION**

Opinion by Justice BENAVIDES.

Appellant, Roger Sefzik, sued the appellee, the Texas Department of Transportation (TxDot), seeking a declaration that the Texas Administrative Procedure Act's provisions governing "contested cases" apply to TxDot's denial of an application for a

permit to erect an outdoor-advertising sign. Sefzik also sought damages for constitutional due process violations. TxDot filed a plea to the jurisdiction, asserting that sovereign immunity barred Sefzik's claims. The trial court granted TxDot's plea to the jurisdiction, and Sefzik now appeals. We affirm, in part, and reverse and remand, in part.

## I. BACKGROUND

On March 18, 2005, Sefzik filed an application with TxDot for a permit to erect an outdoor-advertising sign at a designated location on the north side of Interstate 30 in Greenville, Texas. Sefzik sought to advertise on behalf of two businesses at the specific location: T–Bar Fence, Inc. and Gym's Star Gymnastics. As part of the **\*130** application process, Sefzik was required to demonstrate that the two businesses had been operating for at least 90 days (the "90–day waiting period").[1] TxDot received Sefzik's application at its Paris, Texas office on March 21, 2005.

[1]     43 TEX. ADMIN. CODE §§ 21.142(2)(K), 21.150(b)(4).

Apparently, Gym's Star Gymnastics had not been operating for the requisite 90 days at the time TxDot received Sefzik's application. Rather, the 90–day waiting period did not end until April 2, 2005. TxDot did not immediately notify Sefzik of the defect in his application. On April 4, 2005, Daum Advertising applied for a permit to erect an advertising sign at the same location on behalf of the same businesses.

On June 15, 2005, TxDot denied Sefzik's application for a permit. In its denial letter, TxDot informed Sefzik that his application to advertise for Gym Star Gymnastics did not satisfy the 90–day waiting period at the time that TxDot received his application. Additionally, TxDot informed Sefzik that Daum Advertising's permit had been received on April 4, 2005, which was 92 days after Gym's Star Gymnastics opened for business. It told Sefzik that because Daum Advertising's application satisfied the 90–day waiting period, Daum Advertising was awarded the permit.

On June 20, 2005, Sefzik resubmitted his permit application,[2] and on June 29, 2005, he appealed the previous denial of his application.[3] Sefzik filed his appeal with Michael Behrens, TxDot's Executive Director. He argued that his application was the only one on file on April 2, 2005 when the 90–day waiting period expired. Sefzik argued that TxDot should have notified him of the deficiency in his permit application so that he could resubmit his application. He requested an oral, contested-case hearing, which he asserted was required under Texas Government Code section 2001.051.[4]

[2]     The Texas Administrative Code appears to contemplate that if a permit application is filed with errors, TxDot will notify the applicant and allow him or her to correct any deficiencies and resubmit the application. *Id.* § 21.150(c).

[3]     *Id.* § 21.162(a) ("An applicant may file a petition with the executive director to appeal a denied permit.").

[4]     "In a contested case, each party is entitled to an opportunity: (1) for hearing after reasonable notice of not less than 10 days; and (2) to respond and to present evidence and argument on each issue involved in the case." TEX. GOV'T CODE ANN. § 2001.051 (Vernon 2000).

On October 7, 2005, Behrens denied Sefzik's appeal without holding a hearing. Behrens opined that TxDot acted reasonably in denying Sefzik's permit application because the initial application did not meet the 90–day waiting period. Behrens cited to the administrative code, which states that applications are considered on a first-come, first-serve basis.[5] Sefzik filed a motion for rehearing,[6] arguing that TxDot failed to comply with the Administrative Procedure Act ("APA")'s[7] contested case **\*131** procedures by refusing to provide him with a contested-case hearing under government code section 2001.051. That

motion was overruled by operation of law on November 21, 2005.[8]

5      43 TEX. ADMIN. CODE 21.150(c) ("Permits will be considered on a first-come, first-serve basis. If an application is returned because of errors or incomplete information, other applications received for the same or conflicting sites between the time a denied application is returned to the applicant and the time it is resubmitted, will be considered before the resubmitted application. A second application for a conflicting site may be held until a decision is made on the first application.").

6      TEX. GOV'T CODE ANN. § 2001.146 (Vernon 2000).

7      *Id.* §§ 2001.001–2001.902 (Vernon 2000 & Supp.2007).

8      *Id.* § 2001.146(c).

Sefzik then filed the underlying lawsuit in Travis County District Court. Sefzik alleged jurisdiction pursuant to Texas Government Code section 2001.171, which provides for appeals to the Travis County District Courts from administrative decisions in contested cases.[9] Sefzik alleged claims for declaratory relief under the Uniform Declaratory Judgments Act ("UDJA")[10] and the APA's declaratory judgment provision.[11] Sefzik sought a declaration that the APA's contested-case procedures apply to TxDot's denial of his permit application and that, therefore, he was entitled to an oral hearing on appeal of TxDot's denial of his permit application. Sefzik also alleged that by denying him a contested-case proceeding, TxDot violated his due process rights under the United States and Texas Constitutions.[12] Finally, he sought attorney's fees under the UDJA.[13]

9      *Id.* § 2001.171 (Vernon 2000) ("A person who has exhausted all administrative remedies available within a State agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter."). On appeal, Sefzik does not assert this provision as a ground for jurisdiction.

10     TEX. CIV. PRAC. & REM.CODE §§ 37.001–37.011 (Vernon 1997 & Supp.2007).

11     TEX. GOV'T CODE ANN. § 2001.038 (Vernon 2000). Section 2001.038(a) provides: "The validity or applicability of a rule, including an emergency rule adopted under Section 2001.034, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." *Id.*

12     U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 19.

13     TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997).

TxDot filed a plea to the jurisdiction and a general denial, asserting that Sefzik's claims were barred by sovereign immunity. It asserted that Sefzik was not entitled to a contested-case proceeding; therefore, he was not entitled to appeal under Texas Government Code section 2001.171. TxDot further argued that Sefzik was required to demonstrate a waiver of sovereign

immunity for his claims for declaratory relief and for constitutional violations. It argued that Sefzik did not have a property interest in the permit but, rather, only had an expectation of a permit. TxDot reasoned that because Sefzik did not have a property interest, he could not establish that the APA's declaratory relief provision waived sovereign immunity. For the same reason, TxDot argued that sovereign immunity barred his constitutional claims. Furthermore, TxDot argued that the UDJA is merely a procedural device for deciding cases already within a trial court's jurisdiction. Therefore, the UDJA claim was also barred by sovereign immunity.

Sefzik argued in response that sovereign immunity is not implicated by actions for declaratory relief or for violations of constitutional rights; therefore, he was not required to establish a waiver of immunity. The trial court agreed with TxDot and granted its plea to the jurisdiction, and this appeal ensued.[14]

[14] The case was transferred to the Thirteenth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *TEX. GOV'T CODE ANN. § 73.001 (Vernon 1998)*.

## *132 II. STANDARD OF REVIEW

[1] [2] We review a trial court's ruling on subject-matter jurisdiction *de novo*. *Tex. Natural Resource Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002). When reviewing a trial court's order on a plea to the jurisdiction, a court of appeals should consider only the "pleadings and evidence pertinent to the jurisdictional question." *Jenkins v. Entergy Corp.,* 187 S.W.3d 785, 795 (Tex.App.–Corpus Christi 2006, pet. denied) (citing *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002)).

[3] [4] [5] [6] "A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Although the claims form the context of the jurisdictional inquiry, the plea should be decided "without delving into the merits of the case." *Id.* In some circumstances, a court will be unable to determine the jurisdictional question without some development of the evidence in the case; in those circumstances, the trial court has discretion to refuse to decide the jurisdictional question until after the case has progressed past the preliminary hearing stages. *Id.* But a party should not be required to put on their entire case in order to establish that they are entitled to be in court in the first place. *Id.* ("The purpose of a dilatory plea is not to force the plaintiffs to preview their case on the merits but to establish a reason why the merits of the plaintiffs' claims should never be reached.").

## III. SOVEREIGN IMMUNITY AND ACTIONS FOR DECLARATORY RELIEF

In this appeal, we must examine the effect of sovereign immunity on a claim for declaratory relief. The principal disagreement between the parties involves the logical construct of the sovereign immunity doctrine. TxDot argues that sovereign immunity, as a general rule, bars claims for declaratory relief and that a plaintiff must therefore establish a waiver of sovereign immunity to proceed with a claim for declaratory relief. We believe, however, that TxDot's analysis ignores the theoretical underpinnings of the doctrine of sovereign immunity and the substantial precedent holding that suits for declaratory relief are not suits against the State, and it requires a plaintiff to establish his or her right to declaratory relief in order to establish jurisdiction. Accordingly, we refuse to require Sefzik to establish that he is entitled to declaratory relief before the trial court can even consider his request for that relief. Rather, we hold, as many other courts have held, that a claim for declaratory relief generally does not implicate the doctrine of sovereign immunity in the first place.

### A. Suits for declaratory relief do not implicate sovereign immunity

[7] [8] "Sovereign immunity, unless waived, protects the State from lawsuits *for damages*." *Gen. Serv. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 594 (Tex.2001) (emphasis added); *see also IT–Davy,* 74 S.W.3d at 853;

*First Health Plans, Inc.,* 214 S.W.3d 709, 716–18 (Tex.App.–Austin 2007, pet. filed) (holding that suit for declaratory relief was not a suit against the State because it did not seek to impose liability or seek money damages). The doctrine is based on the premise that the legislature's policy-making function deserves protection. *IT–Davy,* 74 S.W.3d at 854. As the Texas Supreme Court has explained,

> [s]ubjecting the government to liability may hamper governmental functions by shifting tax resources away from their intended purposes toward defending **\*133** lawsuits and paying judgments. Accordingly, the Legislature is better suited than the courts to weigh the conflicting public policies associated with waiving immunity and exposing the government to increased liability, the burden of which the general public must ultimately bear.

*Id.* (citations omitted).

For example, sovereign immunity bars a claim for damages arising out of a breach of contract unless a waiver of sovereign immunity can be established or consent is obtained from the legislature. *Id.* This ensures that current policymakers are not bound by their predecessors' long-term contracts and can respond to changing conditions in the public's best interest. *Id.*

[9] Certain types of actions, however, do not implicate these concerns and, therefore, do not implicate the sovereign immunity doctrine. *Nueces County v. Ferguson,* 97 S.W.3d 205, 217 (Tex.App.–Corpus Christi 2002, no pet.). For example, Texas courts have consistently distinguished suits against the State for money damages from suits for declaratory relief-the latter does not implicate the sovereign immunity doctrine. *See IT–Davy,* 74 S.W.3d at 855; *Hawkins,* 214 S.W.3d at 716; *City of Dallas v. Blanton,* 200 S.W.3d 266, 279 (Tex.App.–Dallas 2006, no pet.); *Ferguson,* 97 S.W.3d at 218. "[N]o consent is required when suit is filed seeking only a declaration or enforcement of rights." *Ferguson,* 97 S.W.3d at 217.[15] In fact, just recently, this Court specifically held as much. *See Powell v. Tex. Dep't of Criminal Justice,* 251 S.W.3d 783, 790–91 (Tex.App.–Corpus Christi 2008, pet. filed).

15    This is not to say that a party can escape the doctrine of sovereign immunity by artfully pleading a claim for damages as an action for declaratory relief. *Tex. Natural Resource Comm'n v. IT–Davy,* 74 S.W.3d 849, 855–56 (Tex.2002). For example, declaratory judgment actions against State officials seeking to declare a contract's validity, enforce a contract, or impose contractual liabilities implicate the doctrine of sovereign immunity because they seek to impose liability on the State. *Id.*

The reason for this distinction is that "suits to compel state officers to act within their official capacity do not attempt to subject the State to liability." *IT–Davy,* 74 S.W.3d at 855; *Hawkins,* 214 S.W.3d at 716–18; *Blanton,* 200 S.W.3d at 279 ("A party generally can maintain a suit to determine its rights without legislative permission because such suits are not considered 'suits against the State' for purposes of sovereign immunity."). In other words, suits for declaratory relief do not hamper current policymakers' ability to perform their job in the public interest by binding them to outdated or expired policies. If a statute sought to be construed through a declaratory judgment is outdated, and thus a declaration of rights under that statute causes problems for the general public, it is the policymakers' job to change the statute, not to ignore it or violate it with impunity.

On more than one occasion, this Court has rejected the idea that the State is immune from declaratory judgment actions seeking to determine a party's rights under a statute. *See Ferguson,* 97 S.W.3d at 218; *Dewhurst v. Gulf Marine Inst. of Tech.,* 55 S.W.3d 91, 97 (Tex.App.–Corpus Christi 2001, pet. denied) ("[W]e distinguish suits to determine a party's rights against the State from suits seeking damages. A party can maintain a suit to determine its rights without legislative permission."); *see also Nueces County v. Hoff,* 105 S.W.3d 208, 211 (Tex.App.–Corpus Christi 2003) (noting that sovereign immunity is not implicated when the suit "does not seek to impose liability on the State, seek money damages against the **\*134** State, or seek to control state action, as in a declaratory judgment suit"), *rev'd on other grounds,* 153 S.W.3d 45 (Tex.2004). It is, therefore, well established that when a private plaintiff merely seeks a declaration of his or her rights under a statute, such an action is not subject to a sovereign immunity defense, and a waiver or consent to suit is unnecessary. *Hawkins,* 214 S.W.3d at 716–17; *Blanton,* 200 S.W.3d at 279; *Ferguson,* 97 S.W.3d at 217.

**B. By characterizing the APA's declaratory relief provision as a "waiver" of immunity, TxDot asks this Court to improperly reach the merits of Sefzik's claims**

TxDot argues that because Sefzik has not demonstrated compliance with the requirements of the APA's declaratory relief provisions, he has not demonstrated a waiver of immunity. The dissent extends this reasoning to TxDot's UDJA claim, asserting that Sefzik has to demonstrate he is entitled to declaratory relief in order to establish jurisdiction. TxDot's and the dissent's view of sovereign immunity would skew the Court's jurisdictional analysis because it would require the Court to decide the merits of Sefzik's declaratory judgment action.

[10] [11] When a statutory waiver of immunity is involved, it is axiomatic that the plaintiff's failure to plead the statutory elements means that sovereign immunity bars the suit. For example, the Texas Tort Claims Act provides a waiver of sovereign immunity in limited circumstances. *Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 587 (Tex.2001). If a plaintiff suing under the Texas Tort Claims Act does not satisfy the specific requirements of the statute, sovereign immunity is not waived. *Id.* Because the Tort Claims Act also provides the cause of action for recovery against the State, a plaintiff suing under the Tort Claims Act must also satisfy the Tort Claims Act's requirements in order to recover. Such is not the case here, where sovereign immunity is not *implicated.*

By characterizing the APA's declaratory relief provision as a waiver of immunity, TxDot sets up additional hurdles for a plaintiff to cross before ever reaching the merits of his or her claim. For example, TxDot argues that the legislature has imposed strict limits on the scope of a trial court's ability to review agency decisions, and for that reason, a party seeking a declaratory judgment under Texas Government Code section 2001.038 is limited to challenging a rule as invalid or inapplicable. TEX. GOV'T CODE ANN. § 2001.038 (Vernon 2000). TxDot argues that Sefzik merely challenges whether TxDot correctly applied a rule and, in turn, whether TxDot's actions comply with the APA's provisions governing its operation. It argues that under these circumstances, Sefzik is not entitled to a declaratory judgment under section 2001.038. Additionally, TxDot argues that Sefzik does not have a legal right or privilege within the meaning of section 2001.038. *Id.* ("The validity or applicability of a rule, including an emergency rule adopted under Section 2001.034, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a *legal right or privilege* of the plaintiff.") (emphasis added). Finally, TxDot argues that permit denial appeals are not contested cases under the APA. For all these reasons, TxDot asserts that the trial court lacks jurisdiction. The dissent goes a step further and applies this logic to the UDJA claim: it asserts that because Sefzik cannot establish that **\*135** his rights, status, or legal relations have been affected, there is no jurisdiction.

These arguments go to the merits of Sefzik's claims for declaratory relief, not to jurisdiction. It may be that Sefzik's claims for declaratory relief are not contemplated by the UDJA or the APA. But that is for the trial court to decide on the merits. By characterizing the APA as a waiver of sovereign immunity, TxDot asks this Court to delve into the merits of Sefzik's claim, which is improper at this stage of the proceedings. *Bland Indep. Sch. Dist.,* 34 S.W.3d at 554.

**C. Exercising jurisdiction does not violate separation of powers**

[12] [13] TxDot further argues that by exercising jurisdiction over a UDJA claim based on the interpretation of a constitutional or statutory provision, the trial court would violate separation of powers concerns. Specifically, TxDot argues that "if the courts could review any and all statutes and constitutional provisions without reliance on a separate basis of jurisdiction, the courts would in essence exercise unmitigated control over the other branches of government." Br. of Appellee at 9, *Sefzik v. Tex. Dep't of Transp.,* No. 13–06–550–CV (Tex.App.–Corpus Christi Feb. 12, 2007). We do not perceive any violation of the separation of powers doctrine by our holding that a suit for declaratory relief does not invoke the doctrine of sovereign immunity. TxDot fails to recognize that sovereign immunity is a common-law doctrine, and it is the courts' province to define the scope of that doctrine and whether it exists in the first place. *Reata Constr. Corp. v. City of Dallas,* 197 S.W.3d 371, 375 (Tex.2006).

Moreover, under TxDot's analysis, a suit to test the construction of the statute that applies to an administrative agency could not be entertained. The net effect of such an analysis is that administrative agencies can ignore the APA with impunity, leaving a party entitled to procedures under the APA without any method of enforcing those procedures. In short, an agency can deny that the APA applies and claim sovereign immunity from an action seeking to test that determination. Because TxDot's analysis makes the APA a meaningless exercise of legislative power, we decline to adopt it.

For all the foregoing reasons, we focus only on the type of relief Sefzik seeks—declaratory relief—and hold that a suit seeking to determine his rights under the UDJA or the APA does not invoke the doctrine of sovereign immunity. Accordingly, the trial court erred in granting TxDot's plea to the jurisdiction as to his claims for declaratory relief.

## IV. SOVEREIGN IMMUNITY AND SEFZIK'S CONSTITUTIONAL CLAIMS

Sefzik brought claims against TxDot for violations of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and under Article I, section 19 of the Texas Constitution. U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land."). He alleged that TxDot failed to afford him due process and due course of law by refusing to grant him a hearing in his appeal of TxDot's denial of his permit application. TxDot argues that Sefzik failed to allege the existence of a right protected by these constitutional provisions; therefore, sovereign immunity bars Sefzik's claim.[16] Sefzik argues that it **\*136** is not necessary to demonstrate a waiver of immunity when a party seeks relief for constitutional violations. We agree with TxDot.

[16]     The Texas Supreme Court has held that the Texas Constitution's due course of law provision, Article I section 19, protects essentially the same interests as the due process provisions in the United States Constitution. *NCAA v. Yeo,* 171 S.W.3d 863, 867–68 & n. 14 (Tex.2005).

Sefzik's claim for constitutional violations sought damages from TxDot. TxDot's argument against this claim was raised in a jurisdictional plea based solely on sovereign immunity—TxDot did not argue, and we do not decide, whether any cause of action for damages actually exists for the alleged constitutional violations. *Perry v. Texas A & I Univ.,* 737 S.W.2d 106, 108 (Tex.App.–Corpus Christi 1987, writ ref'd n.r.e.) ("[T]he issues before us are restricted to the question of the application of the principles of governmental immunity to these defendants and not whether any cause of action for damages arises from the allegations of constitutional violations.").

[14] As we have previously stated, "[i]n addressing the issue of immunity from suit, it is critical to recognize that the action is one for damages and not one seeking injunctive relief." *Id.* As such, Sefzik's claim for damages for constitutional violations is a "suit against the State" that invokes the doctrine of sovereign immunity. *Id.* This Court's prior holdings treat the constitutional provisions as waivers of immunity and require that the plaintiff plead a valid cause of action thereunder in order to establish immunity. *Id.* at 109; *see also State Dep't of Pub. Safety v. Petta,* 44 S.W.3d 575, 581 (Tex.2001) (holding that suit against department of public safety under 42 U.S.C. § 1983 was suit against the State, and plaintiff's failure to properly plead claim under that provision meant that claim was barred by sovereign immunity); *Univ. of Tex. Sys. v. Courtney,* 946 S.W.2d 464, 469 (Tex.App.–Fort Worth 1997, writ denied) (on reh'g) (holding that university had sovereign immunity from suit for federal due process claims because plaintiff did not properly plead a 42 U.S.C. § 1983 claim).

For example, in *Perry v. Texas A & I University,* a counselor at Texas A & I University sued the university alleging the deprivation of property in violation of the Fourteenth Amendment to the United States Constitution and Article I, section 19 of the Texas Constitution. 737 S.W.2d at 107. The counselor sought damages from the University. *Id.* We referenced the general rule that a suit that seeks to impose liability on the State invokes the doctrine of sovereign immunity. *Id.* at 109. The counselor argued that "when a violation of constitutional or property rights is alleged, the courts have a right to review the acts of legislative and administrative bodies." *Id.* We rejected this argument, noting that the counselor was not seeking review of administrative or legislative acts but, rather, was seeking monetary damages. *Id.* We then held that the counselor had not alleged that she had a vested property right that was denied. *Id.* We held that "because there was no pleading by the plaintiff to take her out of the general rule that the courts of the State of Texas have no jurisdiction to impose liability on the State without legislative consent, we sustain the judgment [dismissing her claims for lack of jurisdiction]." *Id.*[17]

[17]     In dicta in *Nueces County v. Ferguson,* we stated that "[a]lthough a request for money damages does not affect the jurisdiction of the trial court over a claim of a violation of article I, section 19, even when the State is a defendant, there is no right to a money judgment for such a violation." 97 S.W.3d 205, 221–22 (Tex.App.–Corpus Christi 2002, no pet.). In a footnote, we stated that "[a]

suit brought for a violation of article I, section 19 of the constitution that seeks money damages would not be barred by sovereign immunity as the constitution itself provides a waiver of sovereign immunity for violations of this provision." *Id.* at 222 n. 23. However, we noted that nowhere in Ferguson's pleading had she alleged a violation of Article I, section 19. *Id.* at 221. These statements were dicta. In fact, two of the cases cited therein demonstrate that a waiver of immunity is, in fact, necessary when a plaintiff seeks damages for alleged violations of Article I, section 19. *See Univ. of Tex. Sys. v. Courtney,* 946 S.W.2d 464, 469 (Tex.App.–Fort Worth 1997, writ denied) (op. on reh'g) (court lacked jurisdiction over plaintiff's claim for damages under Article I, section 19); *Alcorn v. Vaksman,* 877 S.W.2d 390, 404 (Tex.App.–Houston [1st Dist.] 1994, writ denied) ("However, consent is not needed when, as here, the breach of contract (or other government action) constitutes a state constitutional violation and the plaintiff seeks a remedy other than money damages.... We conclude that consent is required to bring suit for a money judgment that would be paid from the state treasury."). The rest of the cases cited either did not address immunity or are factually distinguishable. *Steele v. City of Houston,* 603 S.W.2d 786, 791 (Tex.1980) (takings clause of Texas Constitution expressly authorizes award of damages for violation; therefore, the clause provides a waiver of immunity for claims for damages); *Tex. A. & M. Sys. v. Luxemburg,* 93 S.W.3d 410, 425 (Tex.App.–Houston [14th Dist.] 2002, pet. denied) (holding that violation of Article I, section 19 does not give rise to an action for damages without addressing sovereign immunity); *Tex. State Employees' Union/CWA Local 6184 v. Tex. Workforce Comm'n,* 16 S.W.3d 61, 67 (Tex.App.–Austin 2000, no pet.) (holding that plaintiff's claim was not subject to sovereign immunity doctrine because plaintiff sought only equitable relief as opposed to monetary damages). To the extent that *Ferguson* can be read to imply that a suit for damages under Article I, section 19 is not subject to a sovereign immunity defense, we disapprove of that implication.

**\*137** The *Perry* decision correctly held that constitutional provisions operate as a waiver of immunity that is coextensive with the cause of action provided, if any. *Id.; see also Tex. Parks & Wildlife Dep't v. Callaway,* 971 S.W.2d 145, 149 (Tex.App.–Austin 1998, no writ) ("When the state or its agency takes, damages, or destroys public property for public use, 'the Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity ...' Thus, if Callaway alleged a valid claim for inverse condemnation ..., sovereign immunity does not bar the claim."). In other words, to demonstrate a waiver of immunity *and* to recover on such a claim, Sefzik must allege facts that, if proven, would satisfy the elements of the claim. Here, as we explain next, Sefzik has not alleged a recognized property right that is deserving of due process protections. Accordingly, he has not demonstrated a waiver of immunity for his claim for due process violations. *Perry,* 737 S.W.2d at 109; *cf. Callaway,* 971 S.W.2d at 151 ("Callaway has a property interest that is entitled to due-process protection.... The trial court therefore did not err in denying the Department's plea to the jurisdiction as to Callaway's due-process claim.").

[15] [16] To state a valid due process or due course of law claim, a plaintiff must first allege the existence of a protected right. *NCAA v. Yeo,* 171 S.W.3d 863, 867–68 (Tex.2005). If the plaintiff has a protected right, the court must determine what amount of process is due. *Univ. of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 930–31 (Tex.1995). To have a property interest in a governmental benefit, a person must have more than a unilateral expectation of that benefit. *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Smith v. Travis County Bail Bond Bd.,* 559 S.W.2d 693, 694 (Tex.Civ.App.–Austin 1977, no writ) (holding plaintiff had no property interest in expired license); *see also* **\*138** *Shrieve v. Tex. Parks & Wildlife Dep't,* No. 03–04–00640–CV, 2005 WL 1034086, at *5–6 (Tex.App.–Austin May 5, 2005, no pet.) (mem. op.) (holding that Shrieve's expectation of a permit was not a protected property interest). Rather, the plaintiff must have a legitimate claim of entitlement to the benefit. *Smith,* 559 S.W.2d at 694.

[17] Sefzik's permit application merely sought a governmental benefit to which he was not already entitled. As such, Sefzik merely had an expectation of the governmental benefit—his expectation is not a protected property right. *Smith,* 559 S.W.2d at 694; *Shrieve,* 2005 WL 1034086, at *5–6. This is not a case where a permit has been granted but has later been taken away by the State without cause. *See, e.g., House of Tobacco, Inc. v. Calvert,* 394 S.W.2d 654, 657–58 (Tex.1965); *Richardson v. Alsup,* 380 S.W.2d 923, 923 (Tex.App.–Eastland 1964, writ ref'd). Accordingly, we hold that Sefzik has failed to demonstrate that sovereign immunity is waived for his due process and due course of law claims. Thus, the trial court did not err in sustaining TxDot's plea to the jurisdiction as to these claims.

### V. CONCLUSION

We hold that the trial court erred in sustaining TxDot's plea to the jurisdiction as to Sefzik's requests for declaratory relief

under the Uniform Declaratory Judgments Act and under the Administrative Procedure Act. We reverse and remand those requests for further proceedings. Finding that Sefzik's due process and due course of law claims are barred by sovereign immunity, we affirm the trial court's order sustaining TxDot's plea to the jurisdiction as to these claims.

Dissenting Opinion by Justice VELA.

VELA, Justice, dissenting.

I agree with the majority's opinion with respect to its holding that the trial court did not err in sustaining TxDOT's plea to the jurisdiction as to Sefzik's due process and due course of law claims. I, too, would hold that the trial court did not err in sustaining TxDOT's plea to the jurisdiction as to these claims. I would also hold that the trial court did not err in granting TxDOT's plea to the jurisdiction with respect to Sefzik's claims under the UJDA and the APA.

## I. The Texas Administrative Procedure Act

First, Sefzik urges that the trial court has jurisdiction pursuant to the Texas Administrative Procedure Act. TEX. GOV'T CODE ANN. § 2001.038 (Vernon 2000). The statute provides that the validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff. *Id.* While Sefzik urges that he is seeking to determine the "applicability" of a rule, in fact, the entire APA is the "rule" he seeks to be "applied" to TxDOT's permit-application process.

By its plain language, section 2001.038 allows a plaintiff to challenge either the validity or applicability of agency rules. *Star Houston, Inc. v. Tex. Dep't of Transp.,* 957 S.W.2d 102, 111 (Tex.App.–Austin 1997, writ denied). To qualify for a declaratory judgment, one must seek validation or application of a rule. That same rule must interfere with or impair a legal right or privilege before it can be applied. Sefzik's claim is that it is the permit application process, as addressed in the administrative code, that interferes with or impairs his legal right or privilege. The APA does not. Rather, the APA, if applied, would expand rather than interfere or impair Sefzik's right to judicial review. **\*139** Because Sefzik seeks to apply the APA to his claim even though he claims that it is the administrative code that impairs his purported legal right or privilege, he misapplies the explicit language of section 2001.038. I would hold that Sefzik is not entitled to relief under section 2001.038.

## II. Uniform Declaratory Judgments Act (UDJA)

The UDJA enables a person whose "rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a) (Vernon 1997) (UDJA). At the very least, it is Sefzik's burden to establish his right to declaratory relief in order to establish jurisdiction. In other words, Sefzik must show that his rights, status or legal relations have been affected.

Section 21.159 of the Texas Administrative Code (TAC) explicitly denies a permit or license holder contractual or property rights from the issuance of a permit or license. It states, "Issuance of a permit or license shall not be deemed to create a contract or property right in the permit holder or license holder." 43 TEX. ADMIN. CODE § 21.159 (2008) (Tex. Dep't of Transp., Property Right Not Created). Thus, to conclude that Sefzik, as an applicant for a permit, has a property or contractual right when the statute denies those rights to an actual permit holder is not logical. Because section 21.159 of the

administrative code precludes Sefzik from claiming any contractual right, he has no right, status or "legal relation" as defined by case law. *See* 43 TEX. ADMIN. CODE § 21.159. Thus, Sefzik does not have a status or legal relation as required by section 37.004 of the UDJA sufficient to bring his complaint within the court's power to declare rights, status, and other legal relations. TEX. CIV. PRAC. & REM.CODE ANN. § 37.003(a) (Vernon 1999).

If the UDJA were construed as Sefzik insists it should be, any suit brought affecting a governmental entity would require its participation as a party and would effectively waive the State's immunity. This would defeat the legislative intent that statutes be construed as written and would destroy "the legislature's interest in managing state fiscal matters through the appropriations process." TEX. GOV'T CODE ANN. § 311.034 (Vernon Supp.2007).

For the reasons set forth above, I would hold that the trial court is without subject matter jurisdiction.

**All Citations**

267 S.W.3d 127

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

[PDF] Original Image of 891 S.W.2d 243 (PDF)

891 S.W.2d 243
Supreme Court of Texas.

THE STATE BAR OF TEXAS, James Parsons, III, in his capacity as President of the State Bar of Texas and Karen Johnson, in her capacity as Executive Director of the State Bar of Texas, Petitioners, v. Maria GOMEZ, Alicia Naveja, and Leonardo Chavez, on Behalf of Themselves and Others Similarly Situated, Respondents.

No. D–4218. | Argued Jan. 20, 1994. | Decided Dec. 22, 1994.

Indigents brought action for declaratory and injunctive relief to require State Bar or Supreme Court to implement mandatory pro bono program for state lawyers. The 353rd Judicial District Court, Travis County, Joseph H. Hart, J., dismissed for lack of subject matter jurisdiction, and indigents appealed. The Court of Appeals, J. Woodfin Jones, J., 856 S.W.2d 804, reversed and remanded. On application for writ of error, the Supreme Court, Cornyn, J., held that indigents' action to compel State Bar or Supreme Court to implement mandatory pro bono program did not present justiciable controversy and, therefore, district court lacked jurisdiction over action.

Reversed and remanded.

Gonzalez, J., concurred and filed opinion.

Hightower, J., dissented and filed opinion in which Gammage and Spector, JJ., joined.

Doggett, J., noted his dissent.

**Attorneys and Law Firms**

**\*244** Lynn Liberato, Houston, Linda A. Acevedo, Austin, Alene Ross Levy, Jeffrey T. Nobles, Houston, Broadus A. Spivey, Eric R. Galton, James M. McCormack, Austin, for petitioners.

Virginia Agnew, Charles Herring, Jr., James C. Harrington, Austin, for respondents.

**Opinion**

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT and ENOCH, Justices, join.

The sole question presented for our determination is whether the district court below has jurisdiction of this suit, which complains of the failure of the State Bar of Texas to compel member lawyers to provide free legal services to Texans who cannot pay for those services. We conclude that the district court correctly dismissed the case for lack of jurisdiction. Thus, we reverse the judgment of the court of appeals and remand this case to the district court with instructions to dismiss. [1]

After being refused free legal services, Maria Gomez, Alicia Naveja, and Leonardo Chaves, on behalf of themselves and others similarly situated (collectively, Gomez), filed suit in a Travis County district court against the State Bar of Texas and two of its officials at that time, James Parsons III, President, and Karen Johnson, Executive Director (collectively, State Bar). Gomez contends that the State Bar, by not effectively encouraging attorneys to volunteer free legal services, has illegally failed to meet the legal needs of indigent Texans. Specifically, Gomez alleges violations of the following provisions of the Texas Constitution: (1) Article I, Section 13 (open courts); (2) Article I, Section 3 (equal protection); (3) Article I, Section 3a (equal rights); (4) Article I, Section 19 (due course of law); and (5) Article I, Section 29 (inviolate nature of the Bill of Rights). Gomez further asserts violations of the Texas antidiscrimination statute, [2] the Texas Disciplinary Rules of Professional Conduct, [3] and the Texas Lawyer's Creed. [4]

The district court dismissed the case, concluding it lacked jurisdiction under Article V, Section 8, of the Texas Constitution. [5] The court of appeals reversed, holding that the district court had jurisdiction to decide the merits of Gomez's claims, but because of this Court's exclusive authority to regulate the legal profession in Texas, it held that the district court could levy only a prohibitory, and not a mandatory injunction against the State Bar. 856 S.W.2d 804 (Tex.1993). The court of appeals explained:

> We conclude that a district court does not have authority to grant relief that would **\*245** unreasonably usurp the

supervisory control vested exclusively in the supreme court. By vesting the supreme court with supervisory control of the practice of law, the constitution and the State Bar Act grant the supreme court *discretion* to decide issues concerning the State Bar and the practice of law. Whether a district court has authority to grant a particular form of injunctive relief depends, we believe, on whether granting such relief would effectively exercise the kind of supervisory discretion that is vested exclusively in the supreme court.

856 S.W.2d at 815. We agree with the court of appeals' identification of the issue but not its conclusion.

 [1]  [2]   The jurisdictional question presented is complex and in some ways unique. As a general proposition, before a court may address the merits of any case, the court must have jurisdiction over the party or the property subject to the suit, jurisdiction over the subject matter, jurisdiction to enter the particular judgment, and capacity to act as a court. *See Austin Indep. Sch. Dist. v. Sierra Club,* 495 S.W.2d 878, 881 (Tex.1973). Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable. *See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–46 (Tex.1993). If the district court lacks jurisdiction, in any of these senses, then its decision would not bind the parties. *See Austin Indep. Sch. Dist.,* 495 S.W.2d at 881 (noting that collateral attacks on a judgment are allowed when the district court lacked jurisdiction). And, a decision that does not bind the parties is, by definition, an advisory opinion prohibited by Texas law. *See Texas Ass'n of Business,* 852 S.W.2d at 444 (citing Article II, Section 1, of the Texas Constitution as prohibiting advisory opinions).

 [3]  [4]   The unique aspect of this jurisdictional inquiry, as the court of appeals recognized, arises out of this Court's power to regulate the practice of law in the State of Texas. This power is derived from both statutory and inherent powers. The primary statutory grant of power is found in the State Bar Act, which gives the Court administrative control over the State Bar and provides a statutory mechanism for promulgating regulations governing the practice of law. *See* TEX.GOV'T CODE § 81.011(c). The other source of this court's power to regulate the practice of law in this state, its inherent power, is not secured by any legislative grant or specific constitutional provision, but is necessarily implied to enable the Court to discharge its constitutionally imposed duties. *See Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398–99 (Tex.1979) (noting that doctrine of inherent power is derived, in part, from the separation

of powers dictated by Article II, Section 1 of the Texas Constitution). Those duties include our obligation, as the head of the judicial department, to regulate judicial affairs. Because the admission and practice of Texas attorneys is inextricably intertwined with the administration of justice, the Court must have the power to regulate these activities in order to fulfill its constitutional role. *See generally* JIM R. CARRIGAN, INHERENT POWERS OF THE COURTS 2 (1973) (defining inherent powers as those "reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective"). The Court's inherent powers, such as the power to regulate the practice of law, are not *jurisdictional* powers. *See Eichelberger,* 582 S.W.2d at 399. These powers are *administrative* powers, necessary to the preservation of the judiciary's independence and integrity.

 [5]  [6]   Because the Court's power to regulate the practice of law is an administrative one, the exercise of that power does not in and of itself deprive lower courts of general subject matter jurisdiction over challenges to that governance. They do not, however, have jurisdiction over *all* such challenges because in every individual case, jurisdiction also depends on justiciability. And, as the court of appeals acknowledged, for a controversy to be justiciable, there must be a real controversy between the parties that will be actually resolved by the judicial relief sought. 856 S.W.2d 804, 811 (citing *Texas Ass'n of Business,* 852 S.W.2d at 446 and **\*246** *Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955)). While we do not find it necessary to set the precise boundaries of the district court's jurisdiction under these circumstances, we hold that these facts do not present a justiciable controversy and that the district court therefore has no jurisdiction.

 [7]   Gomez seeks to compel either the State Bar or this Court to implement a mandatory pro bono program for Texas lawyers. To the extent a remedy is sought against the State Bar, Gomez seeks relief from an entity that is powerless, acting alone, to implement that remedy. The State Bar's authority is limited to proposing regulations to this Court, which may accept or reject any recommendation, in whole or in part. *See* TEX.GOV'T CODE § 81.024(a). For example, when the latest amendment to the rules governing lawyer advertising was recommended by the State Bar, we modified the proposed amendment before promulgation. *See* Amended Order of Promulgation and Adoption of Disciplinary Rules, West's Texas Cases Advance Sheet 884–885 issue 49, pp. LXIX–LXXXI. Thus, the relief sought against the State Bar,

even if granted by the trial court, could not resolve the dispute between these litigants.

 **[8]**    Moreover, to the extent the remedies are sought against the Supreme Court, they would clearly impinge on the Court's exclusive authority to regulate the practice of law. The Legislature itself implicitly acknowledged the Court's fundamental authority in this area when it enacted the State Bar Act as *an aid* to the Court in carrying out this function. *See* TEX.GOV'T CODE § 81.011(b). No subordinate court in Texas has the power to usurp our authority or responsibility in this area. The dissenting justices acknowledge this limitation when they say, "An injunction mandating this court or the State Bar to implement a mandatory pro bono program would be improper. It would inappropriately involve the district court in the regulation of the practice of law." *Infra,* 891 S.W.2d at 252 (citations omitted).

This is not to say that all remedies bearing upon the regulation of the legal profession would be unacceptable infringements on the inherent powers of the Court. Had this Court actually promulgated rules establishing a pro bono program and had Gomez challenged the constitutionality of such rules, the district court would have jurisdiction to decide, in the first instance, whether such rules met constitutional standards. *See O'Quinn v. State Bar,* 763 S.W.2d 397 (Tex.1988) (upholding the trial court's decision on a constitutional challenge to the rules of disciplinary conduct promulgated by the Court). In due course, we would review any adverse determination in our adjudicative capacity. *See Cameron v. Greenhill,* 582 S.W.2d 775, 777 & n. 3 (Tex.1979) (holding that the Court could both promulgate a rule and determine its constitutionality). The important distinction between such a case and the one at hand is that in the former case, the district court would not be cast in the impermissible role of effectively promulgating policies and regulations governing Texas lawyers. Such a case would be justiciable because the district court would be capable of rendering a judgment that accords the parties complete relief, subject of course to appellate review.

But when, as here, the essence of a complaint is that this Court has failed to establish rules governing some aspect of lawyer conduct, a district court has no authority to assume this Court's authority to regulate the legal profession. This prohibition includes the rendition of orders that would, as a practical matter, preempt this Court's authority. Because the district court cannot effect a remedy that would resolve this dispute, this case does not present

a justiciable controversy. Once again, acknowledging the limitations on the district court's authority in this area, the dissenting justices nevertheless contend, "The district court does, however, have jurisdiction to issue a mandatory injunction which requires the State Bar to implement a more effective *voluntary* pro bono program calculated to meet constitutional and statutory demands which may exist." *Infra,* 891 S.W.2d at 252 (emphasis added). We are at a loss to understand, and the dissenting justices do not explain, how a mandatory injunction to enforce a *voluntary* program could ever be enforced by any court. By limiting the district court's jurisdiction to such illusory relief, the dissenting justices have, in effect, conceded that the **\*247** trial court cannot grant plaintiffs the real relief they seek.

Our decision that the district court lacks jurisdiction does not, however, leave the parties without a forum in which to seek redress of their grievances. This Court, in the exercise of its constitutional responsibilities, wants and needs input from interested persons concerning its supervisory responsibility over Texas lawyers. Ordinarily, interested parties would be free to informally petition this Court in its administrative capacity, to urge reconsideration of the proper constitutional mandates for this Court's regulation of attorney conduct. However, given the potentially far-reaching effects of this particular challenge to our scheme of regulation, we direct that this matter be placed on the Court's administrative agenda for further consideration. All interested parties have until April 14, 1995, to submit their written arguments on the merits of the underlying claims. *Cf. Barger v. Brock,* 535 S.W.2d 337, 342 (Tenn.1976) (ordering a lower court to dismiss a challenge to the Supreme Court's rules but directing the lower court to forward the petitions for further consideration as a direct motion in the Supreme Court).

Accordingly, we reverse the judgment of the court of appeals and remand to the district court with instructions to dismiss for want of jurisdiction.

DOGGETT, J., dissents.

GONZALEZ, Justice, concurring.

This case presents significant issues of public policy. Respondents seek a court declaration that indigent citizens of our State are entitled to free legal services in civil cases. They also seek an injunction that would require the State Bar of Texas to implement a program mandating pro bono legal services from all attorneys licensed to practice law in Texas. [1]

For the reasons stated in the majority opinion, I agree with the trial court and this Court that this case does not present a justiciable controversy within the trial court's jurisdiction. I thus concur in the judgment.

I write separately because I disagree with the Court prolonging resolution of the mandatory pro bono issue by placing the matter "on the Court's administrative agenda for further consideration." 891 S.W.2d at 247. This procedure is unnecessary, and it gives Respondents false hope that a majority of the Court is seriously considering implementing such a sweeping change in the practice of law in Texas. As for the invitation for interested parties to submit more briefs to the Court, I think that any information which anyone gives the Court will merely duplicate what we already have for determining the merits of Respondents' request. The issue of how to provide legal services for the indigent is a problem in our society that has been widely debated and studied. More hearings, briefs, or argument before us will be of little utility.

Mandating any program for legal services to the poor is a political question, over which this Court in its administrative capacity and the Legislature would have jurisdiction. However, in my opinion, any attempt to draft and implement such a program would unnecessarily divert the Court from its primary business of adjudicating disputes. The Legislature is better suited to undertake the activities necessary for drafting and implementing a program to provide indigents legal services. Different program options, as well as their legal and constitutional ramifications, will need to be considered. Since the problem of access to legal services faces society as a whole, the burden of resolving it does not solely rest on the legal profession.

I acknowledge that a very real problem exists for individuals who seek legal representation but lack the financial resources to retain counsel. Studies clearly document that our poor citizens need greater access to legal services. *See, e.g.,* COMMITTEE ON LEGAL SERVICES TO THE POOR IN CIVIL MATTERS, STATE BAR OF TEXAS, REPORT ON MANDATORY PRO BONO (1991); STATE BAR OF TEXAS ET AL., LEGAL NEEDS OF THE POOR ASSESSMENT PROJECT (1991). This need led the Court to create the Texas Equal Access to Justice foundation in 1984 to administer the voluntary **\*248** IOLTA (Interest on Lawyers' Trust Accounts) program.[2] *See* TEXAS EQUAL ACCESS TO JUSTICE PROGRAM §§ 1–9 (effective May 19, 1994), *reprinted in* TEX.GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULESS art. XI, §§ 1–9). In December,

1988, we signed an order that made the IOLTA program mandatory. *Id.* (amended December 13, 1988). We took this action under our authority to regulate the practice of law.

Realistically, the Court has progressed as far as it can to extend legal services to the poor. A mandatory pro bono program is quite different from the IOLTA program. This Court lacks the resources and/or the political will to attempt further resolution of the profound problem of providing legal services for indigent citizens. I would tell Respondents frankly that we are not going to order mandatory pro bono. The Legislature is better suited to tackle this social problem.

HIGHTOWER, Justice, joined by GAMMAGE and SPECTOR, Justices, dissenting.

Because I believe that the district court has jurisdiction of this suit and that the Court would effectively deny the Plaintiffs' access to a meaningful forum in which to seek redress of their grievances, I respectfully dissent.

## I.

The jurisdictional inquiry begins with Article V, Section 8 of the Texas Constitution which provides in part:

> District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings and remedies, *except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal or administrative body.*

Tex. Const. art. V, § 8 (emphasis added). The district court held that it lacked jurisdiction because the legislature had conferred jurisdiction over matters concerning the administration of the State Bar upon this Court in the State Bar Act. *See* Tex.Gov't Code Ann. § 81.011(c) (West 1988). I disagree.

What the legislature conferred upon this Court was "*administrative control*" over the state bar." Tex.Gov't Code Ann. § 81.011(c) (West 1988) (emphasis added). "Jurisdiction" within the meaning of Article V, Section 8 includes only the *judicial* powers of the courts. These judicial powers are typically the only ones at issue when the Court

makes statements such as: "[J]udicial power is divided among the various named courts by means of express grants of 'jurisdiction.' " *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398 (Tex.1979) (citing *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641 (1933)). But Texas courts have duties in addition to their judicial responsibilities.

I do not disagree that this Court's inherent power to regulate the practice of law is more expansive than the administrative authority that the legislature has "granted" to us. *See Daves v. State Bar,* 691 S.W.2d 784 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.) (noting the Court's inherent power to adopt rules governing the practice of law by extra-statutory means); *see also* Tex.Gov't Code Ann. § 81.011(b) (West 1988) (stating that the State Bar was a legislative creation passed to *aid* the Court in exercising its judicial power). *See State Bar v. Heard,* 603 S.W.2d 829, 831 (Tex.1980). Even so, it does not necessarily follow that this inherent power is so great that it deprives the state's courts of general jurisdiction of the authority to hear a challenge pertaining to the governance of the legal profession.

The proper question to determine whether the district court has jurisdiction over this case is not whether this Court, in its administrative capacity, *could* act in a manner that would decide or moot the issues raised. Rather, three questions must be asked: (1) **\*249** whether the State Bar and its officers are the proper parties in this case; (2) if so, whether the district court is an appropriate forum to hear a matter over which this Court exercises such extensive authority; and (3) whether the failure to act, as opposed to an affirmative action, nevertheless presents an issue over which the district court may exercise authority. I would answer all three questions in the affirmative.

However couched, the Plaintiffs' claims are actually directed not so much at the State Bar [1] as at an alleged deficiency in the current system of lawyer regulation established by this Court and the legislature. This Court, both by legislative grant and its inherent powers, possesses authority to regulate the practice of law and exercises control over the State Bar. *See* Tex.Gov't Code Ann. §§ 81.011, 81.024(a) (West 1988) (clarifying this Court's supervisory role over the State Bar); *State Bar v. Heard,* 603 S.W.2d at 831 ("The State Bar Act was passed in aid of this court's exercise of its inherent power to regulate the practice of law.") (footnotes omitted). The legislature recognized the Court's fundamental responsibility in this area when it passed the State Bar Act "in aid of the judicial department's powers under the constitution

to regulate the practice of law." Tex.Gov't Code Ann. § 81.011(b) (West 1988).

The State Bar's actual power in this regard is limited to proposing regulations to this Court, which could reject or amend any such recommendation. Under a strict concept of justiciability, one could argue that there is no justiciable controversy between the State Bar and the Plaintiffs. *See Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955) (defining "justiciable controversy" as the requirement that there shall be a real controversy between the parties that will actually be determined by the judicial declaration sought). On the other hand, more modern notions of justiciability would acknowledge that the State Bar is an acceptable "surrogate defendant" for the Court in this matter. In fact, the State Bar has served as such a surrogate in several recent cases. *See, e.g., O'Quinn v. State Bar,* 763 S.W.2d 397 (Tex.1988); *State Bar v. Tinning,* 875 S.W.2d 403 (Tex.App.—Corpus Christi 1994, writ denied); *Musslewhite v. State Bar,* 786 S.W.2d 437 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Daves v. State Bar,* 691 S.W.2d 784 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). [2] For these reasons, I conclude that the district court's jurisdiction is not suspect on this basis.

## II.

Next we must decide whether the district court has subject matter jurisdiction over a challenge to an administrative decision of this Court. I believe the answer is yes. Promulgating court rules in our administrative capacity does not and cannot imply a concomitant determination by this Court in its judicial capacity that such rules are constitutional in every respect. Hopefully, this Court does not abandon its collective knowledge of the Constitution when it exercises its rulemaking authority, and surely it would not knowingly promulgate any rule it regarded as violating the United States or Texas Constitutions. However, we are not omniscient. It is simply beyond the capacity of this or **\*250** any other court to envision every possible constitutional ramification or factual application of its orders or rules, particularly before it has the benefit of a case and controversy that vigorously explores both sides of the issues. *See* Order of the Supreme Court of February 28, 1966, Transmitting Amendments to Rules of Civil Procedure, 383 U.S. 1029, 1032 (Black, J., dissenting) (stating that "the Court's transmittal does not carry with it a decision that the amended rules are all constitutional" because "such a decision would be the equivalent of an advisory

opinion which, I assume the Court would unanimously agree, we are without constitutional power to give."); *Grand Bahama Petroleum Co. v. Canadian Transp. Agencies,* 450 F.Supp. 447, 450 (W.D.Wash.1978) (holding that the district court had jurisdiction to consider a constitutional challenge to a federal rule of civil procedure, noting that "[w]hile the [United States Supreme] Court certainly considers the constitutionality of a rule recommended by a committee, it is not possible for its members to anticipate every constitutional objection."). This is especially true when, as here, it is the *failure* to provide for some constitutionally mandated system that is alleged.

Nor would the mere determination by the district court that the current system is constitutionally deficient invade this Court's inherent power to regulate the practice of law. We have no inherent power to create a system that violates the Constitution, just as the legislature has no power to pass unconstitutional statutes. *See Reese v. State,* 772 S.W.2d 288, 290 (Tex.App.—Waco 1989, pet. ref'd) (reasoning that a court may not enact a procedural rule that conflicts with a provision of the constitution); *Picard v. State,* 631 S.W.2d 761, 763 (Tex.App.—Beaumont 1981, no writ) (holding that the rule-making authority of any court may not conflict with constitutional provisions and that any unconstitutional rule is inoperative). For example, the Constitution provides that this Court may not appoint to the State Commission on Judicial Conduct more than one judge from the same Supreme Judicial District. Tex. Const. art. V, § 1–a(2). If the Court breached this restriction, surely it would be answerable to the legal system. If this be conceded, there can be only two possible mechanisms to enforce constitutional restrictions on the Court acting in its administrative capacity: a suit against the Court in a lower court or an original proceeding in the Court itself. Either of these courses is permissible, but at least one is necessary. Under the Court's analysis, however, there is no mechanism to enforce constitutional restrictions on the Court acting in its administrative capacity. In this case, the Plaintiffs are left without a meaningful forum in which to seek redress of their grievances. The Court has directed "that this matter be placed on the Court's administrative agenda for further consideration." In essence, the Court suggests that the Plaintiffs directly petition the Court for redress of their "complaint." However, the Court is not required to consider or take any action on the "petition"—ever! Obviously this does not constitute a meaningful forum. [3] It is also unclear whether the Plaintiffs could seek redress of their grievances in the Legislature. Based upon the Court's expansive description of its inherent powers to regulate the practice of law, it

is doubtful that the Legislature has the power to impose a mandatory pro bono system upon the State Bar.

Some state supreme courts have expressly provided for the filing of petitions challenging their orders and rules directly with that court. *See, e.g., Aldridge v. Watling Ladder Co.,* 275 Ark. 225, 628 S.W.2d 322, 323 (1982) (holding that a case involving construction of supreme court rule should have been certified to supreme court under Supreme Court Rule 29(1)(c)); **\*251** *Goetz v. Harrison,* 153 Mont. 403, 457 P.2d 911, 912 (1969) (stating that questions involving the constitutionality of a supreme court rule should be presented to the supreme court in an "appropriate original proceeding.")

This Court has, with narrow exceptions, never provided such a procedure. [4] Because supreme court rules must comport with the Constitution and because the judicial branch is entrusted with interpreting the Constitution, jurisdiction to consider challenges to rules must exist at the district court level. This view comports with the general understanding of Texas law, and with what is probably the majority rule in most of the states that have been confronted with the issue. *See, e.g., Beard v. North Carolina State Bar,* 320 N.C. 126, 357 S.E.2d 694, 695 (1987) (holding that a "direct challenge of the constitutionality of an order of this Court ... must be litigated as an original action in the General Court of Justice."); *Berberian v. Kane,* 425 A.2d 527, 528 n. 2 (R.I.1981) (holding that a rule may be challenged in a case seeking declaratory judgment that the rule was unconstitutional).

### III.

The question remains whether this case is nonjusticiable because the district court does not have jurisdiction to grant the relief sought. Plaintiffs seek a declaratory judgment that the State Bar is violating their constitutional and statutory rights. Among other things, Plaintiffs requested that the district court "[d]eclare that the official policies, actions, and failure to act alleged herein, which involve the refusal to Defendants to adequately provide for the legal services needed by Plaintiffs and the class, violate the Texas Constitution and Tex.Civ.Prac. & Rem.Code § 106.001." Plaintiffs also seek an injunction prohibiting the State Bar from continuing to violate the rights of indigent citizens and an injunction mandating the State Bar to implement an adequate and more effective pro bono program. First, declaratory relief is proper whether or not further relief is or could be claimed. *See* Tex.Civ.Prac. & Rem.Code Ann.

§ 37.003(a). The district court has the authority to render a judgment declaring the constitutional and statutory rights of Plaintiffs and, also, to declare whether such rights have been violated. See Tex.Civ.Prac. & Rem.Code Ann. § 37.003. I fail to see the distinction between the district court's jurisdiction to determine the constitutionality of the official policies, actions, and failure to act caused by the refusal of the State Bar to adequately provide for the legal services needed by Plaintiffs *and* the district court's jurisdiction to determine the constitutionality of rules proposed by the State Bar and promulgated by this Court. In both cases, the district court's determination could be reviewed by this Court in its adjudicative capacity. Contrary to the Court's assertion, the determination of the constitutionality of the refusal to the State Bar to adequately provide for the legal services needed by Plaintiffs would not cast the district court in the role of effectively promulgating policies and regulations governing Texas lawyers.

Concerning injunctive relief, a prohibitory injunction, one prohibiting the State Bar from continuing to violate Plaintiffs' rights, would be proper in the event the district court holds such rights are being violated. It is axiomatic that a court has the power to enforce its orders determining the legal rights of the parties. *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644–45 (1933). "Reason and experience argue that courts empowered ... [to decide] constitutional mandates cannot be left without the means to order appropriate relief." *Terrazas v. Ramirez,* 829 S.W.2d 712, 718 (Tex.1991). Furthermore, a mandatory injunction could also be proper. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 399 (Tex.1989); *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491, 494 (Tex.1991); *Terrazas,* 829 S.W.2d at 717–20. However, courts should tread lightly when dealing with powers traditionally reserved to other areas of government. For example, in *Terrazas,* although we held that the courts could order apportionment, we were careful to state,

> **\*252** [T]hat power ought to be used only after investigation and careful consideration of the many, diverse interests affected, after due deference to the Legislature to rectify its own statutes, and after due regard for the effect of the court's order on the election process.

829 S.W.2d at 718. Likewise, in *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d at 399, we stated, "Although we have ruled the school financing system to be unconstitutional, we

do not now instruct the legislature as to the specifics of the legislation it should enact...."

Moreover, a court should not overstep the line between adjudication and regulation. Regulation of the practice of law is within the exclusive control of this Court. Tex.Gov't Code Ann. § 81.011(c) (Vernon 1986); *Daves v. State Bar,* 691 S.W.2d 784, 788–89 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). An injunction mandating this Court or the State Bar to implement a mandatory pro bono program would be improper. It would inappropriately involve the district court in the regulation of the practice of law. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d at 399; *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d at 493–94. The district court does, however, have jurisdiction to issue a mandatory injunction which requires the State Bar to propose and implement a more effective voluntary pro bono program calculated to meet constitutional and statutory demands which may exist. *Id.* In addition, the district court would have jurisdiction to issue a mandatory injunction which requires the State Bar to propose regulations creating a mandatory pro bono program to this Court.

Finally the question remains whether this case is nonjusticiable because it alleges constitutional sins of omission. I believe that the Plaintiffs' complaint that the State Bar has failed to act as required by various constitutional and statutory provisions does not affect the justiciability of their claims. Distinctions between an act and an omission in this context are not helpful. *See generally* Lisa E. Heinzerling, Note, *Actionable Inaction: Section 1983 Liability for Failure to Act,* 53 U.CHI.L.REV. 1048, 1057–63 (1986) (criticizing the entire act/omission analysis in the context of governmental responsibilities under the Constitution, primarily because its tort-based reasoning is ill-suited to explain existing doctrine). If this Court concluded that the district court lacked jurisdiction over the Plaintiffs' claims because they allege an omission rather than an act, the Plaintiffs could simply recast their allegations. Thus, the difference between acts and omissions in this highly unusual context seems semantic. *See* David A. Fischer, *Causation in Fact in Omission Cases,* 1992 UTAH L.REV. 1335, 1339 ("[A]s a matter of semantics, any omission can be characterized as part of a larger encompassing act."). The mere fact that the Plaintiffs have alleged an unconstitutional omission cannot deprive the district court of jurisdiction when it clearly would have jurisdiction to review an unconstitutional act.

For the foregoing reasons, I respectfully dissent.

**Parallel Citations**

38 Tex. Sup. Ct. J. 140

Footnotes

1    This disposition of the limited issue before us means that we do not, as Justice Gonzalez's concurring opinion does, comment on the merits of the underlying claims.

2    TEX.CIV.PRAC. & REM.CODE § 106.001. This statute generally prohibits the state or its agents from discriminating against persons because of race, religion, color, sex, or national origin. Remedies available to a successful litigant include injunctive relief, attorney's fees, and court costs. *Id.* § 106.002. A person who knowingly violates this statute is subject to a fine and confinement in the county jail. *Id.* § 106.003.

3    TEX.DISCIPLINARY R.PROF.CONDUCT, pmbl. ¶ 6, *reprinted in* TEX.GOV'T CODE, tit. 2, subtit. G app. (West Supp.1992) (STATE BAR RULES art. X, § 9) ("The provision of free legal services to those unable to pay reasonable fees is a moral obligation of each lawyer as well as the profession generally.").

4    Texas Lawyer's Creed—A Mandate for Professionalism (adopted by the Supreme Court of Texas and the Court of Criminal Appeals of Texas, Nov. 7, 1989), *reprinted in* TEXAS RULES OF COURT 487 (West 1994). In the Creed, lawyers are urged to commit themselves "to an adequate and effective pro bono program." *Id.*

5    Section 8 defines the district courts' jurisdiction, but excepts those cases where jurisdiction has been conferred on some other court. *See* TEX. CONST. art. V, § 8. The district court held that this Court's power to regulate the practice of law was sufficient to bring this case within Section 8's exception.

1    Respondents deny that they are seeking a mandatory pro bono program, but they do not suggest any other method of providing legal services to the indigent.

2    The IOLTA foundation administers a program wherein lawyers convert their non-interest bearing trust accounts to interest bearing accounts. Financial institutions remit all interest earned on IOLTA accounts to the IOLTA foundation. The foundation in turn channels money to organizations that deliver civil legal services to the poor. Since inception of the mandatory IOLTA program, the foundation has distributed approximately $42 million to assist people unable to afford an attorney in civil actions.

1    The current pro bono policy was adopted by the State Bar of Texas Board of Directors in May 1992. The policy includes an aspirational goal of fifty (50) hours per year and an annual voluntary pro bono reporting system.

2    We need not decide in this case whether Plaintiffs could have proceeded against this Court itself. Like other state courts of last resort, we have been named defendants in district court at least once before. *Cameron v. Greenhill,* 582 S.W.2d 775 (Tex.1979); *see also CWA Local 1044 v. Chief Justice of the Sup. Ct.,* 118 N.J. 495, 572 A.2d 613 (1990) (challenging a New Jersey Supreme Court decision made in the course of labor negotiations with its judicial employees); *American Trial Lawyers Ass'n v. New Jersey Sup. Ct.,* 66 N.J. 258, 330 A.2d 350 (1974) (challenging a New Jersey Supreme Court order limiting contingent attorney's fees in certain tort cases); *Vermont Sup. Ct. Admin. Directive No. 17 v. Vermont Sup. Ct.,* 154 Vt. 217, 576 A.2d 127 (1990) (challenging a Vermont Supreme Court order postponing civil jury trials due to budgetary shortfalls). But some jurisdictions expressly proscribe suing the state's highest court. *See, e.g., Goetz v. Harrison,* 153 Mont. 403, 457 P.2d 911 (1969) (holding that a lower court has no supervisory control over the Supreme Court and thus cannot entertain a challenge to a Supreme Court rule relating to bar admissions).

3    It is unclear whether the Court is creating a "parallel administrative docket" in which interested persons could petition the Court for various forms of relief. Are these "petitioners" entitled to timely consideration of their petition and oral argument? *See Barger v. Brock,* 535 S.W.2d 337, 342 (Tenn.1976) ("[I]n order that the parties may have their insistences considered, we direct that all pleadings in this cause be delivered to the Clerk of this Court at Nashville forthwith. This Court will treat the pleadings as constituting a motion to vacate or modify Rule 42. This matter will be docketed for oral argument, in Knoxville, at the heel of the calendar on 7 May 1976. Briefs will be filed with the Clerk in Nashville by 23 April 1976. The sole issue before the Court is the constitutionality of Rule 42.").

4    Our lack of an original proceeding may actually be salutary. This Court's resolution of complex questions concerning the constitutionality of our rules would most likely be enhanced by the fuller development of issues and arguments that usually attend the appellate process.

---

**End of Document**                                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** City of McKinney v. Hank's Restaurant Group, L.P., Tex.App.-Dallas, September 18, 2013

893 S.W.2d 432
Supreme Court of Texas.

TEXAS EDUCATION AGENCY et al., Petitioners,
v.
Gary W. LEEPER et ux. et al., Respondents.

No. D–2022. | June 15, 1994. | Rehearing Overruled March 16, 1995. | Opinion by Justice Gonzalez Concurring in Part and Dissenting in Part on Rehearing filed March 16, 1995.

Home school parents and home school curriculum providers brought class action suit against state officials, challenging construction of compulsory attendance law. The District Court No. 17, Tarrant County, Charles J. Murray, J., awarded declaratory and injunctive relief, and state appealed. The Fort Worth Court of Appeals, Hal M. Lattimore, J., 843 S.W.2d 41, affirmed, and writ of error was sought. The Supreme Court, Hecht, J., held that home school can be private school within meaning of statutory exemption to compulsory attendance law, so long as children are taught in bona fide manner from curriculum designed to meet basic education goals.

Affirmed in part and reversed in part.

Gonzalez, J., concurred in part, dissented in part, and filed opinion.

**Attorneys and Law Firms**

**\*433** Janet Little Horton, Houston, S. Anthony Safi, El Paso, John Owens, Dan Morales and James C. Todd, Austin, for petitioners.

Chester G. Ball, Arlington, J. Shelby Sharpe, Fort Worth, Morris Harrell, Dallas, John W. Whitehead, Charlottesville, VA, for respondents.

**Opinion**

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HIGHTOWER, DOGGETT, CORNYN, GAMMAGE, ENOCH and SPECTOR, Justices, join, and in Parts I, II and III of which GONZALEZ, Justice, joins.

All school-age children in Texas are required to attend public schools a minimum number of days each year unless exempted by law. TEX.EDUC.CODE § 21.032. Among those exempt from this requirement is "any child in attendance upon a private or parochial school which shall include in its course a study of good citizenship". *Id.* § 21.033(a)(1). The dispute in this class action centers on whether the private school exemption includes children who are taught at home, in a bona fide manner, a curriculum designed to meet certain basic education goals, including a study of good citizenship. The district court construed the exemption to include such children and permanently enjoined all school districts and their attendance officers from enforcing the compulsory attendance law based upon any other reading of § 21.033(a)(1). The district court also awarded attorney fees. The court of appeals affirmed. 843 S.W.2d 41.

The relative merits of home schooling and public education are currently the subject of a vigorous and sometimes emotional debate in which the legal issues we address here do not require us to take part. We agree that Texas law does not require children who are taught in legitimate home schools to attend public schools. We therefore affirm the lower courts' construction of § 21.033(a)(1) and the award of attorney fees. The State has charged a number of parents who educate their children at home with criminal violations of the compulsory attendance law. The district court enjoined all further such

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

prosecutions not based upon a proper construction of the private school exemption. We conclude, however, that a permanent injunction against school districts and their agents is unwarranted, as there is no showing that school officials will refuse to abide by our decision in this case. Accordingly, we reverse the injunctive portion of the lower courts' judgments.

# I

## A

The important features of the historical backdrop to this litigation are not among the issues in dispute and may be described as follows.

At the beginning of this century the public school system of Texas was not well developed. No more than ten percent of school-age children attended public schools, according **\*434** to the uncontradicted evidence at trial, and as there were few private and parochial schools in the State, many children were taught at home.

Public school attendance was not mandatory in Texas until 1916. The first compulsory attendance law, enacted the prior year, required children between eight and fourteen years of age to attend public school for 60 days during the 1916–1917 school year, 80 days the following year, and 100 days each year afterward. Act of March 8, 1915, 34th Leg., R.S., ch. 49, § 1, 1915 Tex.Gen.Laws 92, 93. Parents (and persons acting as parents) were responsible for assuring that children complied. *Id.* § 9, at 96–97. Failure to discharge this responsibility was a misdemeanor punishable by a fine, unless the person in the parental role could not control the child. *Id.* A child who refused to attend school could be disciplined by the juvenile court as a habitual truant. *Id.* The statute authorized appointment of attendance officers to enforce its provisions. *Id.* §§ 6–7, at 94–95.

Over the years the details of these statutory provisions have changed, but the basic structure remains in place.[1] Now children from about six to seventeen years of age must attend public school at least 170 days each school term. TEX.EDUC.CODE § 21.032(a).[2] A parent or person in that role who has been warned in writing to require a child to comply with the compulsory attendance law, and who fails to do so, may be fined, and a child's refusal to attend school may be sanctioned by the juvenile court. *Id.* § 4.25(a)-(b);[3] **\*435** TEX.FAM.CODE § 51.03(b)(2).[4] Each day a child is absent after warning is given or attendance is ordered is a separate offense. TEX.EDUC.CODE § 4.25(a). Also, a parent's rights in a child may be terminated if the parent fails to enroll a child in public school as required by law. TEX.FAM.CODE § 15.02(a)(1)(J)(i).[5]

---

[1]  Present statutes omit one significant provision of the 1915 law: "Any child within the compulsory school attendance ages who shall be insubodinate [sic], disorderly, vicious or immoral in conduct, or who persistently violates the reasonable rules and regulations of the school which he attends, or who otherwise persistently misbehaves therein so as to render himself an incorrigible, shall be reported to the person exercising the duties of attendance officer of said school, who shall proceed against such child in the juvenile court as herein provided." Act of March 8, 1915, 34th Leg., R.S., ch. 49, § 9, 1915 Tex.Gen.Laws 92, 97.

[2]  "Unless specifically exempted by Section 21.033 of this code or under other laws or unless a child is at least 17 years of age and has been issued a high school equivalency certificate, every child in the state who is as much as six years of age, or who is less than seven years of age and has previously been enrolled in first grade, and who has not completed the academic year in which his 17th birthday occurred shall be required to attend the public schools in the district of his residence or in some other district to which he may be transferred as provided or authorized by law a minimum of 170 days of the regular school term of the district in which the child resides or to which he has been transferred."

[3]  Until 1993, § 4.25 provided as follows:
      (a) If any parent or person standing in parental relation to a child, within the compulsory school attendance ages and not lawfully exempt or properly excused from school attendance, fails to require such child to attend school for such periods as required by law, it shall be the duty of the proper attendance officer to warn, in writing, the parent or person standing in

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

parental relation that attendance must be immediately required. If after this warning the parent or person standing in parental relation intentionally, knowingly, recklessly, or with criminal negligence fails to require the child to attend school as required by law, the parent or person standing in parental relation commits an offense. The attendance officer shall file a complaint against him in the county court, in the justice court of his resident precinct, or in the municipal court of the municipality in which he resides or in the municipality or justice of the peace precinct in which the school is located. In addition, if the child has been voluntarily absent from school for 10 or more days or parts of days within a six-month period or three or more days or parts of days within a four-week period without the consent of his parents, the attendance officer shall refer the child to the county juvenile probation department for action as conduct indicating a need for supervision under Section 51.03(b), Family Code. A court in which a complaint is filed under this subsection shall give preference to a hearing on the complaint over other cases before the court. An offense under this section is punishable by a fine of not less than $5 nor more than $25 for the first offense, not less than $10 nor more than $50 for the second offense, and not less than $25 nor more than $100 for a subsequent offense. Each day the child remains out of school after the warning has been given or the child ordered to school by the juvenile court may constitute a separate offense. If the court probates the sentence, the court may require the defendant to render personal services to a charitable or educational institution as a condition of probation.

(b) It is a defense to prosecution under Subsection (a) of this section that the parent or person standing in parental relation to the child is unable to compel the child to attend school.

In 1993, there were three amendments, each without reference to the others, to this version of § 4.25. *See* Act of May 18, 1993, 73rd Leg., R.S., ch. 358, § 2, 1993 Tex.Gen.Laws 1528, 1629–30; Act of May 28, 1993, 73rd Leg., R.S., ch. 347, § 6.01, 1993 Tex.Gen.Laws 1479, 1527–28; Act of May 29, 1993, 73rd Leg., R.S., ch. 930, § 1, 1993 Tex.Gen.Laws 3949, 3950. None of these amendments are important to the issues in this case.

[4]     "Conduct indicating a need for supervision is ... the unexcused voluntary absence of a child on 10 or more days or parts of days within a six-month period or three or more days or parts of days within a four-week period from school without the consent of his parents...."

[5]     "[A] petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that ... the parent has ... been the major cause of ... the failure of the child to be enrolled in school as required by the Texas Education Code...."

The first compulsory attendance statute exempted several classes of children from compliance, including "[a]ny child in attendance upon a private or parochial school or who is being properly instructed by a private tutor." Act of March 8, 1915, 34th Leg., R.S., ch. 49, § 2(a), 1915 Tex.Gen.Laws 92, 93. This provision was amended in 1923 to add two requirements for private and parochial schools and to remove the reference to private tutors, so that the statute was changed to exempt:

> Any child in attendance upon a private or parochial school which shall include in its course a study of good citizenship, and shall make the English language the basis of instruction in all subjects....

Act approved March 23, 1923, 38th Leg., R.S., ch. 121, § 2, 1923 Tex.Gen.Laws 255, 255. At the time, according to all the evidence presented in this case, a child pursuing a bona fide course of study at home designed to meet the basic education goals of reading, spelling, grammar, mathematics and good citizenship was considered to be attending a private school. Thus, the 1923 amendment to the exemption, omitting the reference to private tutors, did not affect children schooled at home. The only other times the exemption was amended was in 1969 and 1971, when the English language restriction was first moved and then dropped. *See* Act of May 7, 1969, 61st Leg., R.S., ch. 289, § 1–3, 1969 Tex.Gen.Laws 871, 871; Act of May 20, 1971, 62nd Leg., R.S., ch. 405, § 40, 1971 Tex.Gen.Laws 1449, 1513. The exemption, as we noted at the outset, is now codified as § 21.033(a)(1), TEX.EDUC.CODE.

Enactment of the compulsory attendance law in 1915 did not end home schooling; some children continued to be educated at home just as they had before. The important fact, for purposes of analysis of the legal issues before us, is that some school-age children have been educated at home since before the compulsory attendance law was passed in 1915, and the State never attempted to prohibit or even restrict home schooling, or to allege a violation of the compulsory attendance law based solely on a child's being taught at home, until 1981.

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

That year, a staff attorney for the Texas Education Agency advised an assistant superintendent for one school district that "home instruction is not one of the enumerated exemptions" to the compulsory attendance law.[6] He added:

[6] The Texas Education Agency is actually the Central Education Agency, which is composed of the State Board of Education, the State Board for Vocational Education, the commissioner of education, and the State Department of Education. TEX.EDUC.CODE § 11.01. The State Board of Education and the State Board for Vocational Education are identical. *Id.* § 11.24. The SBOE, which has fifteen members elected from districts in the state, is responsible for implementing legislative policy for the public school system. *Id.* §§ 11.2101, 11.24. The commissioner of education is the executive officer of the TEA and the SBOE. *Id.* §§ 11.25, 11.52. The State Department of Education is the professional, technical and clerical staff of the TEA. *Id.* § 11.61.

In order to avoid the sanctions of compulsory attendance, home instruction would, **\*436** most likely, have to be qualified as a private school. Unfortunately, there are no provisions in the law which define a private school for these purposes.

... [A]s a result of the present status of the law and as a result of the general absence of legislative guidance in this area, school districts and parents alike would be well advised to proceed with caution in this area. In light of all this confusion, it would appear that the courts would be the proper forms [sic] in which to evaluate any particular home study situation as a prospective exemption from compulsory attendance.

The following year the TEA's assistant general counsel expressed an even stronger position in response to an inquiry by parents considering home schooling:

The compulsory student attendance laws of the State of Texas do not permit students to be taught at home.... The exemption statute provides that a child in attendance upon a private or parochial school which shall include in its course a study of good citizenship is exempt from the requirements of compulsory attendance. There is no exemption for home tutorial programs.

... A school, whether private, public, or parochial, must include retained and qualified teachers; a collection of students from different families; a curriculum that includes the basic academics as are taught in public schools; and some organizational structure that assures that instruction does, in fact, occur.

The continuous policy of this office is based upon much more than a cursory review of the statutes. All of our legal research concludes that a person may not teach their children at home simply by calling their home a private school. If educational programs conducted in a home environment are to be allowed as exemption to the compulsory attendance law, action of the Legislature will be required.

The Legislature took no action, although a number of bills were introduced in 1985.[7] That same year, the Texas Education Agency issued a publication entitled HOUSE BILL 72 AND SUBSEQUENT EDUCATIONAL LEGISLATION: COMPREHENSIVE REFERENCES AND EXPLANATIONS, which included a section devoted to the compulsory attendance law, even though that law was not affected by House Bill 72 or any subsequent educational legislation. For the first time, the TEA published its interpretation of the private school exemption:

[7] Tex.H.B. 29, 69th Leg., R.S. (1985) (requiring home educators to register, provide at least 170 days of instruction, and maintain attendance and immunization records, and requiring students not to score below the district average on annual tests); Tex.H.B. 431, 69th Leg., R.S. (1985) (exempting persons from compulsory attendance law based upon sincerely held religious belief); Tex.H.B. 673, 69th Leg., R.S. (1985) (exempting children schooled by parents from compulsory attendance law). None of these bills were reported out of committee. House Bill 317, which attempted to amend § 4.25(a) of the Education Code by removing parents and guardians of home schooled students from the class of individuals subject to criminal sanctions for violating the compulsory attendance law, was reported out of committee but defeated on the House floor, apparently for fear that the provision would establish a precedent for regulation of home schools. Tex.H.B. 317, 69th Leg., R.S. (1985).

It is the agency's interpretation that under this compulsory attendance law, private school attendance is an acceptable substitute for public school attendance. However, educating a child at home is not the same as private school instruction

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

and, therefore, not an acceptable substitute.

> If a school district knows of a situation in which a school age student is not being educated in compliance with compulsory attendance statutes, the district should file charges against the parent under the compulsory attendance law.

> **\*437** Correspondence courses are not a legal substitute for attendance at a public or private school.

TEX.EDUC.AGENCY, House Bill 72 and Subsequent Educational Legislation: COMPREHENSIVE REFERENCES AND EXPLANATIONS 213 (1985).

Although the Commissioner of Education testified that the TEA never changed its policy refusing to exempt home schooled students from the compulsory attendance law, the fact remains that there is no evidence of such policy prior to 1981. Nor were the policy statements from 1981–1985 made after hearings or other proceedings before the TEA. Most importantly, the TEA itself now concedes in its briefs and oral argument before this Court that its interpretation of the private school exemption, beginning in 1981 and restated in its 1985 publication, was "anomalous".

## B

Based upon the TEA's policy statements from 1981–1985, school districts and their attendance officers began prosecuting violations of the compulsory attendance law based upon nothing other than the fact that a child was being schooled at home. In all, some 150 prosecutions were initiated, and about 80 of them were actually tried. The State's position in those prosecutions was that a home school was never a private school within the meaning of the statutory exemption, § 21.033(a)(1), and never exempt from the compulsory attendance law.

To halt the State's enforcement of this policy, this class action was filed in March 1985. The district court certified three plaintiff classes: one comprised of parents, another of private schools who furnish curricula for home schools, and the third of other providers of home school curricula. Specifically, the district court defined the first class as those parents—

> who either [a] have enrolled their school-age children in private or parochial schools outside their homes receiving the curricula and instruction of these schools in their homes which includes in the course a study of good citizenship or [b] have established a private school in their homes which involves in its course a study of good citizenship.

Nine married couples with school-age children were named as representatives of the class.[8] Two of the couples had been prosecuted for violating the compulsory attendance law, based upon the TEA's 1981 policy, and two others had been threatened with prosecution.[9] The second class included the Calvert School, Inc., the First Baptist Academy of Dallas, Christian Liberty Academy Satellite Schools, and others "who have established private or parochial schools where the students receive their curricula including a study of good citizenship and instruction in their homes." The third class consisted of Reform Publications, Inc. d/b/a Basic Education, American Christian Schools, Inc., and others "who provide curricula including in their courses a study of good citizenship and instruction for private schools in homes." The Home School Legal Defense Association was named as an individual plaintiff.

[8]     The class representatives were Gary W. and Cheryl Leeper, Bruce and Patricia Smythe, Calvin E. and Wanda Minkler, Quinten T. and Sandra Parten Jr., Tony and Suzanne Martinez, Charles and Corlee Kent, John W. and Helen Jackson Jr., Michael R. and Sally K. Galbraith, and Richard and Kay Wells.

[9]     The Galbraiths and Wells were actually prosecuted; the Leepers and Minklers received letters from school officials threatening prosecution.

The district court also certified a defendant class comprised of all "public school districts and their school attendance

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

officers", represented by three such districts and officers.[10] Besides this class, there were **\*438** four named defendants: the TEA; the Texas Commissioner of Education; the Assistant General Council of the TEA; and the Attorney General of Texas.

[10]    Named as representatives of the defendant class were the Arlington Independent School District and its attendance officer, Max Kidd; the Katy Independent School District and its attendance officer, Helena Blackstock; and the El Paso Independent School District and its attendance officer, Charles F. Hart.

Plaintiffs contended that defendants had misinterpreted the private school exemption and sought a declaration to that effect under the Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011. Plaintiffs also claimed that defendants' enforcement of the compulsory attendance law infringed upon their constitutional rights, in violation of the federal Civil Rights Act, 42 U.S.C. § 1983. Plaintiffs sought an injunction prohibiting all school districts and attendance officers from enforcing the compulsory attendance law against bona fide home schools. Plaintiffs also claimed attorney fees.

Consistent with the TEA's 1985 statement of policy, the Attorney General in his original answer in this suit specifically denied that a home school could be a private school within the meaning of § 21.033(a)(1). No other defendant adopted this position, however, and the Attorney General himself abandoned it in later pleadings. About a year after the suit was filed, on April 12, 1986, the State Board of Education issued a resolution calling upon the Legislature to define the private and parochial school exemption and recommending that school districts follow new standards in applying the exemption pending legislative action.[11] That resolution stated:

[11]    As noted above, *supra* n. 6, the SBOE is the component of the TEA charged with implementing legislative policy.

WHEREAS the State Board of Education has been requested by various parties to define the terms "private or parochial school" as contained in Article 21.033 of the Texas Education Code; and

WHEREAS the legal authority of the State Board of Education to make such definition has been questioned by various entities, including, we are advised, the Texas Legislative Council;

NOW, THEREFORE, the State Board of Education urges the Texas Legislature either to define such terms or specifically to authorize the State Board of Education to do so at its regular session in 1987.

The State Board of Education further recommends to the various school districts of Texas that the following guidelines may be utilized in determining whether an entity is a private or parochial school for the purposes of Article 21.033 pending the action of the Texas legislature:

(1) An entity that is accredited by an accrediting organization recognized by the Commissioner of Education, or

(2) An entity that meets the following criteria:

a. It instructs students in facilities that comply with applicable local fire and sanitation codes;

b. It has a written regular plan of instruction sufficient to meet basic student educational goals;

c. Its students shall annually be administered a recognized nationally norm-referenced standard achievement test. Evidence of such administration and the results thereof shall be furnished upon request to the attendance officer for the public school district in which the private or parochial school is located. The local school district may require that the next administration of such achievement test be by qualified test administrator, or

(3) An entity that furnishes evidence satisfactory to the attendance officer of the school district in which the private or parochial school is located, that it meets the criteria required by the Commissioner of Education for an entity to be accredited by a recognized accrediting organization under (1) of this section.

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

The above guidelines will not be interpreted in such a manner as to interfere with the exercise of religious freedom guaranteed by the United States and Texas Constitutions.

**\*439** Defendants contended that the 1986 resolution—to which the Legislature chose not to respond—mooted plaintiffs' complaints, for reasons we consider in detail below. The district court rejected this contention.

Shortly after the SBOE issued the 1986 resolution, the parties to this action notified the members of the various classes that they had reached agreement concerning the proper construction of § 21.033(a)(1). That construction was to be effectuated by an agreed interlocutory judgment of the district court which provided in part as follows:

> Accordingly, the Court declares that a school-aged child residing in the State of Texas who is regularly and diligently pursuing in the child's home a written curriculum of either a private or parochial school in which the child is enrolled which exists apart from the child's home or which has been obtained from other sources, said curriculum following a regular plan of instruction designed to meet basic educational goals of reading, language arts, mathematics and a study of good citizenship, is considered to be in attendance upon a private or parochial school within the meaning of [§ 21.033(a)(1) ]. The Court further finds that the current curricula of [the named representatives of the second and third plaintiff classes] are written curricula following a regular plan of instruction designed to meet basic educational goals of reading, language arts, mathematics and a study of good citizenship. This finding is made so that the school attendance officers of the public school districts in the State of Texas will be able to identify a curriculum for a school-aged child at home who is considered to be in attendance upon a private or parochial school. The Court also finds that if parents or those standing in the parental relationship to such a child furnish to any public school attendance officer upon his written request the results of a nationally normed standard achievement test which was given in accordance with the instructions accompanying the test and was taken within the preceding twelve (12) months of the written request showing that the child is making reasonable academic progress for that child, then this furnishing shall establish that the child is regularly and diligently pursuing the curriculum being taken.

The agreement did not encompass plaintiffs' claims for injunctive relief, damages and attorney fees. In response to the notice to the classes, a number of members of the first class of plaintiffs appeared before the district court and objected to the proposed agreed judgment. Consequently, the named plaintiffs withdrew from the agreement, and the proposed judgment was never presented to the district court.

Following trial before the bench, the district court rendered judgment in favor of plaintiffs. One portion of that judgment declared the proper construction of the private school exemption in § 21.033(a)(1). We quote the district court's declaration, inserting divisions among its components:

a school-age child

- residing in the State of Texas who is pursuing under the direction of a parent or parents or one standing in parental authority in or through the child's home

- in a bona fide (good faith, not a sham or subterfuge) manner

- a curriculum consisting of books, workbooks, other written materials, including that which appears on an electronic screen of either a computer or video tape monitor, or any combination of the preceding from either (1) of a private or parochial school which exists apart from the child's home or (2) which has been developed or obtained from any source,

- said curriculum designed to meet basic education goals of reading, spelling, grammar, mathematics and a study of good citizenship,

is in attendance upon a private or parochial school within the meaning of Section 21.033(a)(1) of the Texas Education Code and exempt from the requirements of compulsory attendance at a public school.

The court's judgment further provided:

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

> **\*440** This judgment does not preclude the Texas Education Agency, the Commissioner of Education or the State Board of Education from suggesting to the public school attendance officers lawful methods, including but not limited to inquiry concerning curricula and standardized test scores, in order to ascertain if there is compliance with the declaration contained in this judgment. However, this judgment is not to be interpreted as requiring standardized tests in order for there to be compliance with the interpretation made by the court of [§ 21.033(a)(1) ]. The lawful powers of investigation by public school attendance officers and the constitutional rights of persons subject to such investigations are not affected by this judgment.

This construction of § 21.033(a)(1), and the use of standardized tests as one indicia of compliance, are essentially the same provisions to which the parties agreed prior to trial before plaintiffs withdrew their consent.

The district court also held that children of the named representatives of the parent class and children studying materials provided by the named plaintiff institutions at home in a bona fide manner were exempt from the compulsory attendance law. The district court determined that any enforcement of the policy in the 1985 publication or the recommendation in the 1986 resolution would violate plaintiffs' due process and equal protection rights under the United States and Texas Constitutions. The court permanently enjoined all school districts and attendance officers from initiating charges of violations of the compulsory attendance law based upon any construction of § 21.033(a)(1) other than that contained in the court's declaratory judgment. Finally, the court awarded plaintiffs attorney fees against the school districts, but not against any of the other defendants.

The court of appeals concluded that plaintiffs were not entitled to relief under the state declaratory judgments act because the compulsory attendance law is penal. 843 S.W.2d at 48. The court based this conclusion on the rule that the constitutionality of a criminal statute cannot be determined, and its enforcement enjoined, in a civil proceeding absent a showing of irreparable injury to plaintiffs' property rights, which has not been attempted in this case. *Id.; see State v. Morales,* 869 S.W.2d 941 (Tex.1994). The court did not explain why this rule should apply to the private school exemption in § 21.033(a)(1), which is a civil statute distinct from the enforcement provisions of § 4.25, or why the rule should preclude a construction of § 21.033(a)(1) without reference to its constitutionality. The court of appeals did hold, however, that plaintiffs had demonstrated a violation of their constitutional rights to equal protection, and were therefore entitled to all the relief awarded by the district court under the federal Civil Rights Act. 843 S.W.2d at 48–51. In the course of its analysis the court concluded that the district court properly construed the private school exemption. *Id.* at 51–52.

We granted writ of error to review the correctness of the district court's construction of the private school exemption, the propriety of injunctive relief, and the award of attorney fees to plaintiffs.

## II

Before we turn to the central issues in the case, we must address three jurisdictional issues raised by defendants: whether plaintiffs' action was mooted by the SBOE's 1986 resolution; whether plaintiffs seek to construe and enjoin enforcement of a criminal statute over which a civil district court lacked jurisdiction; and whether the TEA's 1986 resolution regarding the private school exemption is an administrative rulemaking.

### A

[1] Defendants contend that plaintiffs' complaints are directed against the TEA's 1985 policy statement which defendants now admit was "anomalous" and which the TEA has abandoned. Defendants argue that plaintiffs meet the standard the SBOE adopted in its 1986 resolution and thus can no longer complain of the TEA's enforcement of the compulsory attendance law.

**\*441** Although there is language in the court of appeals' opinion to suggest that the named individual plaintiffs in the action

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

would meet the standard adopted in the 1986 resolution, 843 S.W.2d at 51–52, the evidence does not bear this out. The first requirement of the 1986 resolution is that the facilities where students are instructed—*i.e.,* plaintiffs' homes—comply with applicable local fire and sanitation codes. There is no evidence that the nine couples named in the action instruct their children in homes that comply with applicable local fire and sanitation codes (or, for that matter, of what those codes require of homes). The third requirement of the 1986 resolution is that students be given nationally norm-referenced standard achievement tests annually. According to the evidence at trial, only one of the nine plaintiff couples met this requirement. Eight of the plaintiff parents testified that they had tested their children at least once, but two testified that they would not do so again because they know without tests how their children are progressing. There is no evidence whether one of the nine couples did or did not give their children achievement tests. Plaintiffs oppose making either of these factors—compliance with building codes or administration of achievement tests—essential to qualification for the private school exemption. With respect to the second requirement of the 1986 resolution—a written plan of instruction sufficient to meet basic student educational goals—plaintiffs agreed that some plan was important but that it did not always need to be written. Moreover, it is not clear whether plaintiffs and the TEA would agree on what are basic student educational goals.

In sum, plaintiffs and defendants do not agree on when home schooled children should be exempt from the compulsory attendance law. Plaintiffs contend that the 1986 resolution does not correctly construe § 21.033(a)(1); defendants disagree. A case is moot when there is no actual controversy between the parties. *City of West University Place v. Martin,* 132 Tex. 354, 123 S.W.2d 638, 639 (1939). The disagreement among the parties in this case is not academic or abstract; it is real and affects the rights and interests of all parties. The case is clearly not moot.

**B**

[2] [3] Defendants argue, and the court of appeals concluded, that the district court had no jurisdiction to construe and enjoin enforcement of § 21.033(a)(1) in a civil proceeding because it is a criminal statute. Defendants and the appeals court are correct that, as a rule, a party cannot seek to construe or enjoin enforcement of a criminal statute in a civil proceeding without a showing of irreparable injury to the party's vested property rights, which showing is absent here. *See State v. Morales,* 869 S.W.2d 941 (Tex.1994). However, the rule does not apply in this case because § 21.033(a)(1) is not a criminal statute.

It clearly is not a criminal statute on its face, and defendants do not argue that it is; rather, they argue that it is *in effect* a defense to prosecution under § 4.25, which clearly *is* a criminal statute, and that the general compulsory attendance provision, § 21.032(a), the exemptions, § 21.033, and the enforcement provision, § 4.25, should all be read together as parts of a penal provision. That the three statutes must be read together cannot be denied: it is impossible to determine whether a fine should be imposed under § 4.25 without determining whether the subject child is exempt from attending public schools under § 21.033. That fact alone, however, does not dictate that a statute which is not criminal on its face must be considered part of one that is, and therefore beyond the jurisdiction of civil courts to construe.

If the sole function of § 21.033 were to define the elements of the offense proscribed by § 4.25, or the elements of a defense to prosecution, the question whether § 21.033 is penal would be much closer. As it is, § 21.033 serves a function unrelated to prosecution under § 4.25. It is part of the basis for determining whether a child who is not in attendance in public school is subject to supervision under § 51.03 of the Family Code, **\*442** and whether a parent of the child may have his or her parental rights terminated for failing to enroll the child in school under § 15.02 of the Family Code. Not only is § 21.033 on its face a civil statute, it also has civil consequences. Defendants cite no authority for treating a statute like § 21.033 as a criminal statute.

[4] Defendants argue that plaintiffs have foregone any claim to relief under the declaratory judgment statutes because they did not perfect an appeal to this Court from the court of appeals' adverse ruling on this issue. Such an appeal, however, was unnecessary. The appellate court's judgment upheld plaintiffs' claims for declaratory and injunctive relief, albeit on the basis of § 1983 and not state law. Since plaintiffs prevailed in the court of appeals, they are entitled to support that court's judgment by any argument, including those that the appellate court rejected. They need not perfect a separate application for writ of error unless they wish to obtain from this Court a different and more favorable judgment. *See Donwerth v. Preston II Chrysler–Dodge,* 775 S.W.2d 634, 639 n. 5 (Tex.1989); *see also id.* at 643 (Ray, J., concurring) (explaining cross-points and separate appeals in intermediate courts and supreme court).

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

Accordingly, we conclude that the district court had jurisdiction to construe § 21.033(a)(1).

## C

[5] Defendants argue that the SBOE's 1986 resolution is an administrative rulemaking which, under the Administrative Procedure Act ["the APA"], can be challenged only by appeal to a district court in Travis County. TEX.GOV'T CODE § 2001.038.[12] The recommendation contained in the resolution, defendants argue, fits squarely within the statutory definition of an administrative rule: "a state agency statement of general applicability that ... implements, interprets, or prescribes law or policy...." *Id.* § 2001.003(6)(A)(i). Plaintiffs respond that the Legislature has not authorized the SBOE to make rules construing private schools generally or § 21.033(a)(1) in particular. Alternatively, plaintiffs argue that the 1986 resolution cannot be a rule because it does not say it is a rule and the SBOE made no attempt in issuing it to comply with the notice and hearing requirements for rulemaking proceedings. Defendants answer that plaintiffs' arguments are precisely the sort of complaints that § 2001.038 of the APA requires to be raised in a district court in Travis County. Defendants also argue that plaintiffs were required to raise their complaints within two years of the issuance of the 1986 resolution under § 2001.035 of the APA.[13]

[12]  The law governing administrative rulemaking in 1986, TEX.REV.CIV.STAt.Ann. ART. 6252–13A, HAS SINCE BEEN RECODIFIED AS CHAPTER 2001 OF THE GOVERNMENT CODE. FOR PURPOSES OF THIS CASE THE REPEALED PROVISIONS ARE IDENTICAL TO THE RECODIFIED PROVISIONS, AND WE REFER TO THE LATTER.
Section 2001.038 provides in pertinent part:
"(a) The validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.
"(b) The action may be brought only in a Travis County district court."

[13]  "(a) A rule adopted after January 1, 1976, is not valid unless a state agency adopts it in substantial compliance with Sections 2001.023 through 2001.034 [prescribing notice, hearing, and other requirements].
"(b) A person must initiate a proceeding to contest a rule on the ground of noncompliance with the procedural requirements of Sections 2001.023 through 2001.034 not later than the second anniversary of the effective date of the rule."

In effect, defendants argue that although the SBOE did not treat the 1986 resolution as a rule at the time, and did not follow any of the procedures prescribed by statute for adopting rules, the resolution is a rule which can be challenged only in a Travis County District Court, and the time for complaining about the total lack of any rulemaking procedures has passed. At best, this argument is disingenuous. On its face, the resolution is little more than an urging to the Legislature to further define the private and parochial **\*443** school exemption in § 21.033(a)(1). It goes no further than to "recommend[ ] to the various school districts ... guidelines ... pending the action of the Texas legislature". It even recites that the SBOE's authority to define "private or parochial school" has been challenged by various entities, among them the Texas Legislative Council. As the SBOE is charged with implementing legislative policy, an opinion of the Legislative Council that the SBOE lacked authority to clarify § 21.033(a)(1) would appear to be entitled to considerable weight.[14] The SBOE offers no explanation why, if it thought the resolution was an agency rule in 1986, it made no effort to comply with the requirements of the APA before the resolution issued.

[14]  The Texas Legislative Council is a legislative agency composed of the Lieutenant Governor, the Speaker of the House of Representatives, the chairs of the Senate and House administration committees, four other senators, and nine other representatives. TEX.GOV'T CODE § 323.001(a)-(b). Among the powers of the Council are to "study and investigate the functions and problems of state departments, agencies, and officers". *Id.* § 323.006(a)(1).

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review. As noted above, the APA applies only to statements of general applicability that implement, interpret or prescribe law or policy. The 1986 resolution was not such a statement. It urged action by the Legislature and recommended guidelines to school districts. The guidelines were only recommended, not prescriptive, and they did not purport to implement or interpret § 21.033(a)(1) or agency policy, but only to provide direction pending action by the Legislature. In these circumstances, defendants' argument that the 1986 resolution constitutes a rule is plainly incorrect.[15]

[15]   *Cf.* 1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.2 (3d ed. 1994) (distinguishing statements to which federal Administrative Procedure Act, 5 U.S.C. § 553, does and does not apply); 3 BASIL J. MEZINES, JACOB A. STEIN & JULES GRUFF, ADMINISTRATIVE LAW § 15.07[4] (1990, Supp.1991) (distinguishing statements to which federal Administrative Procedure Act, 5 U.S.C. § 553, does and does not apply).

Since plaintiffs' challenge to the 1986 resolution is not governed by the APA, the district court had jurisdiction of this case. Having reached this conclusion, we need not address plaintiffs' contention that the SBOE has no authority to make rules construing § 21.033(a)(1).

## III

[6] We come now to the central issue in the case. Defendants acknowledge, contrary to their position from 1981–1986, that a home school can be a private school within the meaning of § 21.033(a)(1). Plaintiffs do not contend that every home school falls within the exemption, but only, as the district court held, homes in which children are taught in a bona fide manner from a curriculum designed to meet basic education goals. Plaintiffs also do not contend that the use of standard achievement tests cannot be considered in ascertaining whether a home school is being taught in a bona fide manner; they argue only, again as the district court held, that the use of such tests cannot be the determining factor.

The evidence in support of the district court's construction of § 21.033(a)(1) is virtually undisputed. Defendants do not deny that from 1916 to 1981 students in bona fide home schools were not prosecuted for violation of the compulsory attendance law. Defendants also concede that the TEA's policy from 1981–1986, that no home school could be a private school within the meaning of § 21.033(a)(1), was wrong. Defendants acknowledge the right of parents to teach their children at home and the efficacy of that means of education when it is conducted in a bona fide manner. Defendants were willing to agree before trial to essentially the same construction of § 21.033(a)(1) as the district court eventually reached. Defendants argue even now that the nine plaintiff couples come within the "private school" exemption from the compulsory attendance law, even though there is no evidence that they have met two of the elements prescribed by the 1986 resolution. From the record before us, we conclude that the district court's declaration of the meaning of "private school" in **\*444** § 21.033(a)(1), as it relates to home schools, is clearly correct.

Defendants argue that the district court's judgment deprives the SBOE of its proper role in developing policies for the public schools. We do not believe that it does. The SBOE has the power and duty to "take actions necessary to implement legislative policy for the public school system of the state." TEX.EDUC.CODE § 11.24(a). Legislative policy regarding the exemption of students in private schools from attendance in public schools is expressed in § 21.033(a)(1). The district court has construed that provision as it has been understood and applied for most of this century. The SBOE continues to have responsibility for implementing the statutory policy. The SBOE is not authorized, however, to change legislative policy; that is the sole province of the Legislature. The Legislature has not accepted the SBOE's invitation in its 1986 resolution to clarify the private school exemption. The Legislature has indicated, however, that it considers home schools to fall within the exemption. In amending § 4.25 and other provisions of the Education Code in 1989, the Legislature stated:

> Nothing in this Act applies to students in attendance upon a private or parochial school, *which includes home schools,* in accordance with Section 21.033, Education Code.

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

Act of May 28, 1989, 71st Leg., R.S., ch. 658, § 11, 1989 Tex.Gen.Laws 2165, 2168 (emphasis added).

As we have noted above, plaintiffs argue that the TEA has no authority to promulgate rules construing § 21.033(a)(1). The decision we reach does not require that we address this argument today. On the other hand, nothing in our opinion precludes the TEA from setting such guidelines for enforcement of the compulsory attendance law as are within its authority. Specifically, the TEA is not precluded from requesting evidence of achievement test results in determining whether children are being taught in a bona fide manner. While administration of such tests cannot be a prerequisite to exemption from the compulsory attendance law, we do not preclude the TEA from giving this factor heavy weight. Should the SBOE choose to promulgate additional rules under the Administrative Procedure Act, its authority to do so and the propriety of such rules will be subject to judicial review.

### IV

The district court awarded plaintiffs costs and attorney fees to be paid by the defendant school districts, but not by any of the other defendants.[16] The court based its award on a provision of the Texas Uniform Declaratory Judgments Act ["the DJA"], TEX.CIV.PRAC. & REM.CODE § 37.009, which authorizes the award of such reasonable and necessary attorney fees as are just and equitable, and 42 U.S.C. § 1988. The court of appeals affirmed, but only on the basis of § 1988. We conclude that the award of attorney fees was proper under the DJA and do not address § 1988.

[16]     The trial court also concluded that the representative school district fees should not have to bear their attorney fees and expenses alone, and awarded these districts fees from the other districts in the defendant class. The representative districts do not argue that governmental immunity would bar their awards from the other districts.

The school districts argue that as a rule they have governmental immunity from liability for attorney fees, and that this immunity is not waived by the DJA. A number of decisions from the courts of appeals have concluded that the DJA does not waive governmental immunity for attorneys fees.[17] At **445** least one appellate court has concluded that the Act does waive governmental immunity from an award of attorney fees and costs for a municipality, insofar as the Act defines "person" as including municipalities, requires municipalities to be joined in actions involving the validity of an ordinance, and allows awards of attorney fees and costs without any indication of an intent to exempt municipalities.[18] Several other cases affirm attorney fee awards against governmental entities without any discussion of sovereign immunity.[19]

[17]     *See Dallas Area Rapid Transit v. Plummer,* 841 S.W.2d 870 (Tex.App.—Dallas 1992, writ denied); *Waugh v. City of Dallas,* 814 S.W.2d 492 (Tex.App.—Dallas 1991, writ denied); *Rodeheaver v. Steigerwald,* 807 S.W.2d 790 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *Texas Dep't of Human Serv. v. Methodist Retirement Serv., Inc.,* 763 S.W.2d 613 (Tex.App.—Austin 1989, no writ); *City of Houston v. Lee,* 762 S.W.2d 180 (Tex.App.—Houston [1st Dist.] 1988), *rev'd on other grounds, Lee v. City of Houston,* 807 S.W.2d 290 (Tex.1991); *Texas Employment Comm'n v. Camarena,* 710 S.W.2d 665 (Tex.App.—Austin 1986), *rev'd on other grounds,* 754 S.W.2d 149 (Tex.1988). *See also City of Houston v. De Trapani,* 771 S.W.2d 703 (Tex.App.—Houston [14th Dist.] 1989, writ denied) (affirming award of fees under federal civil rights act, but noting that such award would not be available under state declaratory judgments act).

[18]     *City of El Paso v. Croom Const. Co.,* 864 S.W.2d 153 (Tex.App.—El Paso 1993, writ denied) (construing contract to build stadium).

[19]     *See, e.g., District Judges v. Commissioners Court,* 677 S.W.2d 743 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). *See also International Ass'n of Firefighters Local 624 v. City of San Antonio,* 822 S.W.2d 122, 132 (Tex.App.—San Antonio 1991, writ denied) (reversing on other grounds and remanding for possible award of attorney fees under § 37.009); *Lubbock Prof. Firefighters v. City of Lubbock,* 742 S.W.2d 413, 418–19 (Tex.App.—Amarillo 1987, writ ref'd n.r.e.) (reversing on other grounds and remanding for possible award of attorney fees).

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

We have touched on the issue in several cases without ever expressly deciding it. In *Oake v. Collin County,* 692 S.W.2d 454 (Tex.1985), a declaratory judgment action involving a property tax dispute, we considered whether the trial court had abused its discretion in refusing to award attorney fees against various governmental entities and concluded that it had not. We did not suggest that the taxing units and counties in that case were immune from liability for attorney fees under the DJA. In *Duncan v. Pogue,* 759 S.W.2d 435 (Tex.1988), *rev'g* 753 S.W.2d 255 (Tex.App.—Tyler 1988), without mentioning governmental immunity, we concluded that the trial court acted within its discretion in awarding attorney fees against the county commissioners' court. The court of appeals had held that the DJA does not authorize an award of attorney fees against a county.

In other cases we have awarded attorney fees against governmental entities based upon other statutes. In *Texas State Employees Union v. Texas Dep't of Mental Health and Mental Retardation,* 746 S.W.2d 203 (Tex.1987), the award of fees was based on provisions covering damages, costs, and fees adjudged in a cause of action for the deprivation of a right, privilege or immunity secured by the constitution or laws of this State or the United States, against state employees, officers or governing board members who acted in the course or scope of their employment. TEX.CIV.PRAC. & REM.CODE §§ 104.001–.003 (now providing for indemnification up to specified amounts).[20] In *Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149 (Tex.1988), the award of fees was based on provisions prohibiting state officials from discriminating on the basis of a person's race, religion, color, sex, or national origin. TEX.CIV.PRAC. & REM.CODE § 106.001–.002. In *Lee v. City of Houston,* 807 S.W.2d 290 (Tex.1991), the district court granted declaratory relief and attorney fees, and the court of appeals reversed. We reversed the appellate court's holding on the merits and remanded the case to the trial court for entry of judgment consistent with our opinion, without addressing the availability of attorney fees. In a subsequent original proceeding to enforce the Court's judgment, *Lee v. Downey,* 842 S.W.2d 646, 649 (Tex.1992), the Court directed the trial court to award attorney fees and indicated that the award was authorized by TEX.LOCAL GOV'T CODE § 143.015, which allows attorney fees in appeals from decisions of the Fire Fighters' and Police Officers' Civil Service Commission.[21]

[20] We note that although the trial court found that the TEA had acted in bad faith, it did not find that any individual acted in bad faith, and concluded that no attorney fees, expenses or costs shall be borne by any school attendance officer or individual defendant.

[21] A dissenting opinion on rehearing, in which the author of this opinion joined, expressed the view that the DJA does not waive governmental immunity for an award of attorney fees. 842 S.W.2d at 654 n. 4 (Gonzalez, J., dissenting on rehearing).

The DJA is a remedial enactment which allows courts to declare relief, whether or not further relief is or could be claimed, to "settle and afford relief with respects to rights, status, and other legal relations". *Id.* §§ 37.002, .003(a). A person "whose rights, **\*446** status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). All persons who have or claim any interest that would be affected by the declaration must be made parties; those not made a party are not prejudiced by any declaration. *Id.* § 37.006(a). If the validity of a municipal ordinance or franchise is involved, a municipality must be made a party, and if a statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general must be served with a copy of the proceeding and is entitled to be heard. *Id.* § 37.006(b). The Act specifically authorizes an award of "costs and reasonable and necessary attorney's fees as are equitable and just." *Id.* § 37.009.

[7] The DJA expressly provides that persons may challenge ordinances or statutes, and that governmental entities must be joined or notified. Governmental entities joined as parties may be bound by a court's declaration on their ordinances or statutes. The Act thus contemplates that governmental entities may be—indeed, must be—joined in suits to construe their legislative pronouncements. These provisions provide the context for the Act's authorization, in § 37.009, of attorney fee awards. We conclude that by authorizing declaratory judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorney fees, the DJA necessarily waives governmental immunity for such awards.

The school districts complain that the award of fees was not properly adjudicated against them, in that plaintiffs' claims were

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

primarily directed against the state defendants. We note, however, that the district court directed the award to be paid by the TEA from funds designated for public school districts. The school districts also complain about the inclusion of various items in the district court's award. They argue that plaintiffs were required to segregate time spent on temporary injunctive relief and the non-federal claims on which plaintiffs did not prevail. The record reflects that all plaintiffs' attorneys' time was spent on issues related to the declaratory relief which was granted. The school districts also argue that some items of expenses and costs were not recoverable. We conclude, however, that the districts have failed to show reversible error.

Accordingly, we hold that the district court's award of attorney fees was authorized by the DJA and was not an abuse of discretion.

## V

[8] The district court enjoined defendants from enforcing the compulsory attendance law contrary to the construction set out in the court's judgment. There is no indication, however, that defendants will attempt to contravene the district court's judgment, or ours. On the contrary, we are confident that defendants will abide by our decision in carrying out their duties. Accordingly, we conclude that issuance of a permanent injunction was unnecessary and should be reversed.[22]

[22]    The school district defendants argue that the classes of plaintiffs and defendants were improperly certified for an award of injunctive relief. Defendants do not make the same argument with respect to the award of declaratory relief. As we have reversed the district court's injunction, we need not consider whether the classes were properly certified.

The lower courts held that defendants had violated plaintiffs' constitutional rights and § 1983 of the federal Civil Rights Act. As we have accorded plaintiffs all the relief to which they are entitled under the Declaratory Judgments Act, we do not reach their constitutional arguments under § 1983. The 1986 resolution acknowledged that home schooling may involve constitutional claims of religious freedom. Our decision today need not, and does not, address such claims.

* * * * * *

The judgment of the court of appeals is reversed insofar as it affirms the district court's permanent injunction. In all other respects the judgment of the court of appeals is affirmed.

**\*447** GONZALEZ, Justice, concurring in part and dissenting in part on motion for rehearing.

My opinion of June 15, 1994 is withdrawn and this one is substituted in its place. With the exception of the discussion of attorneys' fees and court costs, I join the Court's opinion and judgment. I dissent, however, from Part IV of the Court's opinion, from the order denying a motion for rehearing, and from that part of the judgment which orders that the plaintiffs recover attorneys' fees and court costs from the defendants. In this case, the doctrine of sovereign immunity precludes an award of attorneys' fees against the defendants in the absence of an express waiver of immunity by the Legislature. The Court errs in ruling that the Uniform Declaratory Judgments Act (DJA), TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, implicitly waives sovereign immunity so that defendants may be held liable for attorneys' fees. 893 S.W.2d 432, 445–46 (Tex.1994). The Court gives the DJA a curious construction that is not supported by logic or well-established precedent and a construction which has the potential for disastrous effects on school districts and other governmental agencies. I would grant the motion for rehearing and hold that the school districts are not liable for attorneys' fees under the DJA, but would consider whether they are available under 42 U.S.C. § 1983.

I continue to adhere to the principles expressed in my opinion in *Lee v. Downey,* 842 S.W.2d 646, 655 n. 4 (Tex.1992) (Gonzalez, J., dissenting on motion for rehearing). To recover attorneys' fees in this case, the plaintiffs must show that their suit is an exception to two broad rules. The first rule is that subdivisions of the sovereign are immune from suit. *See W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 839 (1958) (approving the court of appeals' statement that a suit against

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

the state should be abated "because of the State's immunity from suits brought without its consent," 303 S.W.2d 443, 445 (Tex.Civ.App.—Fort Worth 1957)). Only the Legislature may waive sovereign immunity. *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex.1993); *see Barr v. Bernhard,* 562 S.W.2d 844, 846 (Tex.1978) (citing *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976)) (stating, "any waiver of governmental immunity is a matter to be addressed by the Legislature."); *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847) (holding "No State can be sued in her own Courts without her consent and then only in a manner indicated by that consent."). Furthermore, the Legislature must use clear and unambiguous language to waive immunity. *See Guillory,* 845 S.W.2d at 813–14 (explaining that waiver exposes the government to increased liability that ultimately the state's taxpayers bear); *Texas Prison Bd. v. Cabeen,* 159 S.W.2d 523, 525–28 (Tex.Civ.App.—Beaumont 1942, writ ref'd) (examining a statute to determine if the Legislature had expressly waived sovereign immunity). The second rule is that attorneys' fees may not be awarded unless prescribed by statute for the particular kind of case. *First City Bank v. Guex,* 677 S.W.2d 25, 30 (Tex.1984); *see Texas Employment Comm'n v. Camarena,* 710 S.W.2d 665, 670 (Tex.App.—Austin 1986), *rev'd on other grounds,* 754 S.W.2d 149 (Tex.1988). These rules prohibit a court from awarding attorneys' fees merely because it deems them appropriate. *Camarena,* 710 S.W.2d at 670. Thus, in this case, an award of attorneys' fees would be permissible only if a statute expressly waived sovereign immunity and authorized the recovery of attorneys' fees from the defendant governmental agencies.

The DJA does not. The DJA waives sovereign immunity insofar as it permits plaintiffs to bring actions in order to construe legislative enactments of governmental entities; it also requires that interested parties, including governmental agencies, be joined in these suits. *See* TEX.CIV.PRAC. & REM.CODE §§ 37.004(a), 37.006. However, the Court confuses this waiver of the government's immunity from suit with waiver of immunity from liability. *See Missouri Pac. R.R. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 813 (Tex.1970); *accord Couch v. Ector County,* 860 S.W.2d 659, 661 (Tex.App.—El Paso 1993, no writ); *Avmanco, Inc. v. City of Grand Prairie,* 835 S.W.2d 160, 164–65 (Tex.App.—Fort Worth 1992, appeal dism'd as moot); *Dillard v. Austin Indep. Sch. Dist.,* 806 S.W.2d 589, 592 (Tex.App.—Austin 1991, writ denied). Nowhere does the DJA expressly **\*448** authorize this Court to hold a governmental entity liable for attorneys' fees in a declaratory judgment action. *See Lee,* 842 S.W.2d at 655 n. 4 (Gonzalez, J., dissenting on motion for rehearing); *Dallas Area Rapid Transit v. Plummer,* 841 S.W.2d 870, 875 (Tex.App.—Dallas 1992, writ denied); *Waugh v. City of Dallas,* 814 S.W.2d 492, 496–97 (Tex.App.—Dallas 1991, writ denied); *Rodeheaver v. Steigerwald,* 807 S.W.2d 790, 793 (Tex.App.—Houston [14th Dist.] 1991, writ denied), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 414 (1992); *City of Houston v. De Trapani,* 771 S.W.2d 703, 708 (Tex.App.—Houston [14th Dist.] 1989, writ denied); *Texas Dep't of Human Servs. v. Methodist Retirement Servs., Inc.,* 763 S.W.2d 613, 614 (Tex.App.—Austin 1989, no writ); *City of Houston v. Lee,* 762 S.W.2d 180, 188 (Tex.App.—Houston [1st Dist.] 1988), *rev'd on other grounds,* 807 S.W.2d 290 (Tex.1991); *Camarena,* 710 S.W.2d at 670. For this reason alone, the order that the defendants pay attorneys' fees is erroneous.

The Court compounds its error by determining that the DJA **implicitly** authorizes the plaintiffs' recovery of attorneys' fees in this declaratory judgment suit. 893 S.W.2d at 445–46. This holding conflicts with the legislative admonishment that a "resolution granting permission to sue does not waive to any extent immunity **from liability**." TEX.CIV.PRAC. & REM.CODE § 107.002(b) (Supp.1995) (emphasis added). When the Legislature was considering the House Bill it later enacted as the attorney fee provision of the DJA, the director of the Legislative Budget Board sent a fiscal note to the Committee on Judiciary of the House of Representatives which stated:

> No fiscal implication or additional cost to the State or units of local government attributable to the bill, should it be enacted, is anticipated.

FISCAL NOTE, Tex.H.B. 375, 67th Leg., R.S., ch. 190, § 1, 1981 Tex.Gen.Laws 455, 455 (amending TEX.REV.CIV.STAT. art. 2524–1 § 10, now codified at TEX.CIV.PRAC. & REM.CODE § 37.009). The Legislature did not intend or foresee that it was authorizing the award of attorneys' fees and court costs against state entities when it amended the DJA.

Only through a feat of statutory sleight of hand does the Court achieve its holding that attorneys' fees can be awarded under the DJA. The result is a disappearing act for the rule requiring a clear and unambiguous waiver of sovereign immunity. As stated, the DJA simply does not contain a clear and unambiguous statement that a governmental entity may be held liable for attorneys' fees. *See* TEX.CIV.PRAC. & REM.CODE § 37.009. The Legislature certainly has the power to place this burden on taxpayers. However, in my opinion, it has not done so in the clear and unambiguous language that this Court has previously required.

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

I would retain the rule that the Legislature must expressly waive sovereign immunity. By finding an implied waiver of sovereign immunity in this case, the Court disturbs an important principle in the law of sovereign immunity. Presumably a plaintiff may now recover whatever costs, fees, or damages which he or she can persuade a trial court that a statute impliedly allows. By its ruling today, the Court turns the law of sovereign immunity on its head. Now a governmental entity will have to identify statutes that expressly **bar** recovery of costs, fees, or damages before it will be excused from such liability. Thus, the Court's implied waiver ruling introduces a grave threat to the state's financial resources.

Furthermore, the Legislature is perfectly capable of drafting statutes which expressly waive sovereign immunity, without assistance from us or any other court. For example, the Texas Tort Claims Act has a clear and unambiguous waiver of sovereign immunity, thereby allowing a plaintiff to bring suit against a governmental entity in certain circumstances. *See* TEX.CIV.PRAC. & REM.CODE § 101.025(a) ("Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."). However, the Texas Tort Claims Act does not expressly provide for the recovery of fees and costs, and no court has awarded them to a plaintiff under the Act. *See id.* § 101.021(1) (allowing a governmental unit to be liable solely for "property damage, personal injury, and ***449** death"); *id.* § 101.023 (capping liability for bodily injury or death). Similarly, the Open Government Act expressly authorizes actions against otherwise immune governmental entities in order to prevent violations of the Act. TEX.GOV'T CODE § 551.142. In contrast to the Texas Tort Claims Act, the Open Government Act unambiguously states that a court "may assess costs of litigation and reasonable attorney fees incurred by a plaintiff ... who substantially prevails in an action" against members of "a governmental body." *Id.* Finally, the Whistleblower Act expressly provides for waiver of immunity and for recovery of attorneys' fees. *See id.* §§ 554.001–.009. If a state agency or local government suspends, terminates, or discriminates against a public employee who has reported a law violation, the employee is entitled to sue for injunctive relief, actual and exemplary damages, court costs, and "reasonable attorneys' fees."[1] *Id.* §§ 554.002, 554.003(a). There are other examples in which the Legislature has expressly authorized the recovery of attorneys' fees or costs from a governmental entity. *See, e.g.,* TEX.CIV.PRAC. & REM.CODE § 105.002; *id.* § 106.002(b). The Legislature's specificity of language in the Open Government Act and the Whistleblower Act sharply contrasts with the general provisions the Court relies on in this case for awarding attorneys' fees under the DJA.

[1]     Even then, it may take a legislative appropriation to collect a judgment from the state. *See Green v. Sharp,* 37 Tex.Sup.Ct.J. 1227 (Sept. 29, 1994) (orig. proceeding) (overruling motion for leave to file a petition for writ of mandamus to compel the Comptroller of Public Accounts to issue a check from the state treasury to satisfy a judgment against the Texas Department of Human Services); *Texas Dep't of Human Servs. v. Green,* 855 S.W.2d 136, 145 (Tex.App.—Austin 1993, writ denied) (stating that the prevailing plaintiff must request a legislative appropriation to collect damages awarded him under the Whistleblower Act).

Another flaw with the Court's reasoning regarding attorneys' fees is the possible result: the imposition of a $400,000 burden on Texas taxpayers which the Legislature never envisioned when it passed the DJA. Holding that the DJA waives sovereign immunity to the extent of allowing an award of attorneys' fees in this case could "divert money from the schools and would thereby impair the quality and availability of public education." *Duson v. Midland County Indep. Sch. Dist.,* 627 S.W.2d 428, 429 (Tex.Civ.App.—El Paso 1981, no writ) (affirming the nonapplicability of the Texas Tort Claims Act to public school districts). Unless the plaintiffs are required to obtain a legislative appropriation to collect the $400,000 judgment, the potential drain of tax dollars to pay attorneys' fees from funds earmarked for education cannot be minimized.[2] In today's litigious society, suits against school districts over dress codes, school prayer, sex education, cheerleader selections, and the like are not uncommon. Such litigation drains scarce funds and diverts the energies of school officials from the task of education. Because of the tremendous costs associated with litigating these issues, some school districts will decide to compromise on matters of principle rather than go to court and defend them. Unless the Legislature revisits the issue of governmental immunity from attorneys' fees and court costs, to correct the Court's holding in this case, there is the potential of a further drain on scarce educational dollars.

[2]     For example, besides the $400,000 award for attorneys' fees and court costs from public school funds in this case, a trial court in another case recently awarded $48,000 to the attorneys of an elementary school student who challenged the hair grooming regulations of the school district he was attending. *See* Gamboa, *Judge Rules in Favor of Bastrop Student and His Ponytail,* AUSTIN AM. STATESMAN, Feb. 11, 1995, at B1.

The Court's opinion (although not its judgment) approves the trial court's order that the Texas Education Agency exclusively

**Texas Educ. Agency v. Leeper, 893 S.W.2d 432 (1994)**

98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

pay the plaintiffs' attorneys' fees, in theory to relieve the defendant school districts from the burden of paying them. The effect is the same. Whether the trial court orders the TEA or each district to pay the award of attorneys' fees, school districts will be deprived of money intended for education.

For these reasons, I would withdraw the opinion of the Court and grant the motion for rehearing. A new opinion addressing the issue of the award of attorneys' fees and court costs under 42 U.S.C. § 1983 is preferable **\*450** to the current opinion, which stands the law of sovereign immunity on its head.

**All Citations**

893 S.W.2d 432, 98 Ed. Law Rep. 491, 38 Tex. Sup. Ct. J. 390

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

355 S.W.3d 618
Supreme Court of Texas.

TEXAS DEPARTMENT OF
TRANSPORTATION, Petitioner,
v.
Roger SEFZIK, Respondent.

No. 08–0943.  |  Oct. 21, 2011.

**Synopsis**
**Background:** Applicant for permit to erect outdoor-advertising sign brought suit against Texas Department of Transportation (TxDot), seeking declaration that Administrative Procedure Act's (APA's) provisions governing "contested cases" applied to TxDot's denial of his application and alleging that denial of contested-case proceeding violated due process. The 53rd District Court, Travis County, Suzanne Covington, J., granted TxDot's plea to jurisdiction based on sovereign immunity. Applicant appealed. The Corpus Christi - Edinburg Court of Appeals, 267 S.W.3d 127, affirmed in part and reversed and remanded in part. Review was granted.

**[Holding:]** The Supreme Court held that the sovereign immunity of the Texas Department of Transportation was not waived.

Court of Appeals reversed in part; remanded to trial court.

**Attorneys and Law Firms**

**\*619** Beth Ellen Klusmann, Assistant Solicitor General, Betsy Jane Johnson, Office of the Attorney General, Austin, James C. Ho, Gibson Dunn & Crutcher LLP, Dallas, David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General, Kent C. Sullivan, 14th Court of Appeals, Greg W. Abbott, Attorney General and Clarence Andrew Weber, Kelly Hart & Hallman LLP, Austin, for Texas Department of Transportation.

J. Allen Smith, Scott J. Conrad, Bradley E. McLain, Settle Pou, Dallas and Clyde Russell Woody, Hartzog Conger Cason & Neville, Oklahoma City, OK, for Roger Sefzik.

**Opinion**

PER CURIAM.

 **[1]**    At issue in this case is whether sovereign immunity bars Roger Sefzik's lawsuit seeking declaratory relief under the Uniform Declaratory Judgments Act (UDJA) against the Texas Department of Transportation (TxDOT). In *City of El Paso v. Heinrich,* we dismissed claims **\*620** seeking declaratory and injunctive relief against governmental entities as barred by sovereign immunity. 284 S.W.3d 366, 380 (Tex.2009). The court of appeals relied on our pre-*Heinrich ultra vires* precedent to conclude that declaratory judgment actions do not implicate sovereign immunity. We reverse and hold that state agencies, like TxDOT here, are immune from suits under the UDJA unless the Legislature has waived immunity for the particular claims at issue. However, because Sefzik's claim was filed pre-*Heinrich,* we remand the case to the trial court so that Sefzik has a reasonable opportunity to assert an *ultra vires* claim against state officials.

In March 2005, Sefzik filed a permit application with TxDOT to erect an outdoor advertising sign along Interstate 30. A few weeks later, another company filed a similar application, seeking to create a sign in the same area. After reviewing the conflicting applications, TxDOT found that Sefzik's permit was invalid. Under former section 21.142 of the Texas Administrative Code, applicants for sign permits were required to verify that a sign would be near adjacent commercial or industrial activities that had been open for at least ninety days. *See* 43 TEX. ADMIN. CODE § 21.142(2) (K), (30) (2008) (Tex. Dep't of Transp., Definitions) *repealed* 36 Tex. Reg. 2418 (2011) (proposed Dec. 2, 2010). When TxDOT received Sefzik's application, one of the businesses he listed was only open for seventy-eight days. TxDOT denied Sefzik's application and approved the competing bid.

Sefzik appealed to TxDOT's Executive Director, Michael Behrens, and requested an oral hearing. Behrens denied Sefzik's appeal without holding a hearing, and explained that TxDOT had discretion to deny Sefzik's invalid permit application. Sefzik filed a motion for rehearing, arguing, *inter alia,* that he was entitled to a hearing under the Administrative Procedure Act's (APA) "contested case" procedures. *See* TEX. GOV'T CODE § 2001.051. TxDOT did not respond, and the motion was eventually overruled by operation of law.

Sefzik then filed suit against TxDOT but did not join Behrens or any other TxDOT official. Sefzik sought relief under the

UDJA, requesting that the district court declare the APA's "contested case" procedures entitled him to a hearing. [1] TxDOT filed a plea to the jurisdiction, arguing that sovereign immunity barred Sefzik's suit. The district court granted the plea to the jurisdiction and denied Sefzik's motion for a new trial. Sefzik appealed.

A divided court of appeals reversed, holding that declaratory judgment claims do not implicate sovereign immunity and thus TxDOT was a proper party to the UDJA action. 267 S.W.3d 127, 132–34 ("[W]hen a private plaintiff merely seeks a declaration of his or her rights under a statute, such an action is not subject to a sovereign immunity defense, and a waiver or consent to suit is unnecessary."). Having concluded that the UDJA does not implicate sovereign immunity, the court of appeals did not decide whether the UDJA or the APA waives immunity.

 **[2]**     **[3]**     **[4]**     Reviewing the immunity question de novo, *see Harris County Hosp. Dist. v. Tomball Reg'l Hosp.,* 283 S.W.3d 838, 842 (Tex.2009), we conclude that, under *Heinrich,* sovereign immunity bars UDJA actions against the state and its political subdivisions absent a legislative waiver. *Heinrich* clarified an area of the law that had been unclear, namely, the intersection between the doctrine of sovereign immunity and the *ultra vires* exception to it. While the doctrine of sovereign immunity originated to protect the public fisc from unforeseen expenditures that could hamper governmental functions, *see Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002), it has been used to shield the state from lawsuits seeking other forms of relief, *see, e.g., W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 839 (1958) ("[T]he rule of state immunity from suit without its consent applies to suits under the Uniform Declaratory Judgments Act...."). Concomitant to this rule, however, is the *ultra vires* exception, under which claims may be brought against a state official for nondiscretionary acts unauthorized by law. *See, e.g., Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 404 (Tex.1997). Such lawsuits are not against the state and thus are not barred by sovereign immunity. *Id.*

 **[5]**     In *Heinrich,* we addressed which governmental entities —the state, its subdivisions, or the relevant government actors in their official capacities—are proper parties to a suit seeking declaratory relief for an *ultra vires* action. 284 S.W.3d at 371–73. Heinrich sued the City of El Paso and various government officials, claiming the defendants violated her statutory rights when they altered her pension benefits. *Id.* at 369–70. She asked the courts to declare that the defendants acted without authority in taking such action. *Id.* Our precedent made clear that "suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity." *Id.* at 372. While we recognized that these suits are against the state for all practical purposes, we held that they "cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity." *Id.* at 373. Thus, we allowed Heinrich to pursue claims for prospective relief against the state officials, but we dismissed the claims against the city and the other governmental entities. *Id.* at 379–80.

 **[6]**     **[7]**     **[8]**     Two points from *Heinrich* are relevant here. First, *Heinrich* held that the proper defendant in an *ultra vires* action is the state official whose acts or omissions allegedly trampled on the plaintiff's rights, not the state agency itself. *Id.* at 372–373. Sefzik did not sue any state official. [2] Instead, he argues that the court of appeals correctly exempted UDJA actions seeking a declaration of rights from the application of the sovereign immunity doctrine. The second point from *Heinrich* dictates otherwise. As noted, we dismissed Heinrich's claims seeking declaratory and injunctive relief against governmental entities, brought under the UDJA, because the entities were immune. In so doing, we necessarily concluded that the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law. Very likely, the same claim could be brought against the appropriate state official under the *ultra vires* exception, but the state agency remains immune. *See id.* at 372–73. As we have consistently stated, the UDJA does not enlarge the trial court's jurisdiction **\*622** but is "merely a procedural device for deciding cases already within a court's jurisdiction." *Tex. Parks & Wildlife Dep't v. Sawyer Trust,* 354 S.W.3d 384, 388 (2011) (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993)). Accordingly, the underlying action, if against the state or its political subdivisions, must be one for which immunity has expressly been waived.

 **[9]**     **[10]**     **[11]**     Although the UDJA waives sovereign immunity in particular cases, Sefzik's claim does not fall within the scope of those express waivers. For example, the state may be a proper party to a declaratory judgment action that challenges the validity of a statute. *Heinrich,* 284 S.W.3d at 373 n. 6 (citing TEX. CIV. PRAC. & REM.CODE § 37.006(b)); *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 697–98 (Tex.2003); *Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994). [3] But Sefzik is not challenging

the validity of a statute; instead, he is challenging TxDOT's actions under it, and he does not direct us to any provision of the UDJA that expressly waives immunity for his claim.[4]

 **[12]**  Sefzik also suggests that the APA provides a guide for analyzing the application of sovereign immunity to his case. The APA's declaratory judgment provision allows a plaintiff to challenge the validity or applicability of a rule. *See* TEX. GOV'T CODE § 2001.038(a), (c) ("The validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs ... a legal right or privilege of the plaintiff.... The state agency must be made a party to the action."). While the APA may waive sovereign immunity, an issue we do not decide here, Sefzik does not challenge the validity or applicability of any agency *rule.* Instead, he challenges the application of the APA's contested case procedures, which are established by *statute.* As noted in his brief, Sefzik's claim is broader than the APA's scope. Moreover, the APA's mechanism for seeking a declaration of rights does not trump *Heinrich*'s conclusion that the state is generally immune from declaratory actions brought under the UDJA. Accordingly, section 2001.038 does not carry Sefzik's claim over the hurdle of sovereign immunity.

In the event that we reverse the court of appeals' judgment, Sefzik urges this Court to remand the case so that he can replead an *ultra vires* claim within the trial court's jurisdiction. If given that opportunity, Sefzik asserts he would plead a claim against TxDOT officials for improperly denying his permit. As mentioned previously, under the former Administrative Code provisions governing this case, applicants for sign permits were required to verify that a sign would be near adjacent commercial or industrial activities which had **\*623** been open for at least ninety days. *See* 43 TEX. ADMIN. CODE § 21.142(2)(K), (30) (2008) (Tex. Dep't of Transp., Definitions) *repealed* 36 Tex. Reg. 2418 (2011) (proposed Dec. 2, 2010). The Administrative Code

went on to provide that "[p]ermits will be considered on a first-come, first-serve basis." *Id.* § 21.150 (2008) (Tex. Dep't of Transp., Permits) *repealed* 36 Tex. Reg. 2418 (proposed Dec. 2, 2010). If the first application was denied, the Administrative Code specified that other applications would be considered "between the time a denied application is returned to the applicant and the time it is resubmitted." *Id.* Sefzik contends that his application was the only one on file on the 90th day; thus, in denying his permit, TxDOT officials failed to perform a purely ministerial duty.

 **[13]**  When this Court upholds a plea to the jurisdiction on sovereign immunity grounds, we allow the plaintiff the opportunity to replead if the defect can be cured. *See, e.g., Sawyer Trust,* 354 S.W.3d. at 392 (citing *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 840 (Tex.2007)). As mentioned, Sefzik did not sue any state officials; however, Sefzik brought his claim pre-*Heinrich.* As we have observed, our decisions prior to *Heinrich* were "less than clear" as to who the proper party was in a suit for declaratory remedy, as well as the parameters of the *ultra vires* exception to the doctrine of sovereign immunity. *See Heinrich,* 284 S.W.3d at 373. In light of our clarifications to this area of the law in *Heinrich,* Sefzik should have an opportunity to replead in an attempt to cure the jurisdictional defects in his petition. We thus remand the case to allow Sefzik this opportunity without expressing any opinion on the merits of such a claim. *See Sawyer Trust,* 354 S.W.3d at 393.

Accordingly, without hearing oral argument, TEX. R. APP. P. 59. 1, we reverse in part the court of appeals' judgment, and remand the case to the trial court in accordance with this opinion.

Justice JOHNSON did not participate in the decision.

**Parallel Citations**

55 Tex. Sup. Ct. J. 42

---

Footnotes

1    Sefzik also alleged that TxDOT's actions violated his due process and equal protection rights under the United States and Texas Constitutions. The court of appeals ultimately affirmed the district court's dismissal on those issues, 267 S.W.3d at 135–38, and Sefzik did not petition this Court to review that decision.

2    Although Sefzik refused to apply the *ultra vires* label to his suit below, that is the underlying nature of his claim. The relief he seeks —a declaration that he is entitled to a hearing—is directly related to whether Behrens acted outside the scope of his authority in denying a hearing. That is, Sefzik ultimately wishes to compel a government official (Behrens) to perform some act that he considers to be nondiscretionary (holding a hearing). That relief falls within the *ultra vires* rationale.

3      We have recognized this waiver because the UDJA expressly requires joinder of the governmental unit. *See* TEX. CIV. PRAC. & REM.CODE § 37.006(b) ("In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party ... and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard."); *Leeper,* 893 S.W.2d at 446 ("The DJA expressly provides that ... governmental entities must be joined or notified."). This reasoning is consistent with the requirement that the Legislature expressly waive immunity with "clear and unambiguous" language. TEX. GOV'T CODE § 311.034; *Taylor,* 106 S.W.3d at 696.

4      On "rare occasions," we may recognize a waiver absent explicit language. *Taylor,* 106 S.W.3d at 697. Sefzik has not argued that we should infer a waiver of immunity under the UDJA, so we do not consider that possibility.

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

848 S.W.2d 298
Court of Appeals of Texas,
Austin.

UNIVERSITY INTERSCHOLASTIC
LEAGUE and Bailey Marshall, Appellants,
v.
Bruce LaFeyette BUCHANAN, et al., Appellees.
UNIVERSITY INTERSCHOLASTIC LEAGUE
and Dr. Bailey Marshall, Appellants,
v.
Phillip Earl BOMAR, Jr., et al., Appellees.

Nos. 3–92–108–CV, 3–92–161–CV. | Feb. 3,
1993. | Rehearing Overruled March 31, 1993.

Learning disabled high school athletes sought to permanently enjoin organization regulating high school athletics from enforcing rule precluding participation by athletes over 19 years old. The 331st and 53rd Judicial District Courts, Travis County, B.B. Schraub, J., granted the injunction, and organization appealed. The Court of Appeals, Kidd, J., held that: (1) athletes were "disabled" under Rehabilitation Act; (2) organization failed to reasonably accommodate athletes by not allowing exceptions to rule; (3) students' failure to exhaust remedies under Individuals with Disabilities Education Act did not deprive trial court of jurisdiction; and (4) "public interest exception" to mootness doctrine permitted review.

Affirmed.

**Attorneys and Law Firms**

**\*299** William C. Bednar, Jr., Eskew, Muir & Bednar, Austin, for University Interscholastic League.

James R. Raup, McGinnis, Lochridge & Kilgore, Austin, for Austin Independent School Dist. and Dr. Jim Hensley.

Diane M. Henson, Graves, Dougherty, Hearon & Moody, Austin, for Bruce LaFeyette Buchanan and Phillip Earl Bomar, Jr.

Leonard J. Schwartz, Schwartz & Eichelbaum, P.C., Austin, for Dallas Independent School Dist. and Dr. Marvin E. Edwards.

Before CARROLL, C.J., and JONES and KIDD, JJ.

**Opinion**

KIDD, Justice.

The University Interscholastic League and its Executive Director, Bailey Marshall, **\*300** (collectively hereinafter the "UIL") appeal the judgment of the trial court granting a permanent injunction against the enforcement of the UIL's over–19 rule.[1] We will affirm the judgment of the district court.

**FACTUAL BACKGROUND**

Composed of representatives of Texas school districts, the UIL is a voluntary organization that regulates, among other things, the competitive athletics of the junior and senior high school student athletes in Texas. This case involves a challenge to section 400(a) of the UIL Constitution and Contest Rules (the "over–19 rule") which states: "Subject to the other sections of this subchapter, an individual is eligible to participate in a League varsity contest as a representative of a participant school if that individual ... is less than 19 years old on September 1 preceding the contest...."

The UIL states that the underlying purpose of the over–19 rule is to ensure the safety of the participating student athletes and the equality of competitors. It argues that one policy justification for the over–19 rule is the avoidance of potential injury which might result if younger, less developed high school students are required to compete against older students. Furthermore, the UIL argues that the over–19 rule discourages the practice of "redshirting," i.e., having students repeat grades so that they will be more mature and better athletes during their high school years. The UIL permits no exception to or waiver of the over–19 rule based on special circumstances of individual students.

Appellees, Bruce Buchanan and Phillip Bomar (the "Students"), obtained permanent injunctions allowing them to participate in the 1991 football season. The final judgments rendered in these causes stated that the over–19 rule violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West Supp.1992) ("Section 504"), as applied to the Students. Section 504 provides in pertinent part:

> No otherwise qualified individual
> with handicaps in the United States,
> as defined in section 706(8) of

this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

[29 U.S.C.A. § 794](#).

The factual bases for the permanent injunctions involving the Students are as follows.

**Bruce Buchanan**

Buchanan turned nineteen years old before he entered the twelfth grade at Travis High School of the Austin Independent School District ("Austin ISD"). Because he had learning disabilities, he had repeated the first and seventh grades. During ninth grade, Buchanan began participating in his school's football program. Although he was nineteen at the start of his senior year, Buchanan was below the average weight and height of his team members, and he never was a starter on the team.

Both Buchanan's mother and his Admission, Review and Dismissal (ARD) Committee [2] requested a waiver from the over–19 rule. The UIL responded that there were "no rules which allow for a waiver of the 19–year–old rule." Buchanan instituted this lawsuit against the UIL and its director, and later joined Austin ISD and Dr. **\*301** Jim Hensley, the Superintendent of Austin ISD, as defendants in the suit to enjoin the enforcement of the rule.

**Phillip Bomar**

Bomar was also nineteen years of age at the start of his senior year. He had repeated his fourth and seventh grades, and was classified by his school district, Dallas Independent School District ("Dallas ISD"), as learning disabled. Like Buchanan, Bomar began playing football for his high school, Justin F. Kimball High School. Bomar was average in size compared to the other members of his football team and was a starting linebacker during his junior year of high school.

Bomar's mother and high school principal applied for a waiver of the over–19 rule for Bomar, which the UIL refused. In response, Bomar filed this action against the UIL, its director, Dallas ISD, and Dr. Marvin Edwards, the Superintendent of Dallas ISD.

**CROSS–CLAIMS OF THE SCHOOL DISTRICTS**

Both school districts filed cross-claims against the UIL, stating that the UIL's mandatory forfeiture rule caused them to violate the rights of the Students. Section 700(a)(2)(C)(ii) of the UIL Constitution and Contest Rules (the UIL's "mandatory forfeiture rule") provides that if a school allows a student who is finally determined ineligible to participate in a UIL contest under a court order, the school must forfeit all contests in which the student participated. In the past, the UIL has enforced the mandatory forfeiture rule to require that a school forfeit all of its contests in which the litigating student participated even though the student's participation was pursuant to a lawful court-ordered injunction. [3]

In October 1991, the trial court issued temporary orders enjoining the enforcement of the over–19 rule against the Students and the mandatory forfeiture rule against Austin ISD and Dallas ISD. These two causes were then consolidated for purposes of trial and appeal. After a trial on the merits, the district court rendered a final judgment in favor of the Students and the school districts, enjoining the enforcement of the two rules.

From this judgment, the UIL appeals bringing forth four points of error.

**IMPACT OF THE REHABILITATION
ACT ON THE OVER–19 RULE**

**[1]** **[2]** In order to obtain injunctive relief, an applicant must establish the existence of a wrongful act, imminent harm, and irreparable injury, and the absence of an adequate remedy at law. *Hues v. Warren Petroleum Co.,* 814 S.W.2d 526, 529 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *Priest v. Texas Animal Health Comm'n,* 780 S.W.2d 874, 875 (Tex.App.—Dallas 1989, no writ). The decision to grant or deny a permanent injunction lies within the trial court's sound discretion, and appellate review is restricted to whether the action involved a clear abuse of discretion. *Hues,* 814 S.W.2d at 529; *Priest,* 780 S.W.2d at 875.

**[3]** **[4]** The UIL argues in its first two points of error that the trial court erred in granting the permanent injunctions against the over–19 rule and in awarding attorneys' fees. [4] In

its first point of error, the UIL alleges that the rule does not discriminate solely on the basis of the Students' handicaps; the UIL maintains that the Students are ineligible due to their ages which are determined by their birth dates. The rule and its purposes, it contends, apply equally to both handicapped and non-handicapped students.

 **\*302** We agree that the UIL's enforcement of its over–19 rule as to these Students was not on the basis of a current handicap or because of a history of being handicapped. However, the record clearly demonstrates that both Students repeated grades in school because of learning disabilities. Had they not experienced difficulties in the classroom and progressed through school at a pace slower than most students, they would have turned nineteen after September 1 of their senior year and thus would have been age-eligible to participate in interscholastic athletics.

The United States District Court, in *Doe v. Marshall,* 459 F.Supp. 1190 (S.D.Tex.1978), *vacated and remanded on other grounds,* 622 F.2d 118 (5th Cir.1980), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2336, 68 L.Ed.2d 855 (1981),[5] invoked a balancing test of the harms inflicted upon the various parties in its determination of whether to grant a preliminary injunction of a UIL rule. *Id.* at 1192. In the present cases, evidence demonstrated that the Students would benefit emotionally by participating in competitive athletics. The evidence did not show that these Students had been involved in redshirting or that they presented a danger to other student athletes; the concerns that made the rule necessary are not present in these causes and the UIL is not harmed. Thus, the equities before the trial court weighed in favor of enjoining the enforcement of the rule.

The United States Supreme Court has stated that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.... [T]o assure meaningful access, *reasonable accommodations* in the grantee's program or benefit may have to be made." *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985) (discussing *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)) (emphasis added). Furthermore, the United States Court of Appeals in *Brennan v. Stewart,* 834 F.2d 1248, 1262 (5th Cir.1988), concluded that "our precedent requires that the 'reasonable accommodation' question be decided as an issue of fact...."

Although the UIL provides a waiver procedure for some eligibility rules, e.g., the four-year eligibility rule, it fails to furnish such a process for the over–19 rule. Since the UIL already utilizes a waiver procedure for some rules, the evidence indicates that instituting such a procedure for the over–19 rule might be a reasonable accommodation in the UIL program to ensure that handicapped persons achieve meaningful access to the competitions regulated by the UIL. We find the U.S. District Court's reasoning on this issue in *Booth v. University Interscholastic League,* No. A–90–CA–764 (W.D.Tex. Oct. 4, 1990) (case dismissed as moot Jan. 14, 1991), particularly persuasive:

> [T]o uphold the [UIL's] blanket policy against consideration of the Plaintiff's circumstances in this case would be to undermine the objectives of the Rehabilitation Act without advancing the policies behind the 19 year-old eligibility rule. There is no evidence before the Court to suggest that the [UIL] bases its decision to bar the Plaintiff from playing high school football on any particular harm that might result if he is allowed to play, or on anything other than a policy of strictly enforcing its rules. But the Rehabilitation Act *requires* that federally assisted programs do more for those who fall within its ambit. For these reasons, requiring the [UIL] to give special consideration to the Plaintiff based on his history of being handicapped is a reasonable accommodation.

*Booth,* at 11–12. The Students in these causes are entitled to special consideration by the UIL to guarantee that the objectives of Section 504 are effectuated. A waiver mechanism for the over–19 rule would permit the UIL to consider the facts of particular situations in order to make individualized determinations as to the enforcement of the rule. Such determinations are *reasonable accommodations* which would advance both the purposes of Section 504 and the policies behind the over–19 rule. Under **\*303** these factual circumstances, the "no-exception" policy to the over–19 rule must yield to Section 504's reasonable accommodation requirement established by the United States Supreme Court in *Alexander.*

Accordingly, we hold that the trial court did not abuse its discretion in enjoining the enforcement of the over–19 rule. Points of error one and two are overruled.

### EXHAUSTION OF REMEDIES

 **[5]**    In its third point of error, the UIL alleges that, because the Students did not exhaust the administrative remedies under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C.A. §§ 1400–1484 (West Supp.1992), [6] the district court lacked jurisdiction over the causes. Specifically, it complains that the Students did not comply with section 1415(f) of the IDEA which states, "before the filing of a civil action under [the Rehabilitation Act and] such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter." 20 U.S.C.A. § 1415(f). The applicable remedy under this statute consists of a due process hearing and subsequent review for any complaint raised by a handicapped child or its parents regarding the child's education. 20 U.S.C.A. § 1415(b)(2), (c). The UIL maintains that the Students did not comply with this prerequisite for civil suits because they did not request a due process hearing to contest the exclusion of interscholastic athletics from their IEPs. [7]

The Students respond that the IDEA and Section 504 are different statutes with different purposes. They urge that while the IDEA strives to assure that handicapped children receive appropriate free public education, Section 504 prohibits discrimination against handicapped persons. *See Smith v. Robinson,* 468 U.S. 992, 1016, 104 S.Ct. 3457, 3470, 82 L.Ed.2d 746 (1984). The Students argue that their complaint is against the UIL for discrimination on the basis of their handicaps, not against the school districts for denial of a free appropriate public education; hence, relief was only available under Section 504. They argue that, because the UIL is not vested with the duty to provide a free appropriate public education under the IDEA, the Students could not assert their action against the UIL under the IDEA. The record reflects that the school districts applied to the UIL for waivers to the rule which the UIL denied. Therefore, the Students and their school districts acted in accordance with the UIL rules, and the cause of action was governed by Section 504 and not the IDEA. We agree with the Students regarding this exhaustion of remedies point, and thus we overrule the UIL's third point of error.

### MANDATORY FORFEITURE RULE

In its fourth and final point of error, the UIL contends that the trial court erred in enjoining the mandatory forfeiture rule and in awarding attorneys' fees. It insists that "the rule is reasonably related to a legitimate state purpose and is not arbitrary, capricious, or fundamentally unfair."

### Issue of Mootness

The Students reurge this Court to dismiss the appeal as moot. [8] They argue that since the 1991 football season has ended and they have graduated, an active controversy **\*304** no longer exists. The school districts respond by urging that such action on our part would vacate the trial court's judgment and would permit the UIL to invoke the sanctions contained in the mandatory forfeiture rule.

 **[6]    [7]    [8]**    The mootness doctrine is well established. Appellate courts only determine cases in which an actual controversy exists. *Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988); *Texas Educ. Agency,* 797 S.W.2d at 369. The issue of whether an injunction is valid becomes moot when the injunction does not continue to have effect. *See Parr v. Stockwell,* 322 S.W.2d 615, 616 (Tex.1959); *Texas Educ. Agency,* 797 S.W.2d at 369; *Spring Branch I.S.D. v. Reynolds,* 764 S.W.2d 16, 18 (Tex.App.— Houston [1st Dist.] 1988, no writ). An appellate court must set aside the judgment and dismiss the cause when an appeal is moot. *Texas Educ. Agency,* 797 S.W.2d at 369; *Texas Parks & Wildlife Dep't v. Texas Ass'n of Bass Clubs,* 622 S.W.2d 594, 596 (Tex.App.—Austin 1981, writ ref'd n.r.e.).

 **[9]**    Two exceptions to the mootness doctrine currently exist: (1) the "capable of repetition exception" and (2) the "collateral consequences exception." *General Land Office v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 571 (Tex.1990). However, neither exception applies to these causes. *See Spring Branch I.S.D.,* 764 S.W.2d at 18–19.

The UIL urges this Court to avoid dismissal by adopting a new exception to the mootness doctrine, the "public interest exception." According to the UIL, thirty-six states have recognized the "public interest exception," which allows appellate review of a question of considerable public importance if that question is capable of repetition between either the same parties or other members of the public but for

some reason evades appellate review. The UIL points out that other states have applied this doctrine in high school athletic controversies such as this one.

In *Texas Education Agency,* 797 S.W.2d at 369, under similar facts as these, we determined that the appeal was moot because the football eligibility of the litigating students had expired. *See also Spring Branch I.S.D.,* 764 S.W.2d at 18. However, these cases are distinguishable from the instant cause. In neither of those cases was the question of attorneys' fees involved. [9] Furthermore, in the instant cause, the school districts, which are parties to this appeal, have a direct interest in the continued viability of the district court judgment to prevent the UIL from enforcing the mandatory forfeiture rule. *See Mahavongsanan v. Hall,* 529 F.2d 448 (5th Cir.1976) (Student brought action to compel university to grant a degree. After injunctive relief was granted, university awarded degree and appealed the judgment. The Fifth Circuit Court of Appeals held that the case was not moot because the legal interests of the parties continued to be adverse.). Therefore, because of these distinguishing facts, we have decided to review the case pursuant to a "public interest

exception" to the mootness doctrine, and adhere to our earlier ruling overruling the Students' motion to dismiss the appeal as moot.

Because we elect to review these causes under the "public interest exception" to the mootness doctrine, and because we affirm the lower court's final judgment that the over–19 rule violates Section 504 of the Rehabilitation Act, we affirm the district court's ruling that the Students were eligible to play football during the 1991 season. Therefore, since there is no basis for the UIL to invoke the mandatory forfeiture rule, we have no need to address its fourth point of error.

### CONCLUSION

Finding no error, the judgment of the district court is affirmed.

**Parallel Citations**

81 Ed. Law Rep. 1145, 1 A.D.D. 742, 3 NDLR P 263

Footnotes

1    As a preliminary matter, we address the Students' motion to dismiss this appeal as moot. For reasons discussed later in this opinion, we decline to dismiss the appeal as moot.

2    The ARD Committee is composed of, at a minimum, a school administrator, a special education teacher, a regular education teacher, and the child's parent. Other persons may be included in the ARD Committee if determined to be necessary. One of the functions of the ARD Committee is to develop an individualized educational plan (IEP) for the student. Buchanan's IEP did not include interscholastic football as part of his program. Buchanan never petitioned for an administrative appeal of the decision of the ARD Committee to the Texas Education Agency. Buchanan's mother testified that because the ARD Committee recommended a waiver from the over–19 rule, she agreed with its decision, and thus did not feel it was necessary to appeal the decision.

3    *See Texas Educ. Agency v. Dallas Indep. Sch. Dist.,* 797 S.W.2d 367, 369 (Tex.App.—Austin 1990, no writ). (This Court held that the appeal in that case was moot, and therefore the underlying order was vacated. Accordingly, the UIL's determination of ineligibility became final and triggered the enforcement of the mandatory forfeiture rule).

4    As a preliminary matter, the UIL contends in its second point of error that the Students do not meet the definition of "qualified handicapped persons" under section 504 of the Rehabilitation Act. After reviewing the Act and its attendant regulations, we reject this argument and conclude that both students meet the definition of "qualified handicapped persons."

5    Although not controlling, this Court looks to federal precedent for its persuasive value.

6    Among the stated purposes of IDEA are

to assure that all children with disabilities have available to them, within the time periods specified in section 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of children with disabilities and their parents or guardians are protected....

20 U.S.C.A. § 1400(c).

7    The UIL admitted in oral argument that had the school districts declared the Students eligible under the IDEA, the UIL would not have abided by such determination. We also note that the school districts requested waivers from the UIL of

the over–19 rule, and therefore the Students had no need to invoke an administrative procedure designed to request affirmative action from the school authorities.

8    We overruled the Students' original motion to dismiss as moot.

9    If we moot this appeal and the judgment of the district court is vacated, the judgment for attorneys' fees is vacated as well.

---

**End of Document**        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

| Vernon's Texas Statutes and Codes Annotated |
| Civil Practice and Remedies Code (Refs & Annos) |
| Title 2. Trial, Judgment, and Appeal |
| Subtitle C. Judgments |
| Chapter 37. Declaratory Judgments (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 37.006

§ 37.006. Parties

Currentness

(a) When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. A declaration does not prejudice the rights of a person not a party to the proceeding.

(b) In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (190)

V. T. C. A., Civil Practice & Remedies Code § 37.006, TX CIV PRAC & REM § 37.006
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** <span style="float:right">© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle G. Attorneys
        Title 2, Subtitle G--Appendix
          a-1. Rules of Disciplinary Procedure (Refs & Annos)
            Part I. General Rules

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 1.06

1.06. Definitions

Currentness

A. "Address" means the registered address provided by the attorney who is the subject of the Grievance, as that address is shown on the membership rolls maintained by the State Bar on behalf of the Clerk of the Supreme Court at the time of receipt of the Grievance by the Chief Disciplinary Counsel.

B. "Board" means the Board of Directors of the State Bar of Texas.

C. "Chief Disciplinary Counsel" means the person serving as Chief Disciplinary Counsel and any and all of his or her assistants.

D. "Commission" means the Commission for Lawyer Discipline, a permanent committee of the State Bar of Texas.

E. "Committee" means any of the grievance committees within a single District.

F. "Complainant" means the person, firm, corporation, or other entity, including the Chief Disciplinary Counsel, initiating a Complaint or Inquiry.

G. "Complaint" means those written matters received by the Office of the Chief Disciplinary Counsel that, either on the face thereof or upon screening or preliminary investigation, allege Professional Misconduct or attorney Disability, or both, cognizable under these rules or the Texas Disciplinary Rules of Professional Conduct.

H. "Director" means a member of the Board of Directors of the State Bar of Texas.

I. "Disability" means any physical, mental, or emotional condition that, with or without a substantive rule violation, results in the attorney's inability to practice law, provide client services, complete contracts of employment, or otherwise carry out his or her professional responsibilities to clients, courts, the profession, or the public.

J. "Disciplinary Action" means a proceeding brought by or against an attorney in a district court or any judicial proceeding covered by these rules other than an Evidentiary Hearing.

K. "Disciplinary Petition" means a pleading that satisfies the requirements of Rule 3.01.

L. "Disciplinary Proceedings" includes the processing of a Grievance, the investigation and processing of an Inquiry or Complaint, presentation of a Complaint before a Summary Disposition Panel, and the proceeding before an Evidentiary Panel.

M. "District" means disciplinary district.

N. "Evidentiary Hearing" means an adjudicatory proceeding before a panel of a grievance committee.

O. "Evidentiary Panel" means a panel of the District Grievance Committee performing an adjudicatory function other than that of a Summary Disposition Panel with regard to a Disciplinary Proceeding pending before the District Grievance Committee of which the Evidentiary Panel is a subcommittee.

P. "Evidentiary Petition" means a pleading that satisfies the requirements of Rule 2.17.

Q. "General Counsel" means the General Counsel of the State Bar of Texas and any and all of his or her assistants.

R. "Grievance" means a written statement, from whatever source, apparently intended to allege Professional Misconduct by a lawyer, or lawyer Disability, or both, received by the Office of the Chief Disciplinary Counsel.

S. "Inquiry" means any written matter concerning attorney conduct received by the Office of the Chief Disciplinary Counsel that, even if true, does not allege Professional Misconduct or Disability.

T. "Intentional Crime" means (1) any Serious Crime that requires proof of knowledge or intent as an essential element or (2) any crime involving misapplication of money or other property held as a fiduciary.

U. "Just Cause" means such cause as is found to exist upon a reasonable inquiry that would induce a reasonably intelligent and prudent person to believe that an attorney either has committed an act or acts of Professional Misconduct requiring that a Sanction be imposed, or suffers from a Disability that requires either suspension as an attorney licensed to practice law in the State of Texas or probation.

V. "Penal Institution" has the meaning assigned by Article 62.001, Code of Criminal Procedure.

W. "Professional Misconduct" includes:

   1. Acts or omissions by an attorney, individually or in concert with another person or persons, that violate one or more of the Texas Disciplinary Rules of Professional Conduct.

2. Attorney conduct that occurs in another state or in the District of Columbia and results in the disciplining of an attorney in that other jurisdiction, if the conduct is Professional Misconduct under the Texas Disciplinary Rules of Professional Conduct.

3. Violation of any disciplinary or disability order or judgment.

4. Engaging in conduct that constitutes barratry as defined by the law of this state.

5. Failure to comply with Rule 13.01 of these rules relating to notification of an attorney's cessation of practice.

6. Engaging in the practice of law either during a period of suspension or when on inactive status.

7. Conviction of a Serious Crime, or being placed on probation for a Serious Crime with or without an adjudication of guilt.

8. Conviction of an Intentional Crime, or being placed on probation for an Intentional Crime with or without an adjudication of guilt.

X. "Reasonable Attorneys' Fees," for purposes of these rules only, means a reasonable fee for a competent private attorney, under the circumstances. Relevant factors that may be considered in determining the reasonableness of a fee include but are not limited to the following:

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

2. The fee customarily charged in the locality for similar legal services;

3. The amount involved and the results obtained;

4. The time limitations imposed by the circumstances; and

5. The experience, reputation, and ability of the lawyer or lawyers performing the services.

Y. "Respondent" means any attorney who is the subject of a Grievance, Complaint, Disciplinary Proceeding, or Disciplinary Action.

Z. "Sanction" means any of the following:

1. Disbarment.

2. Resignation in lieu of discipline.

3. Indefinite Disability Suspension.

4. Suspension for a term certain.

5. Probation of suspension, which probation may be concurrent with the period of suspension, upon such reasonable terms as are appropriate under the circumstances.

6. Interim suspension.

7. Public reprimand.

8. Private reprimand.

The term "Sanction" may include the following additional ancillary requirements.

a. Restitution (which may include repayment to the Client Security Fund of the State Bar of any payments made by reason of Respondent's Professional Misconduct); and

b. Payment of Reasonable Attorneys' Fees and all direct expenses associated with the proceedings.

AA. "Serious Crime" means barratry; and felony involving moral turpitude; any misdemeanor involving theft, embezzlement, or fraudulent or reckless misappropriation of money or other property; or any attempt, conspiracy, or solicitation of another to commit any of the foregoing crimes.

BB. "State Bar" means the State Bar of Texas.

CC. "Summary Disposition Panel" means a panel of the Committee that determines whether a Complaint should proceed or should be dismissed based upon the absence of evidence to support a finding of Just Cause after a reasonable investigation by the Chief Disciplinary Counsel of the allegations in the Grievance.

DD. "Wrongfully Imprisoned Person" has the meaning assigned by Section 501.101, Government Code.

**Credits**
Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Amended by orders of Dec. 29, 2003, eff. Jan. 1, 2004; May 14, 2008, Aug. 20, 2008, eff. Sept. 1, 2008; Oct. 14, 2013, eff. Nov. 1, 2013.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

Notes of Decisions (26)

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 1.06, TX ST RULES DISC P 1.06
Current with amendments received through 3/15/2015

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| Government Code (Refs & Annos) |
| Title 2. Judicial Branch (Refs & Annos) |
| Subtitle G. Attorneys |
| Title 2, Subtitle G--Appendix |
| a-1. Rules of Disciplinary Procedure (Refs & Annos) |
| Part II. The District Grievance Committees |

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.12

2.12. Investigation and Determination of Just Cause

Currentness

No more than sixty days after the date by which the Respondent must file a written response to the Complaint as set forth in Rule 2.10, the Chief Disciplinary Counsel shall investigate the Complaint and determine whether there is Just Cause.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Amended by order of June 15, 1994, eff. Oct. 1, 1994. Renumbered from Rule 2.11 and amended by order of Dec. 29, 2003, eff. Jan. 1, 2004.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

Notes of Decisions (17)

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.12, TX ST RULES DISC P 2.12
Current with amendments received through June 1, 2015

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle G. Attorneys
        Title 2, Subtitle G--Appendix
          a-1. Rules of Disciplinary Procedure (Refs & Annos)
            Part II. The District Grievance Committees

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.13

2.13. Summary Disposition Setting

Currentness

Upon investigation, if the Chief Disciplinary Counsel determines that Just Cause does not exist to proceed on the Complaint, the Chief Disciplinary Counsel shall place the Complaint on a Summary Disposition Panel docket. At the Summary Disposition Panel docket, the Chief Disciplinary Counsel will present the Complaint together with any information, documents, evidence, and argument deemed necessary and appropriate by the Chief Disciplinary Counsel, without the presence of the Complainant or Respondent. The Summary Disposition Panel shall determine whether the Complaint should be dismissed or should proceed. If the Summary Disposition Panel dismisses the Complaint, both the Complainant and Respondent will be so notified. There is no appeal from a determination by the Summary Disposition Panel that the Complaint should be dismissed or should proceed. All Complaints presented to the Summary Disposition Panel and not dismissed shall be placed on the Hearing Docket. The fact that a Complaint was placed on the Summary Disposition Panel Docket and not dismissed is wholly inadmissible for any purpose in the instant or any subsequent Disciplinary Proceeding or Disciplinary Action. Files of dismissed Disciplinary Proceedings will be retained for one hundred eighty days, after which time the files may be destroyed. No permanent record will be kept of Complaints dismissed except to the extent necessary for statistical reporting purposes. In all instances where a Complaint is dismissed by a Summary Disposition Panel other than where the attorney is deceased or is not licensed to practice law in the State of Texas, the Chief Disciplinary Counsel shall refer the Inquiry to a voluntary mediation and dispute resolution procedure.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Renumbered from Rule 2.12 and amended by order of Dec. 29, 2003, eff. Jan. 1, 2004.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.13, TX ST RULES DISC P 2.13
Current with amendments received through 3/15/2015

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Government Code (Refs & Annos)
Title 2. Judicial Branch (Refs & Annos)
Subtitle G. Attorneys
Title 2, Subtitle G--Appendix
a-1. Rules of Disciplinary Procedure (Refs & Annos)
Part II. The District Grievance Committees

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.14

2.14. Proceeding Upon a Determination of Just Cause

Currentness

All rights characteristically reposed in a client by the common law of this State as to every Complaint not dismissed by the Summary Disposition Panel are vested in the Commission.

A. *Client of Chief Disciplinary Counsel*: The Commission is the client of the Chief Disciplinary Counsel for every Complaint not dismissed by the Summary Disposition Panel.

B. *Interim Suspension*: In any instance in which the Chief Disciplinary Counsel reasonably believes based upon investigation of the Complaint that the Respondent poses a substantial threat of irreparable harm to clients or prospective clients, the Chief Disciplinary Counsel may seek and obtain authority from the Commission to pursue interim suspension of the Respondent's license in accordance with Part XIV of these rules.

C. *Disability*: In any instance in which the Chief Disciplinary Counsel reasonably believes based upon investigation of the Complaint that the Respondent is suffering from a Disability to such an extent that either (a) the Respondent's continued practice of law poses a substantial threat of irreparable harm to client or prospective clients; or (b) the Respondent is so impaired as to be unable to meaningfully participate in the preparation of a defense, the Chief Disciplinary Counsel shall seek and obtain client authority to refer the Complaint to the Board of Disciplinary Appeals pursuant to Part XII of these rules.

D. *Notification of Complaint*: For each Complaint not dismissed by a Summary Disposition Panel, the Chief Disciplinary Counsel shall give the Respondent written notice of the acts and/or omissions engaged in by the Respondent and of the Texas Disciplinary Rules of Professional Conduct that the Chief Disciplinary Counsel contends are violated by the alleged acts and/or omissions. Such notice shall be given by certified mail, return receipt requested, sent to the Respondent at the Address.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Amended by order of Dec. 23, 1992. Renumbered from Rule 2.13 and amended by order of Dec. 29, 2003, eff. Jan. 1, 2004.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

Notes of Decisions (4)

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.14, TX ST RULES DISC P 2.14
Current with amendments received through June 1, 2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Government Code (Refs & Annos)
Title 2. Judicial Branch (Refs & Annos)
Subtitle G. Attorneys
Title 2, Subtitle G--Appendix
a-1. Rules of Disciplinary Procedure (Refs & Annos)
Part II. The District Grievance Committees

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.16

2.16. Confidentiality

Currentness

A. All members and staff of the Office of Chief Disciplinary Counsel, Board of Disciplinary Appeals. Committees, and Commission shall maintain as confidential all Disciplinary Proceedings and associated records, except that:

1. the pendency, subject matter, status of an investigation, and final disposition, if any, may be disclosed by the Office of Chief Disciplinary Counsel or Board of Disciplinary Appeals if the Respondent has waived confidentiality, the Disciplinary Proceeding is based on conviction of a serious crime, or disclosure is ordered by a court of competent jurisdiction;

2. if the Evidentiary Panel finds that professional misconduct occurred and imposes any sanction other than a private reprimand.

a. the Evidentiary Panel's final judgment is a public record from the date the judgment is signed; and

b. once all appeals, if any, have been exhausted and the judgment is final, the Office of Chief Disciplinary Counsel shall, upon request, disclose all documents, statements, and other information relating to the Disciplinary Proceeding that came to the attention of the Evidentiary Panel during the Disciplinary Proceeding;

3. the record in any appeal to the Board of Disciplinary Appeals from an Evidentiary Panel's final judgment, other than an appeal from a judgment of private reprimand, is a public record; and

4. facts and evidence that are discoverable elsewhere are not made confidential merely because they are discussed or introduced in the course of a Disciplinary Proceeding.

B. The deliberations and voting of an Evidentiary Panel are strictly confidential and not subject to discovery. No person is competent to testify as to such deliberations and voting.

C. Rule 6.08 governs the provision of confidential information to authorized agencies investigating qualifications for admission to practice, attorney discipline enforcement agencies, law enforcement agencies, the State Bar's Client Security Fund, the State

Bar's Lawyer Assistance Program, the Supreme Court's Unauthorized Practice of Law Committee and its subcommittees, and the Commission on Judicial Conduct.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Renumbered from Rule 2.15 and amended by orders of Dec. 29, 2003, eff. Jan. 1, 2004. Amended by order of Dec. 7, 2009, eff. Jan. 1, 2010.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

Notes of Decisions (1)

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.16, TX ST RULES DISC P 2.16
Current with amendments received through 3/15/2015

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

V.T.C.A., Education Code § 21.032
VERNON'S TEXAS STATUTES AND CODES ANNOTATED
EDUCATION CODE
**TITLE 2. PUBLIC SCHOOLS**
**CHAPTER 21. PROVISIONS GENERALLY APPLICABLE TO SCHOOL DISTRICTS**
SUBCHAPTER B. ADMISSION AND ATTENDANCE

(Information regarding effective dates, repeals, etc. is provided subsequently in this document.)

§ 21.032. Compulsory Attendance

(a) Unless specifically exempted by Section 21.033 of this code or under other laws or unless a child is at least 17 years of age and has been issued a high school equivalency certificate, every child in the state who is as much as six years of age, or who is less than seven years of age and has previously been enrolled in first grade, and who has not completed the academic year in which his 17th birthday occurred shall be required to attend the public schools in the district of his residence or in some other district to which he may be transferred as provided or authorized by law a minimum of 170 days of the regular school term of the district in which the child resides or to which he has been transferred.
(b) A child enrolled in prekindergarten or kindergarten must attend class or have an excused absence for a minimum of 85 days during each semester for which the child is enrolled.

<Text of subsec. (c) as amended by Acts 1993, 73rd Leg., ch. 347, § 3.01>

(c) Unless specifically exempted by Section 21.033 of this code, a student enrolled in a public school district must attend an extended year program provided by a school district for which the student is eligible or tutorial classes required by the district under Section 21.103(b) of this code. A district shall provide transportation services to students required to attend an extended year program provided by a school district in the same manner as during the regular school year. A school district is not required to provide transportation services to accommodate students required to attend tutorial classes under Section 21.103(b).

<Text of subsec. (c) as amended by Acts 1993, 73rd Leg., ch. 557, § 3>

(c) Unless specifically exempted by Section 21.033 of this code, a student enrolled in a public school district must attend an extended year program for which the student is eligible that is provided by the district for students identified as likely not to be promoted to the next grade level or tutorial classes required by the district under Section 21.103(b) of this code. A district shall provide transportation services to each student required under this section to attend an extended year program who would be eligible for transportation services during a regular school term. A school district is not required to provide transportation services to accommodate students required under this section to attend tutorial classes.

1987 Main Volume Credit(s)

Acts 1969, 61st Leg., p. 2735, ch. 889, § 1, eff. Sept. 1, 1969. Amended by Acts 1981, 67th Leg., p. 2226, ch. 525, § 1, eff. Sept. 1, 1981; Acts 1983, 68th Leg., p. 4908, ch. 871, § 1, eff. Sept. 1, 1983; Acts 1984, 68th Leg., 2nd C.S., ch. 28, art. IV, part E, § 1, eff. Sept. 1, 1984.

1995 Pocket Part Credit(s)

Amended by Acts 1989, 71st Leg., ch. 813, § 6.05, eff. Sept. 1, 1989; Acts 1991, 72nd Leg., ch. 391, § 25, eff. Aug. 26, 1991; Acts 1993, 73rd Leg., ch. 347, § 3.01, eff. May 31, 1993; Acts 1993, 73rd Leg., ch. 557, § 3, eff. Aug. 30, 1993.

EDUCATION CODE

AUXILIARY LAWS

1995 Pocket Part Auxiliary Laws

<For table of special laws classified to Title 49, Education—Public, of the Civil Statutes, that were neither repealed by, nor incorporated into, the Education Code, see V.A.T.S. Education Auxiliary Laws.>

## CHAPTER 21. PROVISIONS GENERALLY APPLICABLE TO SCHOOL DISTRICTS

REPEAL

<Section 8.33(2) of Acts 1993, 73rd Leg., ch. 347, provides for the repeal of Title 2 of the Education Code, except Chapters 16, 20, and 36, effective September 1, 1995>

HISTORICAL NOTES

HISTORICAL AND STATUTORY NOTES

1995 Pocket Part Historical and Statutory Notes

1993 Legislation

Section 3.06 of Acts 1993, 73rd Leg., ch. 347 provides:

"This article takes effect immediately and applies beginning with the 1993-1994 school year."

Section 5 of Acts 1993, 73rd Leg., ch. 557 provides:

"This Act applies beginning with the 1993-1994 school year."

1987 Main Volume Historical and Statutory Notes

The 1981 amendment inserted ", or who is less than seven years of age and has previously been enrolled in first grade,".

Section 2 of the 1981 amendatory act provided that it took effect beginning with the 1981-1982 school year which, under the provisions of § 21.001, began on September 1, 1981.

The 1983 amendment added subsec. (b).

The 1984 amendment in subsec. (a) substituted "who has not completed the academic year in which his 16th birthday occurred" for "not more than 17 years of age" and "170" for "165"; and in subsec. (b) inserted "prekindergarten or" and substituted "85" for "82".

**Prior Law:**
  Acts 1915, 34th Leg., pp. 93, 94, ch. 49, § 1.
  Acts 1923, 38th Leg., p. 255, ch. 121, § 1.
  Acts 1935, 44th Leg., p. 409, ch. 160, §§ 1, 2.
  Acts 1939, 46th Leg., p. 692, § 1.
  Acts 1963, 58th Leg., p. 937, ch. 367, §§ 1, 2.
  Acts 1965, 59th Leg., p. 183, ch. 75, §§ 1, 2.
  Acts 1971, 62nd Leg., p. 3024, ch. 994, § 17(2).
  Vernon's Ann.P.C. (1925) art. 297.
  Vernon's Ann.Civ.St. art. 2892.

REFERENCES

CROSS REFERENCES

1995 Pocket Part Cross References

Failure to attend school, see § 4.251.

1987 Main Volume Cross References

Adult education for those over compulsory attendance age, see § 11.18.
Conduct under this law indicating need for supervision, see V.T.C.A. Family Code, § 51.03(b)(2), (4).
Report of child abuse, violation of this section, see V.T.C.A. Family Code, § 34.02.
Teachers' attendance reports, see § 21.251.
Termination of parent & child relationship, violation of this law, see V.T.C.A. Family Code, § 15.02(1)(H)(i).
Thwarting compulsory attendance law, penalty, see § 4.25.

ADMINISTRATIVE CODE REFERENCES

1987 Main Volume Administrative Code References

Compulsory student attendance, general provisions, see 19 TAC § 129.21.
Department of Human Services, eligibility for child protective services, harm other than abuse or neglect, see 40 TAC § 49.307.
Department of Labor and Standards, child labor, actors, see 16 TAC § 71.6.
School districts, compulsory attendance, see 19 TAC § 61.62.
Texas Education Agency, adaptations for special populations, special education, clarification of provisions in federal regulations and state law,
Handicapped students, see 19 TAC § 89.211.
Parent participation in Admission, Review and Dismissal Committee meetings, see 19 TAC § 89.222.

LAW REVIEW COMMENTARIES

1987 Main Volume Law Review Commentaries

Married and pregnant students. 50 Texas L.Rev. 1196 (1972).

Married pupils. 19 Baylor L.Rev. 442 (1967).

LIBRARY REFERENCES

1987 Main Volume Library References

Schools ☞160.
C.J.S. Schools and School Districts §§ 463 to 470.

ANNOTATIONS

NOTES OF DECISIONS

Age 1 ....................................................... enter p
Attorney fees 6.5 ............................................ enter p
Criminal proceedings 6 ....................................... enter p
Married students 4 .......................................... enter p
Residence 2 ................................................. enter p
Transportation of students 3 ................................ enter p
Tuition 5 ................................................... enter p
Validity 1/2 ................................................ enter p

½. Validity

Parents who did not enroll their children in public school as required under compulsory attendance law [V.T.C.A. Education Code § 21.032] failed to establish that law substantially burdened their exercise of their religious beliefs in violation of free exercise clauses [U.S.C.A. Const.Amend. 1; Vernon's Anno. Const. Art. 1, § 26], thus exempting them from compliance, where parents failed to show that their violation of attendance law was based on anything except their subjective views and where parents did not make any showing of religious or cultural tradition, notwithstanding parents' claim that word of God constituted law that exempted them from compliance with this section. Howell v. State (App. 6 Dist.1986) 723 S.W.2d 755.

Under Texas law, trial court lacked jurisdiction to grant equitable relief or enter declaratory judgment construing or interpreting criminal compulsory school attendance statute, where parties challenging statute did not plead or prove that it was unconstitutional or otherwise void, or show that enforcement of statute had or would result in irreparable injury to their vested property rights. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

Texas Education Agency (TEA) guidelines under which parents of children being educated in private or parochial home schools were subject to prosecution under compulsory attendance statute, while parents of children being educated in private or parochial campus schools were not, was not rationally related to state objective of compelling education of school-aged children in private or parochial schools if they did not attend public schools, in violation of equal protection. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

1. Age

The board of trustees of a school district could not legally refuse to accept a student who was within the scholastic age even though he had graduated from high school. Op.Atty.Gen.1939, No. 0-1388.

A child who attained age of 16 or over before beginning of public free schools in his district was not subject to provisions of compulsory attendance law whether or not child had completed work of 9th grade, but child who attained age of 16 after beginning of public free schools was subject to compulsory attendance law for that school year unless child was exempt from law. Op.Atty.Gen.1949, No. V-954.

A child under 16 years of age who had completed the 9th grade was subject to the provisions of Vernon's Ann.Civ.St. art. 2892 (repealed; now, this section) and Vernon's Ann.P.C. (1925) art. 297 (repealed; now, this section). Op.Atty.Gen.1961, No. WW-1216.

2. Residence

Parents cannot be compelled to send their children to the school district of their residence if they do not desire to do so, especially where they send children to another proper school. Palmer v. District Trustees of Dist. No. 21 (Civ.App.1956) 289 S.W.2d 344, ref. n.r.e.

### 3. Transportation of students

It is legal duty of parents to require their children of 16 years of age or under to attend school, and the way and manner such children are to be conveyed to school is a business problem to be solved by the parents. Cotterly v. Nuirhead (Civ.App.1952) 244 S.W.2d 920, ref. n.r.e.

Where second school district voluntarily taught students in question, although students were nonresidents and had not been lawfully transferred to this district, their attendance was not unlawful, and district of student's residence could not prevent private persons from transporting the students to the schools. Palmer v. District Trustees of Dist. No. 21 (Civ.App.1956) 289 S.W.2d 344, ref. n.r.e.

### 4. Married students

School board was without authority to adopt rule that students who marry during school term must withdraw from school for remainder of school year and board could not deny admission to student, because of fact she was married. Anderson v. Canyon Independent School Dist. (Civ.App.1967) 412 S.W.2d 387.

A girl attending school who attained the age of sixteen years and subsequently married in accordance with State laws was not subject to compulsory school attendance law. Op.Atty.Gen.1956, S-20.

### 5. Tuition

Independent school district may charge tuition for pupils within compulsory school ages transferred from other districts. Muse v. McKinney Independent School Dist. (Civ.App.1931) 35 S.W.2d 780.

### 6. Criminal proceedings

The compulsory education law required school attendance for a minimum of 120 days a year and the failure to file a complaint within the first 120 days of the school year would not preclude a criminal action against the parent or the person standing in parental relation to the child. Op.Atty.Gen.1960, No. WW-862.

### 6.5. Attorney fees

School districts could be held liable for attorneys' fees under federal civil rights attorney fees statute in action in which parents who taught their children at home successfully challenged Texas Education Agency (TEA) guidelines subjecting them to prosecution under compulsory attendance statute, where school districts implemented TEA's unconstitutional policy by requesting criminal prosecution of parents. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

Requiring school districts to pay home school parents' attorneys' fees and costs in action in which parents successfully challenged Texas Education Association (TEA) guidelines subjecting them to criminal prosecution under compulsory attendance statutes was equitable and just, as required by attorney fee statute, although TEA was not required to pay fees. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

Attorneys' failure to segregate their fees and expenses as to claims and parties in class action challenging state guidelines for application of compulsory school attendance statute did not preclude award of attorneys' fees, where all claims arose out of same fact situation and were all interrelated. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

V.T.C.A., Education Code § 21.033
VERNON'S TEXAS STATUTES AND CODES ANNOTATED
EDUCATION CODE
**TITLE 2. PUBLIC SCHOOLS**
**CHAPTER 21. PROVISIONS GENERALLY APPLICABLE TO SCHOOL DISTRICTS**
SUBCHAPTER B. ADMISSION AND ATTENDANCE

(Information regarding effective dates, repeals, etc. is provided subsequently in this document.)

§ 21.033. Exemptions

(a) The following classes of children are exempt from the requirements of compulsory attendance:

(1) any child in attendance upon a private or parochial school which shall include in its course a study of good citizenship;

(2) any child who is handicapped as defined in Section 21.503 of this code and who cannot be appropriately served by the resident district in accordance with the requirements of Section 21.032 of this code;

(3) any child who has a physical or mental condition of a temporary and remediable nature which renders such child's attendance infeasible and who holds a certificate from a qualified physician specifying the temporary condition, indicating the treatment prescribed to remedy the temporary condition, and covering the anticipated period of the child's absence from school for the purpose of receiving and recuperating from such remedial treatment;

(4) any child expelled in accordance with the requirements of law;

(5) any child who is at least 17 years old and in attendance upon a course of instruction to prepare for the high school equivalency examinations;

(6) any child who is at least 16 years old and in attendance upon a course of instruction to prepare for the high school equivalency examinations provided that the person is recommended to the course of instruction by a public agency which has supervision or custody of the person under a court order; and

(7) any child who is enrolled in the Texas Academy of Leadership in the Humanities.

(b) This section does not relieve a resident district as defined by Section 21.502 of this code of its fiscal and administrative responsibilities under Subchapter N of this chapter[1] or of its responsibility to provide a handicapped child with a free appropriate public education.

1987 Main Volume Credit(s)

Acts 1969, 61st Leg., p. 2735, ch. 889, § 1, eff. Sept. 1, 1969. Amended by Acts 1971, 62nd Leg., p. 1513, ch. 405, § 40, eff. May 26, 1971; Acts 1973, 63rd Leg., p. 769, ch. 342, § 1, eff. June 12, 1973; Acts 1975, 64th Leg., p. 2378, ch. 734, § 2, eff. June 21, 1975; Acts 1979, 66th Leg., p. 1321, ch. 602, § 21, eff. Aug. 27, 1979; Acts 1984, 68th Leg., 2nd C.S., ch. 28, art. IV, part E, § 2, eff. Sept. 1, 1984; Acts 1985, 69th Leg., ch. 383, § 1, eff. Aug. 26, 1985.

1995 Pocket Part Credit(s)

Amended by Acts 1990, 71st Leg., 6th C.S., ch. 1, § 3.12, eff. Sept. 1, 1990; Acts 1991, 72nd Leg., ch. 461, § 2, eff. June 11, 1991.

[1] Section 21.501 et seq.

EDUCATION CODE

AUXILIARY LAWS

1995 Pocket Part Auxiliary Laws

<For table of special laws classified to Title 49, Education—Public, of the Civil Statutes, that were neither repealed by, nor incorporated into, the Education Code, see V.A.T.S. Education Auxiliary Laws.>

## CHAPTER 21. PROVISIONS GENERALLY APPLICABLE TO SCHOOL DISTRICTS

REPEAL

<Section 8.33(2) of Acts 1993, 73rd Leg., ch. 347, provides for the repeal of Title 2 of the Education Code, except Chapters 16, 20, and 36, effective September 1, 1995>

HISTORICAL NOTES

HISTORICAL AND STATUTORY NOTES

1995 Pocket Part Historical and Statutory Notes

1989 Legislation

Acts 1989, 71st Leg., ch. 658, § 11 provides:

"Nothing in this Act applies to students in attendance upon a private or parochial school, which includes home schools, in accordance with Section 21.033, Education Code."

1987 Main Volume Historical and Statutory Notes

Vernon's Ann.Civ.St. art. 2893 was amended by Acts 1969, 61st Leg., p. 871, ch. 289, § 3; Acts 1969, 61st Leg., p. 1669, ch. 532, § 1; and by Acts 1969, 61st Leg., p. 1964, ch. 664, § 1. Such amendatory acts were repealed by Acts 1971, 62nd Leg., p. 1533, ch. 405, § 54(2), which by §§ 40, 41 thereof incorporated the provisions of the 1969 Acts into the Education Code by amending this section and adding section 21.0331.

The 1971 amendment deleted the requirement that the school make the English language the basis of instruction in all subjects in subd. (1); rewrote subd. (2) which read:

"any child whose bodily or mental condition is such as to render attendance inadvisable and who holds a definite certificate of a reputable physician specifying the condition and covering the period of absence;";

deleted former subd. (3) which related to any child who was blind, deaf, dumb, or feebleminded; deleted subd. (4) which related to children living more than 2½ miles from school and having no fee transportation; and renumbered former subd. (5) as subd. (3).

The 1973 amendment in subd. (3), deleted "county" before "superintendent" and added subd. (4).

The 1975 amendment rewrote subd. (2); inserted new subd. (3); renumbered former subd. (3) as (4) and therein substituted "chief administrator of the school which such child would otherwise attend" for "superintendent"; deleted former subd. (4); added subd. (5). Prior to deletion, former subd. (4) read:

"any child more than 15 years of age who is enrolled in a technical-vocational training program, a work-study program, or an apprenticeship program approved by the superintendent, parent or guardian of the public school he would otherwise attend."

The 1979 amendment inserted subsection designation "(a)"; in subsec. (a), rewrote subd. (2) which previously read:

"(2) any child who has a physical or mental handicap that:
"(A) is not of a temporary and readily remediable nature, and
"(B) according to the great weight and preponderance of adequate diagnostic and evaluative information of a current nature, consisting of both specialty medical examinations and pertinent specialty assessments by qualified personnel regularly engaged in the provision of special education and related services to handicapped individuals, renders the child's attendance in regular classrooms or in special educational facilities supported with tax funds useless or inconsistent with the child's best interests;";

and in subd. (3) substituted "infeasible" for "unfeasible"; added subsec. (b).

The 1984 amendment in subsec. (a) in subd. (2) substituted "21.503" for "16.104" in subd. (3) added "and" at the end; deleted former subd. (4) which related to children more than 17 years old who had satisfactorily completed ninth grade and who showed that their services were needed by parents or those in a parental relation and renumbered formed subd. (5) as subd. (4).

The 1985 amendment in subsec. (b) substituted "21.502" for "16.104" and substituted "Subchapter N of this chapter" for "that section".

**Prior Law:**
Acts 1915, 34th Leg., pp. 93, 94, ch. 49, § 2.
Acts 1921, 37th Leg., p. 235, ch. 125, § 1.
Acts 1923, 38th Leg., p. 255, ch. 121, § 2.
Acts 1945, 49th Leg., p. 185, ch. 142, §§ 1, 2.
Acts 1965, 59th Leg., p. 1020, ch. 504, § 1.
Acts 1969, 61st Leg., p. 871, ch. 289, §§ 3, 4.
Acts 1969, 61st Leg., p. 1669, ch. 532, § 1.
Acts 1969, 61st Leg., p. 1964, ch. 664, § 1.
Acts 1971, 62nd Leg., p. 1533, ch. 405, § 54(2).
Vernon's Ann.P.C. (1925) art. 298.
Vernon's Ann.Civ.St. art. 2893.

REFERENCES

ADMINISTRATIVE CODE REFERENCES

1987 Main Volume Administrative Code References

Nonpublic and elementary schools, recognition for compulsory attendance, see 19 TAC § 65.2.
Texas Education Agency, adaptations for special populations, special education, clarification of provisions in federal regulations and state law, parent participation in Admission, Review and Dismissal Committee meetings, see 19 TAC § 89.222.

LIBRARY REFERENCES

1987 Main Volume Library References

Schools ☞160.
C.J.S. Schools and School Districts §§ 463 to 470.

ANNOTATIONS

NOTES OF DECISIONS

Private or parochial school 1 ................................ enter p

1. Private or parochial school

Class of parents teaching their children at home met commonality, numerosity and typicality requirements required for class certification in action challenging guidelines for application of compulsory attendance statute; all class members were at risk of prosecution under existing policy which declared that their children could not be considered in attendance at private or parochial school. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

Award of classwide injunctive relief was appropriate in action brought by class of parents who taught their children at home against defendant class of public school districts and their school attendance officers, challenging state guidelines under which parents were subject to prosecution under compulsory attendance statute. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

Evidence concerning history of public education was sufficient to support finding that child receiving home education using curriculum designed to meet basic education goals of reading, spelling, grammar, mathematics and civics was attending a "private or parochial school" within meaning of compulsory education statutes. Texas Educ. Agency v. Leeper (App. 2 Dist.1991) 843 S.W.2d 41, rehearing denied, writ granted.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Statutes and Codes Annotated
>  Government Code (Refs & Annos)
>   Title 2. Judicial Branch (Refs & Annos)
>    Subtitle G. Attorneys
>     Chapter 81. State Bar (Refs & Annos)
>      Subchapter E. Discipline (Refs & Annos)

V.T.C.A., Government Code § 81.072

§ 81.072. General Disciplinary and Disability Procedures

Effective: September 1, 2013
Currentness

(a) In furtherance of the supreme court's powers to supervise the conduct of attorneys, the court shall establish disciplinary and disability procedures in addition to the procedures provided by this subchapter.

(b) The supreme court shall establish minimum standards and procedures for the attorney disciplinary and disability system. The standards and procedures for processing grievances against attorneys must provide for:

(1) classification of all grievances and investigation of all complaints;

(2) a full explanation to each complainant on dismissal of an inquiry or a complaint;

(3) periodic preparation of abstracts of inquiries and complaints filed that, even if true, do or do not constitute misconduct;

(4) an information file for each grievance filed;

(5) a grievance tracking system to monitor processing of grievances by category, method of resolution, and length of time required for resolution;

(6) notice by the state bar to the parties of a written grievance filed with the state bar that the state bar has the authority to resolve of the status of the grievance, at least quarterly and until final disposition, unless the notice would jeopardize an undercover investigation;

(7) an option for a trial in a district court on a complaint and an administrative system for attorney disciplinary and disability findings in lieu of trials in district court, including an appeal procedure to the Board of Disciplinary Appeals and the supreme court under the substantial evidence rule;

(8) an administrative system for reciprocal and compulsory discipline;

(9) interim suspension of an attorney posing a threat of immediate irreparable harm to a client;

(10) authorizing all parties to an attorney disciplinary hearing, including the complainant, to be present at all hearings at which testimony is taken and requiring notice of those hearings to be given to the complainant not later than the seventh day before the date of the hearing;

(11) the commission adopting rules that govern the use of private reprimands by grievance committees and that prohibit a committee:

(A) giving an attorney more than one private reprimand within a five-year period for a violation of the same disciplinary rule; or

(B) giving a private reprimand for a violation:

(i) that involves a failure to return an unearned fee, a theft, or a misapplication of fiduciary property; or

(ii) of a disciplinary rule that requires a prosecutor to disclose to the defense all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, including Rule 3.09(d), Texas Disciplinary Rules of Professional Conduct; and

(12) distribution of a voluntary survey to all complainants urging views on grievance system experiences.

(b-1) In establishing minimum standards and procedures for the attorney disciplinary and disability system under Subsection (b), the supreme court must ensure that the statute of limitations applicable to a grievance filed against a prosecutor that alleges a violation of the disclosure rule does not begin to run until the date on which a wrongfully imprisoned person is released from a penal institution.

(b-2) For purposes of Subsection (b-1):

(1) "Disclosure rule" means the disciplinary rule that requires a prosecutor to disclose to the defense all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, including Rule 3.09(d), Texas Disciplinary Rules of Professional Conduct.

(2) "Penal institution" has the meaning assigned by Article 62.001, Code of Criminal Procedure.

(3) "Wrongfully imprisoned person" has the meaning assigned by Section 501.101.

(c) In addition to the minimum standards and procedures provided by this chapter, the supreme court, under Section 81.024 shall prepare, propose, and adopt rules it considers necessary for disciplining, suspending, disbarring, and accepting resignations of attorneys.

(d) Each attorney is subject to the Texas Rules of Disciplinary Procedure and the Texas Disciplinary Rules of Professional Conduct.

(e) The state bar shall establish a voluntary mediation and dispute resolution procedure to:

(1) attempt to resolve each allegation of attorney misconduct that is:

(A) classified as an inquiry under Section 81.073(a)(2)(A) because it does not constitute an offense cognizable under the Texas Disciplinary Rules of Professional Conduct; or

(B) classified as a complaint and subsequently dismissed; and

(2) facilitate coordination with other programs administered by the state bar to address and attempt to resolve inquiries and complaints referred to the voluntary mediation and dispute resolution procedure.

(e-1) All types of information, proceedings, hearing transcripts, and statements presented during the voluntary mediation and dispute resolution procedure established under Subsection (e) are confidential to the same extent the information, proceedings, transcripts, or statements would be confidential if presented to a panel of a district grievance committee.

(f) Responses to the survey provided for in Subsection (b)(12) may not identify either the complainant or attorney and shall be open to the public. The topics must include:

(1) treatment by the grievance system staff and volunteers;

(2) the fairness of grievance procedures;

(3) the length of time for grievance processing;

(4) disposition of the grievance; and

(5) suggestions for improvement of the grievance system.

(g) A person may not maintain an action against a complainant or witness in a disciplinary proceeding based on a communication made by the complainant or witness to the commission, a grievance committee, or the chief disciplinary counsel. The immunity granted by this subsection is absolute and unqualified.

(h) The state bar or a court may not require an attorney against whom a disciplinary action has been brought to disclose information protected by the attorney-client privilege if the client did not initiate the grievance that is the subject of the action.

(i) A panel of a district grievance committee of the state bar that votes on a grievance matter shall disclose to the complainant and the respondent in the matter the number of members of the panel:

   (1) voting for a finding of just cause;

   (2) voting against a finding of just cause; and

   (3) abstaining from voting on the matter.

(j) A quorum of a panel of a district grievance committee of the state bar must include one public member for each two attorney members.

(k) A member of a panel of a district grievance committee of the state bar may vote on a grievance matter to which the panel was assigned only if the member is present at the hearing at which the vote takes place.

(l) A person may be appointed to serve on a panel of a district grievance committee of the state bar only if the person is a member of the district grievance committee from which the panel was assigned and the person was appointed to serve on the committee in strict accordance with the Texas Rules of Disciplinary Procedure.

(m) A panel of a district grievance committee of the state bar may not be changed in size for the purpose of obtaining a quorum on the panel without the approval of the complainant and the respondent in the grievance matter to which the panel was assigned.

(n) A member of a panel of a district grievance committee of the state bar may not be substituted with another member of the district grievance committee on the day of the hearing for which the panel was assigned without the approval of the complainant and the respondent in the grievance matter.

(o) Whenever a grievance is either dismissed as an inquiry or dismissed as a complaint in accordance with the Texas Rules of Disciplinary Procedure and that dismissal has become final, the respondent attorney may thereafter deny that a grievance was pursued and may file a motion with the tribunal seeking expunction of all records on the matter, other than statistical or identifying information maintained by the chief disciplinary counsel pertaining to the grievance.

**Credits**

Added by Acts 1987, 70th Leg., ch. 148, § 3.01, eff. Sept. 1, 1987. Amended by Acts 1991, 72nd Leg., ch. 795, § 20, eff. Sept. 1, 1991; Acts 2001, 77th Leg., ch. 1436, § 1, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 227, §§ 15, 16, eff. Sept. 1, 2003; Acts 2013, 83rd Leg., ch. 450 (S.B. 825), § 1, eff. Sept. 1, 2013.

Notes of Decisions (20)

V. T. C. A., Government Code § 81.072, TX GOVT § 81.072
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Judgment Withdrawn and Reissued** May 13, 2003

106 S.W.3d 692
Supreme Court of Texas.

WICHITA FALLS STATE HOSPITAL, Petitioner,
v.
Deborah D. TAYLOR, Individually and as Heir of the Estate of Terry Lynn Taylor, Respondent.

No. 01–0491. | Argued April 3, 2002. | Decided March 6, 2003.

After state hospital patient committed suicide following his discharge, patient's wife brought wrongful death and survival action against hospital and one of its doctors, alleging that patient was discharged in a manner contrary to the "patient's bill of rights" adopted by Department of Mental Health and Mental Retardation (MHMR). Hospital filed plea to the jurisdiction. The 249th District Court, Johnson County, denied plea. Hospital appealed. The Court of Appeals, 48 S.W.3d 782, affirmed. Hospital petitioned for review. In a case of first impression, the Supreme Court, Wallace B. Jefferson, J., held that the legislature did not waive the State's sovereign immunity by enacting the patient's bill of rights.

Reversed.

**Attorneys and Law Firms**

**\*693** Lisa Royce Eskow, Atty. General's Office, Austin, John Cornyn, United States Senate, Washington, DC, Howard G. Baldwin, First Asst. Atty. Gen. of Tex., Jeffrey S. Boyd, Office of Atty. Gen., Julie Caruthers Parsley, Office of Sol. Gen., S. Ronald Keister, Office of Atty. Gen., William Rich Thompson, II, Office of Atty. Gen., Austin, for Petitioner.

Michael D. Moore, Weatherford, James B. Barlow and Eugene J. Dozier, Barlow & Garsek, Fort Worth, for Respondent.

**Opinion**

Justice JEFFERSON delivered the opinion of the Court.

This is an interlocutory appeal in a wrongful-death lawsuit against Wichita Falls State Hospital for violations of the "patient's bill of rights," which is codified at chapter 321 of the Texas Health and Safety Code. We must determine whether **\*694** the Legislature intended to waive the State's sovereign immunity by enacting section 321.003 of the Code. We conclude that it did not. Accordingly, we reverse the court of appeals' judgment and dismiss Taylor's claims for want of jurisdiction.

## I

### Background

Terry Lynn Taylor was involuntarily committed to Wichita Falls State Hospital for severe mental illness. Taylor was discharged four days later, after being treated by Dr. Peter Fadow, a psychiatrist at the Hospital. Taylor returned home and committed suicide that same day. Taylor's wife, Deborah Taylor, sued the Hospital and Dr. Fadow under Texas Health and Safety Code section 321.003, asserting claims for wrongful death and survival. TEX. CIV. PRAC. & REM.CODE §§ 71.002, .021. She alleged that Taylor's death was proximately caused by the negligence of the doctor and Hospital in failing to properly diagnose and treat his mental illness, and that the defendants' acts and omissions violated the patient's bill of rights.

*See* 25 TEX. ADMIN. CODEE §§ 133.42, 404.154–.159.

The Hospital moved to dismiss for want of jurisdiction based on sovereign immunity.[1] In her response, Deborah Taylor argued that the Legislature unambiguously waived the Hospital's immunity by enacting Texas Health and Safety Code section 321.003, which provides that a person who has been harmed by a violation of the patient's bill of rights "may sue" for damages. The trial court denied the Hospital's jurisdictional plea and the Hospital appealed. A divided court of appeals affirmed, holding that the Legislature clearly and unambiguously waived immunity from suit against state mental health facilities for violations of the patient's bill of rights. 48 S.W.3d 782. We granted the Hospital's petition for review to consider this issue of first impression.[2]

[1]    Wichita Falls State Hospital was part of the Texas Department of Mental Health and Mental Retardation when the alleged injury occurred and is therefore entitled to assert sovereign immunity. *See* TEX. HEALTH & SAFETY CODE § 532.001(b)(8) (1997), *amended by* Acts 1999, 76th Leg., ch. 543, § 1 eff. June 18, 1999 (Wichita Falls State Hospital and Vernon State Hospital have since merged to create the North Texas State Hospital).

[2]    45 Tex. Sup.Ct. J. 352 (Feb. 2, 2002).

## II

## Discussion

### A. *Sovereign Immunity*[3]

[3]    Courts often use the terms sovereign immunity and governmental immunity interchangeably. However, they involve two distinct concepts. Sovereign immunity refers to the State's immunity from suit and liability. *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). In addition to protecting the State from liability, it also protects the various divisions of state government, including agencies, boards, hospitals, and universities. *Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976). Governmental immunity, on the other hand, protects political subdivisions of the State, including counties, cities, and school districts. *City of LaPorte v. Barfield,* 898 S.W.2d 288, 291 (Tex.1995); *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex.1993); *see also* Renna Rhodes, *Principles of Governmental Immunity in Texas: The Texas Government Waives Sovereign Immunity When it Contracts—Or Does It?,* 27 ST. MARY'S L.J. 679, 693–96 (1996).

[1] [2] [3] In 1847, this Court held that "no State can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *Hosner v. De Young,* 1 Tex. 764, 769 (1847). The Court did not cite the origin of that declaration, but it appears to be rooted in an early understanding of sovereignty:

> **\*695** It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.

THE FEDERALIST No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (dismissing fears that adopting the new Constitution would abrogate states' sovereign immunity). Although sometimes associated in the United States with the feudal fiction that "the King can do no wrong," sovereign immunity "is an established principle of jurisprudence in all civilized nations." *Beers v. Arkansas,* 61 U.S. 527, 529, 20 How. 527, 15 L.Ed. 991 (1857).

Most sovereigns have long since abandoned the fiction that governments and their officials can "do no wrong." To varying

degrees, states and the federal government have voluntarily relinquished the privilege of absolute immunity by waiving immunity in certain contexts. *See, e.g.,* 28 U.S.C. § 1346(b); TEX. CIV. PRAC. & REM.CODE § 101.021. Invariably, however, they have retained a significant measure of immunity to protect the public treasury. *See Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 417 (Tex.1997) (Enoch, J., dissenting); Elizabeth K. Hocking, *Federal Facility Violations of the Resource Conservation and Recovery Act and the Questionable Role of Sovereign Immunity,* 5 ADMIN. L.J. 203, 211 (1991); Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 HARV. L.REV.. 1, 1 (1963); Glen A. Majure et al., *The Governmental Immunity Doctrine in Texas—An Analysis and Some Proposed Changes,* 23 SW. L.J. 341, 341 (1969).

### B. *Waiver of Immunity*

[4] Because consent is pivotal to a waiver of sovereign immunity, it is important to consider the manner in which a sovereign conveys its consent to be sued. Under our form of government, the state derives its authority from "the people." *E.g.,* TEX. CONST. art. I, § 2 (stating that "[a]ll political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit"); *see also Alden v. Maine,* 527 U.S. 706, 759, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (noting that the federal Constitution began "with the principle that sovereignty rests with the people"). In Texas, the people's will is expressed in the Constitution and laws of the State. *See Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147, 153–54 (1943); *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 465–66 (Tex.1997). Consequently, to waive immunity, consent to suit must ordinarily be found in a constitutional provision or legislative enactment.

Courts in other jurisdictions have occasionally abrogated sovereign immunity by judicial decree.[4] We have held, however, that the Legislature is better suited to balance the conflicting policy issues associated with waiving immunity. *See Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002); *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex.1993); *Duhart v. State,* 610 S.W.2d 740, 741 (Tex.1980); **\*696** *Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976). *But see Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 593 (Tex.2001), (Hecht, J., concurring) (noting that judicial abolition of immunity may be necessary to prompt Legislature to enact reasoned system for determining government's responsibility for its torts). Although we have not absolutely foreclosed the possibility that the judiciary may abrogate immunity by modifying the common law, we have no occasion to consider that possibility today.

---

[4]  *See, e.g., Evans v. Bd. of County Comm'rs,* 174 Colo. 97, 482 P.2d 968, 972 (1971); *Molitor v. Kaneland Cmty. Unit Dist. No. 302,* 18 Ill.2d 11, 163 N.E.2d 89, 95 (1959); *Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597, 603 (1975); *Pruett v. City of Rosedale,* 421 So.2d 1046, 1052 (Miss.1982); *Bulman v. Hulstrand Constr. Co.,* 521 N.W.2d 632, 639–40 (N.D.1994); *Mayle v. Pa. Dep't of Highways,* 479 Pa. 384, 388 A.2d 709, 709–10 (1978); *McCall v. Batson,* 285 S.C. 243, 329 S.E.2d 741, 742–43 (1985).

---

[5] [6] [7] [8] [9] [10] When considering immunity in Texas, we address not only whether the State has consented to suit, but also whether the State has accepted liability. *Fed. Sign,* 951 S.W.2d at 405. Immunity from suit prohibits suits against the State unless the State expressly consents to the suit. *Id.* Thus, even if the State acknowledges liability on a claim, immunity from suit bars a remedy until the Legislature consents to suit. *Id.* Immunity from liability protects the State from judgments even after the State has consented to suit. *Id.* Accordingly, even if the Legislature has authorized a claimant to sue, the State's immunity is retained until it acknowledges liability. *Id.* Unlike immunity from suit, immunity from liability does not affect a court's jurisdiction to hear a case and cannot be raised in a plea to the jurisdiction. *See Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638–39 (Tex.1999).

[11] It is settled in Texas that for the Legislature to waive the State's sovereign immunity, a statute or resolution must contain a clear and unambiguous expression of the Legislature's waiver of immunity. *Fed. Sign,* 951 S.W.2d at 405; *Univ. of Tex. Med. Branch at Galveston v. York,* 871 S.W.2d 175, 177 (Tex.1994); *Duhart,* 610 S.W.2d at 742. In 2001, the Legislature ratified this approach by adding section 311.034 to the Code Construction Act. That section provides: "In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." TEX. GOV'T CODE § 311.034.

Some statutes leave no doubt about the Legislature's intent to waive immunity. When the Legislature pronounces, for

example, that "[s]overeign immunity to ... liability is waived and abolished to the extent of liability created by this chapter," we have had little difficulty recognizing a waiver of immunity from liability.[5] But this case presents no such explicit language waiving immunity from liability. And because the State cannot properly assert immunity from liability in a plea to the jurisdiction, we have no occasion to decide the extent to which immunity from liability is implicated here. *Jones,* 8 S.W.3d at 638.

[5]      *See, e.g.,* TEX. GOV'T CODE § 554.0035 ("Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter."); *Id.* § 2007.004(a) ( "Sovereign immunity to ... liability is waived and abolished to the extent of liability created by this chapter."); *Id.* § 2007.024(c) ( "Sovereign immunity to liability is waived to the extent the governmental entity elects to pay compensation under this subsection."); TEX. NAT. RES.CODE § 52.035(c) ("The state waives its right to claim sovereign immunity in any action commenced against the state...."); TEX. CIV. PRAC. & REM.CODE § 110.008 ("Subject to Section 110.006, sovereign immunity ... from liability is waived and abolished to the extent of liability created by Section 110.005...."); *Id.* § 101.021 (expressly imposing liability on a governmental unit for property damage and personal injury).

Similarly, we have little difficulty recognizing the Legislature's intent to waive **\*697** immunity from suit when a statute provides that a state entity may be sued or that "sovereign immunity to suit is waived."[6] This case, however, does not contain the sort of language the Legislature generally uses to confirm its intent to waive immunity from suit. Accordingly, we examine factors we have employed to determine whether a statute that is less explicit may nevertheless waive the State's immunity from suit.

[6]      *See, e.g.,* TEX. CIV. PRAC. & REM.CODE § 101.025(a) ( "Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."); *Id.* § 63.007(b) ("The state's sovereign immunity to suit is waived only to the extent necessary to authorize a garnishment action in accordance with this section."); *Id.* § 81.010(d) ("Governmental immunity to suit is waived and abolished only to the extent of the liability created by Subsection (b)."); *Id.* § 101.025(b) ("A person having a claim under this chapter may sue a governmental unit for damages allowed by this chapter."); *Id.* § 103.002(a) ("A person may bring a suit against the state under this chapter, and the state's immunity from suit is waived."); TEX. GOV'T CODE § 2007.004(a) ("Sovereign immunity to suit ... is waived and abolished to the extent of liability created by this chapter."); *Id.* § 554.0035 ("A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter."); TEX. PROP.CODE § 74.506(c) ("The state's immunity from suit without consent is abolished with respect to suits brought under this section."); *see also* TEX. GOV'T CODE § 554.0035 ("A public employee whose employment is suspended or terminated or who is discriminated against in violation of Section 554.002 is entitled to sue ....") *amended by* Acts 1995, 74th Leg., ch. 721, § 3, eff. June 15, 1995.

[12] We have on rare occasions found waiver of sovereign immunity absent "magic words," such as the State's "sovereign immunity to suit and liability is waived." Although it is more difficult to discern legislative consent under those circumstances, we have employed several aids to help guide our analysis in determining whether the Legislature has clearly and unambiguously waived sovereign immunity. First, a statute that waives the State's immunity must do so beyond doubt, even though we do not insist that the statute be a model of "perfect clarity." *City of LaPorte v. Barfield,* 898 S.W.2d 288, 291–92 (Tex.1995). For example, we have found waiver when the provision in question would be meaningless unless immunity were waived. *Kerrville State Hosp. v. Fernandez,* 28 S.W.3d 1, 8 (Tex.2000) (holding that the anti-retaliation statute had no meaning absent waiver of sovereign immunity).

[13] [14] Second, when construing a statute that purportedly waives sovereign immunity, we generally resolve ambiguities by retaining immunity. *See, e.g., Travis County v. Pelzel & Assocs., Inc.,* 77 S.W.3d 246, 249–50 (Tex.2002); *IT–Davy,* 74 S.W.3d at 853–54; *Guillory,* 845 S.W.2d at 813–14; *Duhart,* 610 S.W.2d at 742–43; *see also Magnolia Petroleum Co. v. Walker,* 125 Tex. 430, 83 S.W.2d 929, 934 (1935) (ambiguities in the terms of a legislative grant of a right or a privilege must be construed in favor of the State). In this respect, our methodology resembles that of the United States Supreme Court when it considers a purported waiver of the federal government's sovereign immunity. *See United States v. Williams,* 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995) (when confronted with purported waiver of federal government's sovereign immunity, Court will "constru[e] ambiguities in favor of immunity"). If the text and history of the statute leave room to doubt whether the Legislature intended to waive sovereign immunity, we are less likely to find a waiver.

[15] Third, if the Legislature requires that the State be joined in a lawsuit for **\*698** which immunity would otherwise attach, the Legislature has intentionally waived the State's sovereign immunity. *Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994) (holding that, "by authorizing declaratory judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorneys fees, the [Declaratory Judgments Act] necessarily waives governmental immunity for such awards").

[16] Finally, we are cognizant that, when waiving immunity by explicit language, the Legislature often enacts simultaneous measures to insulate public resources from the reach of judgment creditors. *See, e.g.,* TEX. CIV. PRAC. & REM.CODE §§ 101.023–.024; TEX. GOV'T CODE §§ 554.003, 2007.023. Therefore, when deciding whether the Legislature intended to waive sovereign immunity and permit monetary damages against the State, one factor to consider is whether the statute also provides an objective limitation on the State's potential liability. *See IT–Davy,* 74 S.W.3d at 854 (noting that "[s]ubjecting the government to liability may hamper governmental functions by shifting tax resources away from their intended purposes toward defending lawsuits and paying judgments"); *Fed. Sign,* 951 S.W.2d at 413–16 (Hecht, J., concurring) (noting that "even if the Court were to abolish governmental immunity from contract suits, successful plaintiffs still could not be paid without legislative appropriation"); *see also Barfield,* 898 S.W.2d at 297 (stating that the rules for waiver of sovereign immunity apply to both the existence and extent of the waiver).

With these principles in mind, we will examine the statute to determine whether the Legislature waived immunity by adopting section 321 of the patient's bill of rights.

### C. *The Patient's Bill of Rights*

In 1993, Texas enacted a patient's bill of rights. TEX. HEALTH & SAFETY CODE § 321.002. Section 321.002 requires that the Texas Department of Mental Health and Mental Retardation and the Texas Commission on Alcohol and Drug Abuse "protect the health, safety, and rights of a patient receiving voluntary or involuntary mental health, chemical dependency, or comprehensive medical rehabilitation services in an inpatient facility." *Id.* § 321.002. Section 321.003 permits a person harmed by a mental health facility's violation of the patient's bill of rights to sue for injunctive relief, damages, or both. *Id.* § 321.003(b). A plaintiff who prevails under section 321.003 may recover actual damages, exemplary damages, and attorney's fees. *Id.* § 321.003(c), (d)

Taylor contends that the Legislature expressly waived the Hospital's sovereign immunity by providing that a patient "may sue" a "mental health facility" for damages and other relief caused by those violations. Section 321.003 provides in part:

> (a) A treatment facility or mental health facility that violates a provision of, or a rule adopted under, this chapter ... *is liable* to a person receiving care or treatment in or from the facility who is harmed as a result of the violation.

> (b) A person who has been harmed by a violation *may sue* for injunctive relief, damages, or both.

*Id.* § 321.003(a), (b) (emphasis added). Nowhere does this section expressly authorize suit against the State of Texas. Therefore, we must examine whether the statute waives the State's immunity by necessary implication.

[17] Taylor argues that immunity is waived because the term "mental health facility" includes the Texas Department of **\*699** Mental Health and Mental Retardation. Taylor acknowledges that the term "mental health facility" is not expressly defined in the statute. She observes, however, that section 321.001—the definitional section of chapter 321—provides that "mental health facility" has the meaning assigned by section 571.003. *See id.* § 321.001(4). Accordingly, we turn to section 571.003 to determine if it contains an unambiguous waiver of sovereign immunity.

Section 571.003, enacted as part of the Texas Mental Health Code two years before chapter 321's enactment, refers expressly to governmental agencies or facilities. Specifically, section 571.003(12) defines "mental health facility" as:

> (A) an inpatient or outpatient mental health facility *operated by the department, a federal agency, a political subdivision,* or any person;

> (B) a community center or a facility operated by a community center; or

(C) that identifiable part of a general hospital in which diagnosis, treatment, and care for persons with mental illness is provided.

*Id.* § 571.003(12)(a)-(c) (emphasis added). "Department" is defined as the Texas Department of Mental Health and Mental Retardation. *Id.* § 571.003(5). Taylor argues that, by incorporating the prior definition of mental health facility into the liability-creating provision of section 321, the Legislature clearly and unambiguously meant to waive the State's immunity from suit.

While the definition of "mental health facility" includes state-operated facilities, it does not contain the sort of explicit language the Legislature generally uses to confirm its intent to waive sovereign immunity.[7] Thus, we must determine whether this incorporated definition is the functional equivalent of an explicit legislative directive waiving the State's immunity.

[7]     *See* statutes cited *supra* notes 5 and 6.

Lower courts have split on whether section 571.003(12)'s definition, read in conjunction with section 321.003(b), is a "clear and unambiguous" statement of the Legislature's intent to waive sovereign immunity.[8] In refusing to find a waiver of sovereign immunity, one court of appeals noted that, although the statute authorizes actions against private facilities licensed by state health care regulatory agencies, it does not "clearly express an intent to *waive immunity* by authorizing actions against governmental entities." *Tex. Dep't of Mental Health & Mental Retardation v. Lee,* 38 S.W.3d 862, 871 (Tex.App.-Fort Worth 2001, pet. filed). The court applied our decisions in *City of LaPorte v. Barfield* and *Duhart v. State* to hold that mere incorporation of section 571.003's definition of "mental health facility," which includes public facilities, into the patient's bill of rights does not by itself manifest a clear legislative intent to waive immunity. *Lee,* 38 S.W.3d at 870–71; *accord Barfield,* 898 S.W.2d at 295; *Duhart,* 610 S.W.2d at 742.

[8]     *See, e.g., Beaumont State Ctr. v. Kozlowski,* 70 S.W.3d 345, 349 (Tex.App.-Beaumont 2002, pet. filed) (holding that section 321.003(b) is a waiver of sovereign immunity); *Cent. Counties Ctr. for Mental Health & Mental Retardation Servs. v. Rodriguez,* 45 S.W.3d 707, 713 (Tex.App.-Austin 2001, pet. filed) (holding that section 321.003(b) is a waiver of sovereign immunity); *Spindletop MHMR v. Doe,* 54 S.W.3d 893, 897 (Tex.App.-Beaumont 2001, pet. filed) (holding that section 321.003(b) is a waiver of sovereign immunity); *Tex. Dep't of Mental Health & Mental Retardation v. Lee,* 38 S.W.3d 862, 871 (Tex.App.-Fort Worth 2001, pet. filed) (holding that section 321.003(b) is not a clear and unambiguous waiver of immunity).

The court of appeals here, however, followed another court of appeals, which held that " '[b]ecause the [State-operated care **\*700** facilities] are mental health facilities as defined in section 571.003, the legislature has consented in section 321.003(b) to their being sued for alleged violations of section 321.003(a).' " 48 S.W.3d at 785 (quoting *Cent. Counties Ctr. for Mental Health & Mental Retardation Servs. v. Rodriguez,* 45 S.W.3d 707, 711 (Tex.App.-Austin 2001, pet. filed)). The court of appeals reasoned that the statutory scheme at issue in *Barfield* was not comparable to chapter 321 because it dealt with incorporation of *subsequently enacted* legislation, while chapter 321's incorporation of "mental health facility" occurred simultaneously with passage of that statute. *Rodriguez,* 45 S.W.3d at 712. Concluding that *Barfield* did not control, the court of appeals held that the Legislature waived sovereign immunity and that any other interpretation would render the statute's language meaningless. *Id.* at 711–12.

The interpretation adopted by the court of appeals in this case, however, overlooks the fact that section 321.003 creates a meaningful cause of action against private mental health care facilities, a claim that remains viable even if suit against the government is barred. As noted above, the fact that the Act remains viable despite the retention of immunity is one indication that the Legislature did not intend to waive immunity by implication. None of the authorities cited by the court of appeals persuades us otherwise.

In *Barfield,* we found a clear and unambiguous waiver of immunity for claims of wrongful discharge against municipalities because the statute had no purpose if immunity had not been waived. 898 S.W.2d at 296–97. Unlike the statute in *Barfield,* the patient's bill of rights undoubtedly applies to private mental health facilities, so it is neither without meaning nor purpose if it is construed against waiver. Indeed, the Act's legislative history indicates that it was designed to curb abuse in private mental health facilities. *See* SENATE COMM. ON HEALTH & HUMAN SERVS., BILL ANALYSIS, Tex. S.B. 205, 73rd

Leg., R.S. (1993) (noting that a study of private psychiatric and substance abuse facilities "revealed surprising and somewhat shocking activities taking place in certain *private treatment facilities* ") (emphasis added); *see also* TEX. GOV'T CODE § 311.023(1),(3) (in construing statutes, courts may consider the legislative history and the object sought to be obtained). As one court of appeals noted, "[t]here is nothing in the statute's history to suggest that the legislature was even aware of the existence of similar abuse in public facilities." *Lee,* 38 S.W.3d at 871. Thus, the patient's bill of rights achieves its stated objective of regulating private treatment facilities even if suit against the State is barred by sovereign immunity. *Cf. Kerrville,* 28 S.W.3d at 6 (holding that the anti-retaliation statute had no meaning absent waiver of sovereign immunity). Accordingly, the patient's bill of rights does not waive the State's immunity beyond doubt.

Carried to its logical conclusion, Taylor's argument would require us to hold that the Legislature intended to waive immunity not only for the State of Texas, but also for the United States. Section 571.003 includes in its definition of "mental health facilities" hospitals or clinics operated by a *federal* agency. TEX. HEALTH & SAFETY CODE § 571.003(12). Because a state legislature has no authority to waive federal immunity, the Legislature could not have intended a wholesale incorporation of section 571.003 into section 321.001(1). *See* U.S. CONST. art. VI; *United States v. Sherwood,* 312 U.S. 584, 587–88, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (holding that only Congress can consent to suit against the United States); *see also* TEX. GOV'T CODE § 311.021 ("In enacting a statute, it is presumed that: (1) compliance with the **\*701** constitution of this state and the United States is intended...."). Instead, had the Legislature intended state agencies to be included, it would have either stated that intention expressly or incorporated only that part of section 571.003 applicable to state agencies.

At best, the incorporation of section 571.003 into section 321.001 sewed ambiguity into the statute. But in cases like this, we require the Legislature to express its intent beyond doubt and will construe ambiguities in a manner that retains the State's immunity. *See Magnolia Petroleum Co. v. Walker,* 125 Tex. 430, 83 S.W.2d 929, 934 (1935) ("Legislative grants of property, rights, or privileges must be construed strictly in favor of the State ... and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity or obscurity in the terms of the statute must operate in favor of the state."). The statute's ambiguity precludes our finding an unmistakable Legislative intent to waive sovereign immunity.

Another factor we have examined is whether the statute requires the State to be joined in litigation involving the patient's bill of rights. Unlike the statute at issue in *Texas Education Agency v. Leeper,* 893 S.W.2d at 446, which required that the State be sued, nothing in the patient's bill of rights requires joinder of the State or its agencies. *Compare* TEX. CIV. PRAC. & REM.CODE § 37.006, *with* TEX. HEALTH & SAFETY CODE § 321.002. This is yet another indication that the Legislature did not intend to waive immunity simply by incorporating section 571.003's pre-existing definition of "mental health facility" into the patient's bill of rights.

[18] Finally, by examining attributes of waiver that exist when the Legislature expressly waives immunity, we have a reliable guidepost to determine if the Legislature intended to waive immunity when its intent is less clear. In particular, we note that in many statutes waiving sovereign immunity explicitly, the Legislature appends a measure designed to protect the public treasury from the consequences of that waiver.[9] Our decisions recognizing a waiver of immunity have generally left undisturbed the Legislature's interest in protecting the State's financial resources. *See, e.g., Barfield,* 898 S.W.2d at 299 (limiting damages to those authorized by the Texas Tort Claims Act); *Kerrville,* 28 S.W.3d at 9–10 (limiting damages to those authorized by the Texas Tort Claims Act); *Leeper,* 893 S.W.2d at 446 (waiving governmental liability for attorney's fees only).

---

[9]     *See, e.g.,* TEX. CIV. PRAC. & REM.CODE § 101.023(a) ( "Liability of the state government under this chapter is limited to money damages in a maximum amount of $250,000 for each person and $500,000 for each single occurrence for bodily injury or death and $100,000 for each single occurrence for injury to or destruction of property."); *Id.* § 81.010(b) (patient may only obtain an order requiring the governmental unit to discharge the mental health services provider who committed the conduct, court costs, and reasonable attorney's fees, as determined by the court); TEX. GOV'T CODE § 2007.023 ("The governmental entity is only liable for, invalidation of the governmental action or the part of the governmental action resulting in the taking."); *Id.* § 554.003 ("A public employee may not recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount that exceeds....").

---

Unlike the statutes in *Barfield, Kerrville,* and *Leeper,* the patient's bill of rights would, under Taylor's construction, subject the State to indeterminate damage awards. The Act expressly permits recovery of actual damages for mental anguish, as well as for exemplary damages and attorneys fees. TEX. HEALTH & SAFETY CODE § 321.003(c), (d). No Texas statute

expressly **\*702** permits suit against the State for exemplary damages. Although not dispositive, the fact that Taylor's construction of the Act would subject the State to exemplary damage awards reinforces our skepticism that the Legislature intended to waive sovereign immunity by mere implication.

## III

### Conclusion

For the foregoing reasons, we reverse the court of appeals' judgment and dismiss Taylor's claims for want of jurisdiction.

**All Citations**

106 S.W.3d 692, 46 Tex. Sup. Ct. J. 494

**End of Document**                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.